UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

WAUSAU UNDERWRITERS INSURANCE
COMPANY and AXIS SPECIALTY INSURANCE
COMPANY,

*INDEX NO.: 06 CV 3212 (VM)*

**AFFIDAVIT
IN SUPPORT
OF CROSS-MOTION**

                                        Plaintiffs,

          - against -

QBE INSURANCE COMPANY and
SCOTTSDALES INSURANCE COMPANY,                    **ECF CASE**

                                        Defendants.
------------------------------------------------------------------X

WILLIAM H. BAVE, JR. being duly sworn deposes and states:

1.       I am a partner with the law firm of Wilson, Bave, Conboy, Cozza & Couzens,

P.C. attorneys for Defendant, **QBE INSURANCE COMPANY ("QBE")** and am fully familiar

with the facts of this case.

2.       This affidavit is in support of **QBE'S** cross-motion for summary judgment and in

opposition to Plaintiff's motion seeking a declaration that **QBE** provide a defense to Barney

Skanska Construction Co. **("SKANSKA")** and New York Economic Development Corp.

**("NYCEDC")** in the underlying action of ***John Moore v. New York City Economic***

***Development Corp., New York City Department of Transportation, Barney Skanska***

***Construction Co., and Kel-Tech Construction, Inc.***, and a third-party action captioned ***New***

***York City Economic Development Corp., New York City Department of Transportation, and***

***Barney Skanska Construction Co. v. Arena Construction Co., Inc.*** pending in New York

County State Supreme Court, Richmond County.

3.       Plaintiff, ***WAUSAU    UNDERWRITERS    INSURANCE    COMPANY***

***("WAUSAU")*** is the insurance carrier for Owen Steel Co., Inc. ***("OWEN")*** who was the steel

contractor on the project. **OWEN** subcontracted the work to John Moore's employer, A.J.

McNulty *("McNULTY")* who was insured by Plaintiff, *AXIS SPECIALTY INSURANCE CO.* *("AXIS")*. Barney Skanska Construction Co. *("SKANSKA")* was the Construction Manager of the project. The insurance carrier for *SKANSKA* is not known by Defendant. The Defendant also does not possess a copy of the contract for *SKANSKA*. Despite seeking relief for *SKANSKA* in this motion, Plaintiff has not provided the insurance policy or contract so it could be determined the obligations of *SKANSKA* under its contract and the insurer under its policy for the underlying action.

4.      Discovery other than automatic disclosure pursuant to Rule 26 has not been conducted. Attached as *EXHIBIT "A"* is Plaintiff's response to automatic disclosure. Rule 26(a)(1)D requires inspection and copying of "any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment."

5.      The complaint in the underlying action alleges that *SKANSKA* was the Construction Manager for the project and as such assumed non-delegable duties under the Labor Law of the State of New York. Plaintiff in the underlying action alleges that he fell through an unguarded opening sustaining injuries. The Labor Law imposes a non-delegable duty on the Construction Manager to guard openings through which workers can fall.

6.      *WAUSAU* and *AXIS* made a decision to defend and if necessary indemnify *NYCEDC* and *SKANSKA* since they are represented by the same law firm in the underlying action. (See appearances on deposition of John Moore, *EXHIBIT "B"*).

7.      From the fact that *WAUSAU* and *AXIS* are Co-Defendants insuring different contractors represented by the same attorney it can be assumed that they have reached some accommodation between themselves as to payment of defense costs, indemnification and priority of coverage.

8.      The attorneys for *NYCEDC* and *SKANSKA* commenced a third-party action against Arena Construction Co., Inc.  The Plaintiffs in this action brought suit against Scottsdale Insurance Company, Arena's insurance carrier alleging that *NYCEDC* and *SKANSKA* are additional insureds on its policy.  Arena provided masonry work on the project.  Despite these allegations, Plaintiff's motion is not directed at Scottsdale but only *QBE*.

9.      *QBE* insured *KEL-TECH*, a masonry contractor that entered into a take over agreement with *NYCEDC*.  As stated in the affidavit of its project manager it was not working in the area where the Plaintiff in the underlying action claims (John Moore) he sustained an injury (Aff. of Thomas Lyons, *EXHIBIT "C"*).  *KEL-TECH* has no Labor Law non-delegable duty toward John Moore since it did not employ him, supervise or control his work.

10.     Plaintiff, *WAUSAU*, tendered the defense of *NYCEDC* and *SKANSKA* in correspondence dated December 13, 2004 and received by Defendant on December 17, 2004 *(EXHIBIT "D")*.  Defendant, *QBE*, through its third-party administrator, Claims Service Bureau, denied the tender of defense and indemnification.  Two grounds were stated; late notice of occurrence and the accident did not arise from *KEL-TECH'S* work *(EXHIBIT "E")*.  There is no allegation that notice of disclaimer was untimely.

11.     Plaintiff argues that Defendants' affirmative defense refers to claim or suit and not occurrence.  Plaintiff was clearly on notice from the December 28, 2004 letter that Defendant was disclaiming for late notice of the occurrence as admitted by Mr. Morrissiey in paragraph 28 of his affidavit.  While not employing the precise word "occurrence", Plaintiff's argument that it is waived is without merit.  This is not a defense that is waived if not raised.  FRCP Rule 12(h) In any event it was raised in the answer and in the initial submission joint letter *(EXHIBIT "F")*.

12.    As more fully discussed in the memorandum of law, failure to provide notice as soon as practicable is a basis to deny coverage to an insured.  The rule applies with equal effect to additional insureds.

13.    By its own admission, *WAUSAU* was aware of the claim on September 27, 2004.  There is no indication of any efforts made by *WAUSAU* to investigate the claim other than to blame *NYC EDC* for the delay in notifying *QBE* of the occurrence.  This failure to document any effort would indicate that none was undertaken.  Plaintiff's submission on this issue does not begin to adequately explain the delay in notifying *QBE* of the occurrence.

14.    The affidavit of Thomas Lyons (Exhibit C), project manager for *KEL-TECH* establishes the fact that *KEL-TECH* had not worked in the area where Mr. Moore claims the accident occurred for almost two months.  It also submits proof that an employee of *SKANSKA* demolished a portion of *KEL-TECH'S* work and moved the planking in the elevator shaft that Moore fell down.

15.    The additional insured endorsement requires that in order to confer addition insured status on a person or organization, the liability must arise from *KEL-TECH'S* work for that insured which in this case is *SKANSKA*.

16.    John Moore testified at his deposition (Exhibit B) that he was working for A.J. McNulty (6)[1] on a crew of four or five men erecting columns and beams with the assistance of a crane (p. 16).  The accident occurred as he stepped backwards on to a cinder block wall (p. 32).  The wall started to crumble and he fell backwards through an open elevator shaft (p. 33).  He fell approximately 2-1/2 floors (p. 36).

17.    The testimony of Mr. Moore in conjunction with the affidavit of Mr. Lyons establishes that *KEL-TECH'S* work in the area had been substantially changed.  The concrete

---

[1] ( ) numbers refer to pages in John Moore's deposition

wall that Mr. Moore stepped on crumbled because *SKANSKA'S* employee demolished it. Mr. Moore fell through the opening of the elevator shaft because the *SKANSKA* employee moved the planks placed there by *KEL-TECH*.

18.    *WAUSAU* and *AXIS* are seeking to shift the defense responsibility to the insurance carrier for a contractor (*KEL-TECH*) that bears no responsibility for the area where the accident occurred.  Nor did *KEL-TECH* supervise or otherwise direct John Moore's work.

19.    If the contract between *NYCEDC* and *SKANSKA* had been produced by the Plaintiff it would state that *SKANSKA* was required to name *NYCEDC* as an additional insured on its policy.  If *SKANSKA'S* insurance policy was provided by Plaintiff, it would state that *SKANSKA* is required to defend *NYCEDC* in this action.

20.    *ARENA* was a masonry contractor on this job who was working at the time of this accident and whose insurance policy names *SKANSKA* and *NYCEDC* as an additional insureds. Scottsdale's policy *(EXHIBIT "H")* contains an additional insured endorsement which provides that the insurance provided to the additional insured is primary in the event of a finding that *ARENA* is solely responsible for the occurrence.  It is respectfully submitted that, if the limiting language in the *QBE* endorsement does not prevent *QBE* from a duty to defend as Plaintiff argues, Scottsdale should likewise be required to defend *NYCEDC* and *SKANSKA* for this occurrence.

21.    It is respectfully submitted that there is no issue of fact as to Plaintiff's failure to provide notice to Defendant as soon as practicable.  As a result, Defendant is entitled to judgment on its cross-motion for summary judgment against *SKANSKA*.

22.    Defendant also submits that the law of New York is not settled as to the issue of when and under what circumstances an additional insured endorsement is triggered to provide coverage.  The law in the Second Judicial Department where the underlying action is pending

requires that before the endorsement is triggered the occurrence must arise from the work of the contractor providing the additional insured coverage.

23.    Since the occurrence did not arise from *KEL-TECH'S* work there is no coverage for *NYCEDC* under Defendant's insurance policy.


_____
**WILLIAM H. BAVE, JR.**


**Sworn to before me this**
**_9th_ day of November, 2006**


_____
**NOTARY PUBLIC**


YESICA MANON
Notary Public, State of New York
No. 01MA6135821
Qualified in Bronx County
Commission Expires 10/24/20___69

## **EXHIBITS**

Exhibit "A"    Plaintiff's Response to Automatic Discovery

Exhibit "B"    Deposition of John Moore

Exhibit "C"    Affidavit of Thomas Lyons

Exhibit "D"    Wausau tender letter dated December 13, 2004

Exhibit "E"    CSB letter dated December 28, 2004

Exhibit "F"    Initial submission joint letter

Exhibit "G"    John Moore 50(h) testimony

Exhibit "H"    Scottsdale policy

Exhibit "I"    Accident report prepared by Barney Skanska USA

Exhibit "J"    A.J. McNulty Accident report

| Renewal of Number | Policy Number |
|---|---|
| BCS0005680 | BCS0008003 |

# ℔ SCOTTSDALE INSURANCE COMPANY®

Home Office:
One Nationwide Plaza - Columbus, Ohio 43215
Administrative Office:
8877 North Gainey Center Drive, Scottsdale, Arizona 85258
1-800-423-7675 (outside Arizona)
A STOCK COMPANY

## COMMON POLICY DECLARATIONS

**Item 1.    Named Insured and Mailing Address**

ARENA CONSTRUCTION COMPANY,
INC.
45 KNOLLWOOD RD
ELMSFORD NY 10523

**Agent Name and Address**

CRC INSURANCE SERVICES INC
80 BROAD ST 25TH FL
NEW YORK NY 10004

Agent No.  31729          Program No.:  NONE

| Item 2.  Policy Period | From:  05-03-04 | To:  05-03-05 | Term: 1  Year |
|---|---|---|---|

12:01 A.M., Standard Time at your mailing address

**BROKERAGE CASUALTY**

Business Description:      GENERAL CONTRACTOR

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.  This policy consists of the following coverage parts for which a premium is indicated. Where no premium is shown, there is no coverage.  This premium may be subject to adjustment.

| Coverage Part(s) | Premium |
|---|---|
| Commercial General Liability Coverage Part | $ _____ |
| Commercial Property Coverage Part | $ _____ |
| Commercial Crime Coverage Part | $ _____ |
| Commercial Inland Marine Coverage Part | $ _____ |
| Commercial Auto (Business Auto or Truckers) Coverage Part | $ _____ |
| Commercial Garage Coverage Part | $ _____ |
| Professional Liability Coverage Part | $ _____ |
| | $ _____ |
| | $ _____ |
| **Total Policy Premium** | $ _____ |
| | $ _____ |
| | $ _____ |

Form(s) and Endorsement(s) made a part of this policy at time of issue:

See Schedule of Forms and Endorsements

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.

OPS-D-1 (12-00)

**COMPANY ISSUED**

**POLICY**

Home Office Copy

R3S-1/21/2005 9:52:00 AM
MCH-Fri May 21 10:08:05 2004

# ⚘ SCOTTSDALE INSURANCE COMPANY®

## COMMERCIAL GENERAL LIABILITY COVERAGE PART
## SUPPLEMENTAL DECLARATIONS

Policy No. BCS0008003

Named Insured ARENA CONSTRUCTION COMPANY,

Effective Date: 05-03-04
12:01 A.M., Standard Time
Agent No. 31729

**Item 1.   Limits of Insurance**

| Coverage | Limit of Liability | |
|---|---|---|
| Aggregate Limits of Liability | $ 1,000,000 | Products/Completed Operations Aggregate |
| | $ 2,000,000 | General Aggregate (other than Products/Completed Operations) |
| Coverage A - Bodily Injury and Property Damage Liability | $ 1,000,000 | any one occurrence subject to the Products/Completed Operations and General Aggregate Limits of Liability |
| Damage To Premises Rented To You | $ 100,000 | any one premises subject to the Coverage A occurrence and the General Aggregate Limits of Liability |
| Coverage B - Personal and Advertising Injury Liability | $ 1,000,000 | any one person or organization subject to the General Aggregate Limits of Liability |
| Coverage C - Medical Payments | $ 5,000 | any one person subject to the Coverage A occurrence and the General Aggregate Limits of Liability |

**Item 2.   Form of Business and Location of Premises**

Form of Business: GENERAL CONTRACTOR

☐ Individual     ☐ Partnership     ☐ Joint Venture     ☐ Trust     ☐ Limited Liability Company

☒ Organization including a corporation (other than Partnership, Joint Venture or Limited Liability Company)

Location of All Premises You Own, Rent or Occupy:

   **See Schedule of Locations**

**Item 3.   Forms and Endorsements**

Form(s) and Endorsement(s) made a part of this policy at time of issue:

   **See Schedule of Forms and Endorsements**

**Item 4.   Premiums**

| | | |
|---|---|---|
| Coverage Part Premium: | $ | ███ |
| Other Premium: | $ | |
| Total Premium: | $ | ███ |

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

CLS-SD-1L (08/01)                    Home Office Copy

R3S-1/21/2005 9:52:00 AM
MCH-Fri May 21 10:08:05 2004

# ⚖ SCOTTSDALE INSURANCE COMPANY®

## COMMERCIAL GENERAL LIABILITY COVERAGE PART
## EXTENSION OF SUPPLEMENTAL DECLARATIONS

Policy No. BCS0008003                    Effective Date: 05-03-04

                                         12:01 A.M., Standard Time

Named Insured ARENA CONSTRUCTION COMPANY,       Agent No. 31729

| Prem. No. 001 | Bldg. No. | Class Code 91341 | Exposure $ 100,000 | Basis PAYROLL/NEAREST THOUSAND |
|---|---|---|---|---|

Class Description:
CARPENTRY - INTERIOR

| Premises/Operations | |
|---|---|
| Rate | Premium |
| ▮ | ▮ |
| **Products/Comp Operations** | |
| Rate | Premium |
| ▮ | ▮ |

| Prem. No. 001 | Bldg. No. | Class Code 91580 | Exposure $ 100,000 | Basis PAYROLL/NEAREST THOUSAND |
|---|---|---|---|---|

Class Description:
CONTRACTORS - EXECUTIVE SUPERVISORS OR
EXECUTIVE SUPERINTENDENTS (PRODUCTS-COMPLETED
OPERATIONS ARE SUBJECT TO THE GENERAL
AGGREGATE LIMIT)

| Premises/Operations | |
|---|---|
| Rate | Premium |
| ▮ | ▮ |
| **Products/Comp Operations** | |
| Rate | Premium |
| | ▮ |

| Prem. No. 001 | Bldg. No. | Class Code 91585 | Exposure $ 4,200,000 | Basis TOTAL COST/NEAREST THOUSAND |
|---|---|---|---|---|

Class Description:
CONTRACTORS - SUBCONTRACTED WORK - IN
CONNECTION WITH CONSTRUCTION, RECONSTRUCTION,
REPAIR OR ERECTION OF BUILDINGS

| Premises/Operations | |
|---|---|
| Rate | Premium |
| ▮ | ▮ |
| **Products/Comp Operations** | |
| Rate | Premium |
| ▮ | |

| Prem. No. | Bldg. No. | Class Code 49950 | Exposure | Basis |
|---|---|---|---|---|

Class Description:
ADDITIONAL INTEREST:
BLANKET GLS-210S W/OPTION B

| Premises/Operations | |
|---|---|
| Rate | Premium |
| | ▮ |
| **Products/Comp Operations** | |
| Rate | Premium |

CLS-SP-1L (10-93)                    Home Office Copy

R3S-1/21/2005 9:52:00 AM
MCH-Fri May 21 10:08:05 2004

# ⅃ᴁ SCOTTSDALE INSURANCE COMPANY®

## COMMERCIAL GENERAL LIABILITY COVERAGE PART
## EXTENSION OF SUPPLEMENTAL DECLARATIONS

Policy No. BCS0008003

Effective Date: 05-03-04

12:01 A.M., Standard Time

Named Insured ARENA CONSTRUCTION COMPANY,

Agent No. 31729

| Prem. No. | Bldg. No. | Class Code 49950 | Exposure | Basis | |
|---|---|---|---|---|---|
| **Class Description:** ADDITIONAL INTEREST: BLANKET WAIVER | | | | Premises/Operations | |
| | | | | Rate | Premium ▮▮▮ |
| | | | | Products/Comp Operations | |
| | | | | Rate | Premium |

| Prem. No. | Bldg. No. | Class Code 73444 | Exposure | Basis | |
|---|---|---|---|---|---|
| **Class Description:** EMPLOYEE BENEFITS | | | | Premises/Operations | |
| | | | | Rate | Premium ▮▮▮ |
| | | | | Products/Comp Operations | |
| | | | | Rate | Premium |

| Prem. No. | Bldg. No. | Class Code | Exposure | Basis | |
|---|---|---|---|---|---|
| **Class Description:** | | | | Premises/Operations | |
| | | | | Rate | Premium |
| | | | | Products/Comp Operations | |
| | | | | Rate | Premium |

| Prem. No. | Bldg. No. | Class Code | Exposure | Basis | |
|---|---|---|---|---|---|
| **Class Description:** | | | | Premises/Operations | |
| | | | | Rate | Premium |
| | | | | Products/Comp Operations | |
| | | | | Rate | Premium |

CLS-SP-1L (10-93)

Home Office Copy



## SCOTTSDALE INSURANCE COMPANY®

## SCHEDULE OF FORMS AND ENDORSEMENTS

Policy No. BCS0008003

Named Insured ARENA CONSTRUCTION COMPANY,

Effective Date: 05-03-04
12:01 A.M., Standard Time

Agent No. 31729

```
COMMON POLICY FORMS AND ENDORSEMENTS
OPS-D-1          12-00     COMMON POLICY DECLARATIONS
UTS-SP-2L        12-95     SCHEDULE OF FORMS & ENDORSEMENTS
UTS-SP-3         08-96     SCHEDULE OF LOCATIONS
IL 00 17         11-98     COMMON POLICY CONDITIONS
IL 00 23         04-98     NUCLEAR ENERGY LIABILITY EXCLUSION ENDT.
UTS-74G          08-95     PUNITIVE OR EXEMPLARY DAMAGE EXCLUSION
UTS-9G           05-96     SERVICE OF SUIT CLAUSE
UTS-COVPG        10-03     COVER PAGE

GENERAL LIABILITY FORMS AND ENDORSEMENTS
CLS-SD-1L        08-01     COMMERCIAL LIABILITY COVERAGE PART DEC
CLS-SP-1L        10-93     GENERAL LIABILITY COVERAGE PART-EXT.
CG 00 01         10-01     COMMERCIAL GENERAL LIABILITY COV FORM
CG 00 62         12-02     WAR LIABILITY EXCLUSION
CG 21 47         07-98     EMPLOYMENT-RELATED PRACTICES EXCLUSION
CG 21 54         01-96     EXCL - DESIGNATED OPERATIONS
CG 21 55         09-99     TOTAL POLLUTION EXCL. WITH HOSTILE FIRE
CG 21 67         04-02     FUNGI OR BACTERIA EXCLUSION
CG 21 75         12-02     EXCL CERTIF ACTS OF TERRORISM & OTHR ACT
CG 22 79         07-98     EXCL-CONTRACTORS-PROF LIAB
CG 24 04         10-93     WAIVER-TRANS RIGHTS AGAINST OTHERS TO US
CG 25 03         03-97     DESIGNATED CONSTRUCTION PROJECTS GENERAL
CG 25 04         03-97     DESIGNATED LOCATIONS GENERAL AGGREGATE
GLS-136S         10-95     NOTICE OF OCCURRENCE
GLS-137S         10-95     KNOWLEDGE OF OCCURRENCE
GLS-148S         06-99     LIABILITY DEDUCTIBLE (PER OCC/OFF)
GLS-152S         12-96     AMENDMENT TO OTHER INS CONDITION
GLS-169S         08-97     EMPLOYEE BENEFIT LIABILITY
GLS-210S         04-99     ADDTL OWNERS-CONTRACTORS-OPTIONAL
GLS-30S          06-98     CONTRACTORS SPECIAL CONDITION
GLS-58S          12-93     LEAD CONTAMINATION EXCLUSION
GLS-74S          11-01     AMENDMENT OF CONDITIONS
UTS-131G         03-92     ASBESTOS EXCLUSION
UTS-291S         06-01     RESIDENTIAL EXCLUSION
GLS-226S         10-00     CONTRACTUAL LIABILITY - RAILROADS
GLS-230S         01-03     MIN AND ADV PREM/MIN EARNED CANCEL PREM
UTS-301G         07-02     SUBSIDENCE EXCL
UTS-72G          10-03     ENDT
```

UTS-SP-2L (12-95)

Home Office Copy

SCOTTSDALE INSURANCE COMPANY®

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
|  |  |  |  |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CONTRACTORS SPECIAL CONDITIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following condition is added to **SECTION IV—COMMERCIAL GENERAL LIABILITY CONDITIONS** section of the policy:

**CONTRACTORS SPECIAL CONDITIONS**

You will obtain certificates of insurance from all independent contractors providing evidence of :

1. Limits of Insurance equal to or greater than the limits provided by this policy; and

2. Coverage equal to or greater than the coverages provided by this policy.

Failure to comply with this condition does not alter the coverage provided by this policy. However, should you fail to comply a premium charge will be made. This premium charge will be based on the "total cost" of all work sublet.

"Total cost" means the cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work and all fees, bonuses or commissions paid.

_____          ___/_____

AUTHORIZED REPRESENTATIVE          DATE

GLS-30s (1-97)

POLICY NUMBER:                                            **COMMERCIAL GENERAL LIABILITY**
                                                                  **CG 25 03 03 97**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DESIGNATED CONSTRUCTION PROJECT(S) GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Designated Construction Projects: |
| --- |
| |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which can be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

1. A separate Designated Construction Project General Aggregate Limit applies to each designated construction project, and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

2. The Designated Construction Project General Aggregate Limit is the most we will pay for the sum of all damages under COVERAGE A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under COVERAGE C regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

3. Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the Designated Construction Project General Aggregate Limit for that designated construction project. Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Construction Project General Aggregate Limit for any other designated construction project shown in the Schedule above.

4. The limits shown in the Declarations for Each Occurrence, Fire Damage and Medical Expense continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Construction Project General Aggregate Limit.

**B.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which cannot be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

1. Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

2. Such payments shall not reduce any Designated Construction Project General Aggregate Limit.

**C.** When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-Completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Designated Construction Project General Aggregate Limit.

**D.** If the applicable designated construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

**E.** The provisions of Limits Of Insurance (SECTION III) not otherwise modified by this endorsement shall continue to apply as stipulated.

Copyright, Insurance Services Office, Inc., 1996

CG 25 03 03 97   □

# ⅄ SCOTTSDALE INSURANCE COMPANY®

## SCHEDULE OF LOCATIONS

Policy No. BCS0008003

Effective Date: 05-03-04

12:01 A.M., Standard Time

Named Insured ARENA CONSTRUCTION COMPANY,

Agent No. 31729

| Prem. No. | Bldg. No. | Designated Premises (Address, City, State, Zip Code) | Occupancy |
|-----------|-----------|------------------------------------------------------|-----------|
| 001 | | 45 KNOLLWOOD RD<br>ELMSFORD, NY 10523-0000 | |
| 002 | | 253 UTICE AVE<br>BROOKLYN, NY 11213-0000 | |
| 003 | | 29-42 NORTHERN BLVD<br>LONG ISLAND CITY, NY 11101-0000 | |
| 004 | | 230 WILLOW ST<br>YONKERS, NY 10701-0000 | |

UTS-SP-3 (8-96)

Home Office Copy

**SCOTTSDALE INSURANCE COMPANY®**

ENDORSEMENT
NO. _____

Attached to and forming a part of
Policy No. BCS0008003
Named insured ARENA CONSTRUCTION COMPANY

Endorsement Effective Date  05-03-04
12:01 A.M., Standard Time
Agent No.  31729

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PUNITIVE OR EXEMPLARY DAMAGE EXCLUSION

In consideration of the premium charged, it is agreed that this policy does not apply to a claim of or indemnification for punitive or exemplary damages.

Punitive or exemplary damages also include any damages awarded pursuant to statute in the form of double, treble or other multiple damages in excess of compensatory damages.

If suit is brought against any insured for a claim falling within coverage provided under the policy, seeking both compensatory and punitive or exemplary damages, then the Company will afford a defense to such action; however, the Company will have no obligation to pay for any costs, interest or damages attributable to punitive or exemplary damages.

_____    /    _____
AUTHORIZED REPRESENTATIVE              DATE

UTS-74g (8-95)

Home Office Copy

SCOTTSDALE INSURANCE COMPANY®

**ENDORSEMENT NO.**_____

Attached to and forming a part of
Policy No. BCS0008003
Named Insured ARENA CONSTRUCTION COMPANY,

Endorsement Effective Date  05-03-04
12:01 A.M., Standard Time
Agent No.  31729

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT CLAUSE

It is agreed that in the event of the failure of the Company to pay any amount claimed to be due under this policy, the Company at the request of the Insured (or reinsured), will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give the Court jurisdiction. All matters which arise will be determined in accordance with the law and practice of the Court. In a suit instituted against any one of them under this contract, the Company agrees to abide by the final decision of the Court or of any Appellate Court in the event of an appeal.

Pursuant to any statute of any state, territory or district of the United States of America which makes a provision, the Company will designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured (or reinsured) or any beneficiary arising out of this contract of Insurance (or reinsurance).

The officer named below is authorized and directed to accept service of process on behalf of the Company:

SUPERINTENDENT OF INSURANCE

EMPIRE STATE PLAZA, AGENCY BUILDING ONE

ALBANY, NY  12257

Having accepted service of process on behalf of the Company, the officer is authorized to mail the process or a true copy to:

_____

_____

_____

_____
AUTHORIZED REPRESENTATIVE          DATE

Home Office Copy

POLICY NUMBER: BCS0008003

COMMERCIAL GENERAL LIABILITY
CG 21 54 01 96

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - DESIGNATED OPERATIONS COVERED BY A CONSOLIDATED (WRAP-UP) INSURANCE PROGRAM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

Description and Location of Operation(s):

ALL "WRAP-UP" PROJECTS

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to paragraph **2.**, Exclusions of COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I - Coverages):

This insurance does not apply to "bodily injury" or "property damage" arising out of either your ongoing operations or operations included within the "products-completed operations hazard" at the location described in the Schedule of this endorsement, as a consolidated (wrap-up) insurance program has been provided by the prime contractor/project manager or owner of the construction project in which you are involved.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

(1) Provides coverage identical to that provided by this Coverage Part;

(2) Has limits adequate to cover all claims; or

(3) Remains in effect.

CG 21 54 01 96

Copyright, Insurance Services Office, Inc., 1994

Page 1 of 1  ☐

Home Office Copy

POLICY NUMBER: BCS0008003

COMMERCIAL GENERAL LIABILITY
CG 24 04 10 93

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**Name of Person or Organization:**

ANY PERSON OR ORGANIZATION THAT THE INSURED HAS AGREED
AND/OR IS REQUIRED BY CONTRACT TO WAIVE RIGHTS OF RECOVERY
AGAINST, PER SCHEDULE ON FILE WITH COMPANY

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US Condition (Section IV – COMMERCIAL GENERAL LIABILITY CONDITIONS) is amended by the addition of the following:

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

Copyright, Insurance Services Office, Inc., 1992

Home Office Copy

**Page 1 of 1**    ☐

POLICY NUMBER: BCS0008003

<div align="right">

COMMERCIAL GENERAL LIABILITY
CG 25 03 03 97

</div>

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# DESIGNATED CONSTRUCTION PROJECT(S)
# GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

Designated Construction Projects:
**ALL PROJECTS**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which can be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

1. A separate Designated Construction Project General Aggregate Limit applies to each designated construction project, and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

2. The Designated Construction Project General Aggregate Limit is the most we will pay for the sum of all damages under COVERAGE A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under COVERAGE C regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

3. Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the Designated Construction Project General Aggregate Limit for that designated construction project. Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Construction Project General Aggregate Limit for any other designated construction project shown in the Schedule above.

4. The limits shown in the Declarations for Each Occurrence, Fire Damage and Medical Expense continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Construction Project General Aggregate Limit.

**B.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which cannot be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

1. Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

2. Such payments shall not reduce any Designated Construction Project General Aggregate Limit.

**C.** When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-Completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Designated Construction Project General Aggregate Limit.

Copyright, Insurance Services Office, Inc., 1996

Home Office Copy

D.  If the applicable designated construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

E.  The provisions of Limits Of Insurance (SECTION III) not otherwise modified by this endorsement shall continue to apply as stipulated.

Copyright, Insurance Services Office, Inc., 1996

CG 25 03 03 97   ☐

Home Office Copy

POLICY NUMBER: BCS0008003

**COMMERCIAL GENERAL LIABILITY**
CG 25 04 03 97

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# DESIGNATED LOCATION(S)
# GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Designated Location(s): |
| --- |
| ALL LOCATIONS |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** For all sums which the insured becomes legally obligated to pay as damages caused by –occurrences– under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which can be attributed only to operations at a single designated –location– shown in the Schedule above:

**1.** A separate Designated Location General Aggregate Limit applies to each designated –location–, and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

**2.** The Designated Location General Aggregate Limit is the most we will pay for the sum of all damages under COVERAGE A, except damages because of –bodily injury– or –property damage– included in the –products-completed operations hazard–, and for medical expenses under COVERAGE C regardless of the number of:

**a.** Insureds;

**b.** Claims made or –suits– brought; or

**c.** Persons or organizations making claims or bringing –suits–.

**3.** Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the Designated Location General Aggregate Limit for that designated –location–. Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Location General Aggregate Limit for any other designated –location– shown in the Schedule above.

**4.** The limits shown in the Declarations for Each Occurrence, Fire Damage and Medical Expense continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Location General Aggregate Limit.

Home Office Copy

B. For all sums which the insured becomes legally obligated to pay as damages caused by –occurrences– under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which cannot be attributed only to operations at a single designated –location– shown in the Schedule above:

1. Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

2. Such payments shall not reduce any Designated Location General Aggregate Limit.

C. When coverage for liability arising out of the –products-completed operations hazard- is provided, any payments for damages because of –bodily injury– or –property damage– included in the –products-completed operations hazard- will reduce the Products-Completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Designated Location General Aggregate Limit.

D. For the purposes of this endorsement, the **Definitions** Section is amended by the addition of the following definition:

–Location– means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

E. The provisions of Limits Of Insurance (SECTION III) not otherwise modified by this endorsement shall continue to apply as stipulated.

Copyright, Insurance Services Office, Inc., 1996

Home Office Copy

CG 25 04 03 97    □

SCOTTSDALE INSURANCE COMPANY®

**ENDORSEMENT**

NO._____

Attached to and forming a part of
Policy No. BCS0008003
Named Insured ARENA CONSTRUCTION COMPANY,

Endorsement Effective Date 05-03-04
12:01 A.M., Standard Time

Agent No. 31729

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NOTICE OF OCCURRENCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following is added to Paragraph **2. Duties in the Event of Occurrence, Offense, Claim or Suit** of SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS:

An "occurrence," or offense originally reported to your workers compensation carrier may later develop into a claim which may be covered by this policy. If you notify us as soon as practicable after you become aware that the "occurrence" or offense may result in a claim against this policy, you will not be deemed in violation of the reporting requirements of this condition.

_____    /
AUTHORIZED REPRESENTATIVE          DATE

GLS-136s (10-95)

Home Office Copy

| | |
|---|---|
| ⚘ SCOTTSDALE INSURANCE COMPANY® | **ENDORSEMENT** NO._____ |
| Attached to and forming a part of Policy No. BCS0008003 Named Insured ARENA CONSTRUCTION COMPANY, | Endorsement Effective Date 05-03-04 12:01 A.M., Standard Time Agent No. 31729 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## KNOWLEDGE OF OCCURRENCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following is added to Paragraph **2. Duties in the Event of Occurrence, Offense, Claim or Suit** of SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS:

Knowledge of an "occurrence," offense, claim, or "suit" by the agent, servant or employee of any insured will not in itself constitute knowledge by the Named Insured unless an executive officer of the Named Insured's organization received such notice from its agent, servant or employee.

_____ / _____
AUTHORIZED REPRESENTATIVE        DATE

GLS-137s (10-95)                          Home Office Copy

 **SCOTTSDALE INSURANCE COMPANY®**

**ENDORSEMENT NO.** _____

Attached to and forming a part of
Policy No. BCS0008003
Named Insured ARENA CONSTRUCTION COMPANY,

Endorsement Effective Date 05-03-04
12:01 A.M., Standard Time

Agent No. 31729

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## BODILY INJURY, PROPERTY DAMAGE, PERSONAL AND ADVERTISING INJURY LIABILITY DEDUCTIBLE ENDORSEMENT
### (Per Occurrence or Offense)

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

### SCHEDULE

| Coverage | Amount and Basis of Deductible | |
|---|---|---|
| Bodily Injury Liability | $ 5000 | per occurrence |
| Property Damage Liability | $ 5000 | per occurrence |
| Personal and Advertising Injury Liability (Personal Injury and Advertising Injury) | $ 5000 | per offense |

**APPLICATION OF ENDORSEMENT**

Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "bodily injury," "property damage," and "personal and advertising injury," ("personal injury" and "advertising injury") however caused:

**NO LIMITATION**

1. Our obligation under the Bodily Injury Liability, Property Damage Liability, Personal and Advertising Injury Liability ("Personal Injury" and "Advertising Injury") Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as

applicable to such coverages, and the Limits of Insurance applicable to Each Occurrence or offense for such coverages will be reduced by the amount of such deductible. Aggregate Limits for such coverages shall not be reduced by the application of such deductible amount.

2. The deductible amounts apply to damages and all legal and loss adjustment expenses.

3. The deductible amounts stated in the Schedule above apply:

   a. Under Bodily Injury Liability Coverage, to all damages because of "bodily injury";

   b. Under Property Damage Liability Coverage, to all damages because of "property damage"; or

   c. Under Personal and Advertising Liability ("Personal Injury" and "Advertising Injury") Coverage, to all damages because of "personal injury" or "advertising injury"

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

Page 1 of 2

as the result of any one "occurrence" or offense, regardless of the number of persons or organizations who sustain damages because of that "occurrence" or offense.

4. The terms of this insurance, including those with respect to our right and duty to defend any "suits" seeking those damages and your duties in the event of an "occurrence," offense, claim or "suit," apply.

irrespective of the application of the deductible amount.

5. We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us..

_____    _____

AUTHORIZED REPRESENTATIVE                                    DATE

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

GLS-148s (6-99)

SCOTTSDALE INSURANCE COMPANY®

**ENDORSEMENT NO.** _____

Attached to and forming a part of
Policy No. BCS0008003
Named Insured ARENA CONSTRUCTION COMPANY,

Endorsement Effective Date  05-03-04
12:01 A.M., Standard Time

Agent No.  31729

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT TO OTHER INSURANCE CONDITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Condition 4. Other Insurance of SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS is deleted in its entirety and is replaced by the following:

**4. Other Insurance**

**a. Primary Insurance**

This insurance is primary except when **b.** below applies.

**b. Excess Insurance**

This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(2) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(3) If the loss arises out of the maintenance or use of aircraft, "auto" or watercraft to the extent not subject to Exclusion **g.** of Coverage A (Section I); or

(4) That is valid and collectible insurance available to you under any other policy.

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all other insurance.

If a loss occurs involving two or more policies, each of which states that its insurance will be excess, then our policy will contribute on a pro rata basis.

_____/_____
AUTHORIZED REPRESENTATIVE                  DATE

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1994

GLS -152s (12-96)

Home Office Copy

RSS-1/21/2005 9:52:00 AM
MCH-Fri May 21 10:08:05 2004

---

**SCOTTSDALE INSURANCE COMPANY®**

**ENDORSEMENT NO.**_____

Attached to and forming a part of
Policy No. BCS0008003
Named Insured ARENA CONSTRUCTION COMPANY,

Endorsement Effective Date 05-03-04
12:01 A.M., Standard Time
Agent No. 31729

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EMPLOYEE BENEFIT LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Coverage | Limits of Insurance | Premium |
|---|---|---|
| Employee Benefits Programs | $ 1,000,000 Each Employee<br>$ 1,000,000 Aggregate | $ ▮▮▮▮ |

**COVERAGE**

**1. Insuring Agreement**

We will pay under this endorsement those sums that the "insured" becomes legally obligated to pay as damages because of any negligent act, error or omission of the "insured," or of any other person for whose acts the "insured" is legally liable. The negligent act, error or omission must be committed in the "administration" of your "employee benefit program" during the policy period. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS of the COMMERCIAL GENERAL LIABILITY COVERAGE FORM, CG 00 01.

The negligent act, error or omission must take place in the "coverage territory." We will have the right and duty to defend any "suit" seeking those damages. But:

a. The amount we will pay for damages is limited as described in the LIMITS OF INSURANCE section of this endorsement;

b. We may at our discretion, investigate any report of a negligent act, error or omission and settle any claim or "suit" that may result; and

c. Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements.

**2. Exclusions**

Insurance under this endorsement does not apply to:

a. Loss arising out of any dishonest, fraudulent, criminal or malicious act or omission, committed by any "insured";

b. "Bodily injury," "property damage," "personal injury" or "advertising injury";

c. Loss arising out of failure of performance of contract by any insurer;

d. Loss arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program";

e. Any claim or "suit" based upon:

(1) failure of any investment to perform as represented by any "insured";

(2) advice given to any person to participate or not to participate in any plan included in the "employee benefit program";

Page 1 of 3

GLS-169s (8-97)

Home Office Copy

f.  Loss arising out of your failure to comply with the mandatory provisions of any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar law; or

g.  Loss for which the "insured" is liable because of liability imposed on a fiduciary by the Employee Retirement Security Act of 1974, as now or hereafter amended.

**WHO IS AN INSURED**

With respect to this endorsement only:

1.  If you are designated in the Declarations as:

    a.  An individual, you and your spouse are "insureds," but only with respect to the conduct of a business of which you are the sole owner.

    b.  A partnership or joint venture, you are an "insured." Your members, your partners, and their spouses are also "insureds," but only with respect to the conduct of your business.

    c.  A limited liability company, you are an "insured." Your members are also "insureds," but only with respect to the conduct of your business. Your managers are "insureds," but only with respect to their duties as your managers.

    d.  An organization other than a partnership, joint venture, or limited liability company, you are an "insured." Your directors and stockholders are also "insureds," but only with respect to their liability as your directors or stockholders.

2.  Each of the following is also an "insured":

    a.  Your partners, executive officers, members, managers, and employees who are authorized to administer your "employee benefit program."

    b.  Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this endorsement.

3.  Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if

there is no other similar insurance available to that organization. However:

a.  Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period whichever is earlier; and

b.  Coverage under this provision does not apply to any negligent act, error or omission that occurred before you acquired or formed the organization.

No person or organization is an "insured" with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**LIMITS OF INSURANCE**

1.  The Limits of Insurance shown in the Schedule of this endorsement and the rules below fix the most we will pay regardless of the number of:

    a.  "Insureds";

    b.  Claims made or "suits" brought;

    c.  Persons or organizations making claims or bringing "suits";

    d.  Acts, errors or omissions which result in loss; or

    e.  Plans included in your "employee benefit program."

2.  The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions committed in the "administration" of your "employee benefit program."

3.  Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one employee, including the employee's dependents and beneficiaries, because of acts, errors or omissions committed in the "administration" of your "employee benefit program."

The Limits of Insurance shown in the Schedule apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding

GLS-169s (8-97)                                                    Home Office Copy

period for purposes of determining the Limits of Insurance.

**DEFINITIONS**

The following **DEFINITIONS** are added to the policy:

1. "Administration" means any of the following acts that you do or authorize a person to do:

   a. Counseling employees, including their dependents and beneficiaries, with respect to the "employee benefit program"; or

   b. Handling records in connection with the "employee benefit program"; or

   c. Effecting or terminating any employee's participation in a plan included in the "employee benefit program."

2. "Coverage territory" means the United States of America (including its territories and possessions), Puerto Rico and Canada.

3. "Employee benefit program" means the following plans:

   a. Group life insurance, group accident or health insurance, "profit sharing plans," pension plans, "stock subscription plans," vacation and savings plans, provided that no one other than an employee may subscribe to such insurance or plans; or

   b. Unemployment insurance, social security benefits, workers compensation and disability benefits; or

   c. Any other similar plan designated in the Schedule.

4. "Insured" means any person or organization qualifying as such under **WHO IS AN INSURED** section of this endorsement.

5. "Profit sharing plans" means only such plans that are equally available to all full time employees.

6. "Stock subscription plans" means only such plans that are equally available to all full time employees.

For the purposes of this endorsement, the definition of "suit" contained in the **DEFINITIONS** section of the policy is deleted in its entirety and is replaced with the following:

"Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding alleging such damages to which you must submit or submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

**CONDITIONS**

It is agreed that Item 2. Duties In The Event Of Occurrence Offense, Claim Or Suit paragraphs a. and b. of **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** are deleted for purposes of this endorsement and replaced with the following:

2. **Duties In The Event Of Act, Error Or Omission, Claim Or Suit.**

   a. You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a claim. Notice should include:

      (1) What the act, error or omission was and when it occurred; and

      (2) The names and addresses of any employees who may suffer damages as a result of the act, error or omission.

   b. If a claim is received by any "insured" you must:

      (1) Immediately record the specifics of the claim and the date received; and

      (2) Notify us as soon as practicable. You must see to it that we receive written notice of the claim as soon as practicable.

---

AUTHORIZED REPRESENTATIVE          DATE

GLS-169s (8-97)          Home Office Copy

---

### SCOTTSDALE INSURANCE COMPANY®

**ENDORSEMENT
NO._____**

Attached to and forming a part of
Policy No. BCS0008003
Named Insured ARENA CONSTRUCTION COMPANY,

Endorsement Effective Date 05-03-04
12:01 A.M., Standard Time
Agent No. 31729

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LEAD CONTAMINATION EXCLUSION

This endorsement modifies insurance provided under:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART

This endorsement excludes "occurrences" at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured; or from the operations of the insured, which result in:

a. "Bodily Injury" arising out of the ingestion, inhalation or absorption of lead in any form;

b. "Property Damage" arising from any form of lead;

c. "Personal Injury" arising from any form of lead;

d. "Advertising Injury" arising from any form of lead;

e. **Medical Payments** arising from any form of lead;

f. Any loss, cost or expense arising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead; or

g. Any loss, cost or expense arising out of any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of lead.

---

AUTHORIZED REPRESENTATIVE                    DATE

GLS-58s (12-93)

Home Office Copy

RJS-1/21/2005 9:52:00 AM
MCH-Fri May 21 10:08:05 2004

**SCOTTSDALE INSURANCE COMPANY®**

ENDORSEMENT
NO. _____

Attached to and forming a part of

Policy No.   BCS0008003

Named Insured   ARENA CONSTRUCTION COMPANY,

Endorsement Effective Date   05-03-04
12:01 A.M., Standard Time

Agent No.   31729

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED-OWNERS, LESSEES OR CONTRACTORS (WITH OPTIONAL COVERAGE PROVISIONS)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Name of Person or Organization:**

SEE BELOW

**Who Is An Insured (Section II)** is amended to include as an insured the person or organization shown in the Schedule, but only to the extent the additional insured is held liable for the Named Insured's negligent acts or omissions arising from occurrences directly caused by, and while in the course of the Named Insured's ongoing operations performed for that additional insured.

Optional Coverage Provisions applicable to the above. The selected option(s) is designated by a mark in the box to the left of the option.

☐ **OPTION A.**   The insurance provided by this endorsement shall be primary, but only in the event of the Named Insured's sole negligence.

☒ **OPTION B.**   The insurance provided by this endorsement shall be primary and noncontributory, but only in the event of the Named Insured's sole negligence.

☒ **OPTION C.**   The insurance provided by this endorsement is amended to include any person or organization that the Named Insured has agreed and/or is required by contract to name as an additional insured, per schedule on file with company.

**Additional Premium $** ███████████ .

_____
AUTHORIZED REPRESENTATIVE                    DATE

Includes copyrighted material of Insurance Services Office Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998
Home Office Copy

GLS-210s (4-99)

---

## SCOTTSDALE INSURANCE COMPANY®

**ENDORSEMENT**
NO._____

Attached to and forming a part of
Policy No. BCS0008003
Named Insured ARENA CONSTRUCTION COMPANY,

Endorsement Effective Date 05-03-04
12:01 A.M., Standard Time

Agent No. 31729

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ASBESTOS EXCLUSION

The coverage afforded by this policy does not apply to bodily injury, personal injury or property damage arising out of:

1. Inhaling, ingesting or prolonged physical exposure to asbestos or goods or products containing asbestos; or

2. The use of asbestos in construction or manufacturing any good, product or structure; or

3. The removal of asbestos from any good, product or structure; or

4. The manufacture, sale, transportation, storage or disposal of asbestos or goods or products containing asbestos.

The coverage afforded by the policy does not apply to payment for the investigation or defense of any loss, injury or damage or any cost, fine or penalty or for any expense of claim or suit related to any of the above.

AUTHORIZED REPRESENTATIVE          DATE

UTS-131g (3-92)

Home Office Copy

 **SCOTTSDALE INSURANCE COMPANY®**

**ENDORSEMENT NO.** _____

Attached to and forming a part of

Policy No.  BCS0008003

Named Insured  ARENA CONSTRUCTION COMPANY,

Endorsement Effective Date  05-03-04
12:01 A.M., Standard Time

Agent No.  31729

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### RESIDENTIAL EXCLUSION

This insurance does not apply, either directly or as assumed by contract, for any lawsuits, actions or any other claim for liability for "bodily injury," "property damage" or "personal and advertising injury" ("personal injury" or "advertising injury") arising from or in any way relating to the insured's operations or interest or any other involvement in any condominium, townhouse, apartment building or residential:

1. Development;

2. Construction;

3. Reconstruction; or

4. Renovation

that occurs:

   a. Prior to inception of this policy;

   b. During this policy term; or

   c. Prior to the inception of this policy and that continues into this policy term.

This exclusion applies in the following state(s):

ALL STATES

_____

AUTHORIZED REPRESENTATIVE                    DATE

Home Office Copy

UTS-291s (6-01)

 SCOTTSDALE INSURANCE COMPANY®

**ENDORSEMENT NO. _____**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CONTRACTUAL LIABILITY—RAILROADS

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

With respect to operations performed for, or affecting, a Railroad, definition "insured contract" of **SECTION V— DEFINITIONS** section is replaced by the following:

"Insured contract" means:

**a.** A contract for lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for

"bodily injury" or "property damage" to a third person or organization. Tort Liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(2)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(1)** above and supervisory, inspection, architectural or engineering activities.

_____ / _____
AUTHORIZED REPRESENTATIVE                DATE

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

GLS-226s (10-00)

Audit Premium means the premium for this Coverage Part that is developed by calculating the difference between the Advance Premium and the Earned Premium.

Earned Premium means the premium for this Coverage Part that is developed by applying the rate(s) in the policy to the actual premium basis for the audit period.

Minimum Premium means the lowest premium for which this Coverage Part will be written for the policy period.

_____
AUTHORIZED REPRESENTATIVE                    DATE

R3S-1/21/2005 9:52:00 AM
MCH-Fri May 21 10:08:05 2004

# SCOTTSDALE INSURANCE COMPANY®

**ENDORSEMENT NO. _____**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## MINIMUM AND ADVANCE PREMIUM/MINIMUM EARNED CANCELLATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART**

### SCHEDULE

MINIMUM PREMIUM $ _____

Item 5. **Premium Audit** Condition of SECTION IV—COMMERCIAL GENERAL LIABILITY CONDITIONS, SECTION IV—LIQUOR LIABILITY CONDITIONS and SECTION IV—PRODUCTS/COMPLETED OPERATIONS LIABILITY CONDITIONS is replaced by:

**5. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as Advance Premium is a deposit premium only. At the close of each audit period we will compute the Earned Premium for that period and a billing notice of any Audit Premium due will be sent to the first Named Insured. The due date for the Audit Premium is the date shown as the due date on the bill. If the sum of the Advance Premium and Audit Premiums is greater than the Earned Premium, we will return the excess to the first Named Insured, subject to us retaining a Minimum Premium as shown above in the Schedule, including any premium adjustments made by endorsement to this policy during the policy period.

c. The first Named Insured must keep records of the information we need for premium computation, and provide us or our representative copies at such times as we may request. In the event the first Named Insured fails or refuses to allow us or our representative to audit your records, we may unilaterally charge an Audit Premium for the policy period at or up to double the Minimum or Advance Premium, whichever is greater, and such Audit Premium shall be immediately due and payable on notice to the first Named Insured.

d. If you request cancellation of this Coverage Part or policy, we will retain not less than twenty-five percent (25%) of the Advance Premium.

For purposes of this endorsement, the terms Advance Premium, Audit Premium, Earned Premium and Minimum Premium are defined as follows:

Advance Premium means the premium for this Coverage Part that is stated in the policy declarations and payable in full by the first Named Insured at the inception of the policy.

 SCOTTSDALE INSURANCE COMPANY®

ENDORSEMENT
NO. _____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SUBSIDENCE EXCLUSION

This policy does not apply to "bodily injury" or "property damage" caused by, resulting from, attributable or contributed to, or aggravated by the subsidence of land as a result of landslide, mudflow, earth sinking or shifting, resulting from operations of the named insured or any subcontractor of the named insured.

**All other terms and conditions remain unchanged.**

_____ / _____
AUTHORIZED REPRESENTATIVE          DATE

UTS-301g (7-02)

 **SCOTTSDALE INSURANCE COMPANY®**

ENDORSEMENT
NO. _____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
|  |  |  |  |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ENDORSEMENT

In the event Scottsdale Insurance Company fails to pay any loss which is payable under this policy as a result of its insolvency, Nationwide Mutual Insurance Company agrees it shall become liable for the loss after receiving written notice and demand for payment from the insured. Any payment shall be subject to and limited by the terms and conditions of this policy.

Nationwide Mutual Insurance Company

*Stephen S. Rasmussen*

President

_____/_____
AUTHORIZED REPRESENTATIVE          DATE

UTS-72g (10-03)

**AFFIDAVIT OF SERVICE**
**BY REGULAR MAIL**

STATE OF NEW YORK   )
                                        : ss.
COUNTY OF NASSAU   )

JEANNE A. BLANCHARD, being duly sworn deposes and says:

Deponent is not a party to the action, is over Eighteen (18) years of age and resides in North Bellmore, New York.

On July 20, 2006 deponent served the within RULE 26 Disclosure by mailing the same in a sealed envelope, with postage paid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

TO:    JAFFE & ASHER, LLP
         Attorneys for Plaintiffs
         WAUSAU UNDERWRITERS INS.
         CO. and AXIS SPECIALTY INS. CO.
         600 Third Avenue, 9th Floor
         New York, New York  10016
         (212) 687-3000

         WILSON, BAVE, CONBOY, COZZA & COUZENS, P.C.
         Attorneys for Defendant
         QBE INSURANCE CORPORATION
         Two William Street
         White Plains, New York  10601

                                                        JEANNE A. BLANCHARD

Sworn to before me this
20 day of July, 2006

NOTARY PUBLIC

ELIZABETH PENAGOS
Notary Public, State of New York
No. 01PE5051168
Qualified in Nassau County
Commission Expires Oct. 30, 2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WAUSAU UNDERWRITERS INSURANCE COMPANY AND AXIS SPECIALTY
INSURANCE COMPANY,

                            Plaintiffs,

   -against-

QBE INSURANCE CORPORATION AND SCOTTSDALE INSURANCE
COMPANY

                            Defendants.

## SCOTTSDALE INSURANCE COMPANY'S REPLY TO CROSS-COMPLAINT

### KRAL, CLERKIN, REDMOND, RYAN
### PERRY & GIRVAN, LLP

*Attorneys for*

69 **DEFENDANT, SCOTTSDALE INSURANCE CO.**

MINEOLA, NEW YORK 11501

(516) 742-3470

§2103 (b) (5) Notice: Service of Papers by Electronic Means is Not Accepted

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

*Dated:* ........................................    Signature........................................................................

   July 20, 2006

                     Print Signer's Name.................... **LEONARD PORCELLI, ESQ.**

*Service of a copy of the within*                                 *is hereby admitted.*

*Dated:*

                             ......................................................................

                              *Attorney(s) for*

*PLEASE TAKE NOTICE*

☐   *that the within is a (certified) true copy of a*

NOTICE OF ENTRY   *entered in the office of the clerk of the within named Court on*               *20*

☐   *that an Order of which the within is a true copy will be presented for settlement to the*

NOTICE OF SETTLEMENT   *Hon.*                     *one of the judges of the within named Court,*

         *at*

         *on*                *20*    , *at*           *M.*

*Check Applicable Box*

*Dated:*

                                    **KRAL, CLERKIN, REDMOND, RYAN**
                                    **PERRY & GIRVAN, LLP**

                  *Attorneys for*

                            69 EAST JERICHO TURNPIKE
                            MINEOLA, NEW YORK 11501

*To:*

*Attorney(s) for*



9.16.04

**BARNEY**
SKANSKA USA

SITE SAFETY
EXHIBIT 13-B

## JOBSITE INCIDENT REPORT

- o Lost Property         o Damaged Property   ☑ Injury ~~Fire~~
- o Suspected Crime or Offense    o Any other unusual occurrence or condition (explain)
- ☑ Trade Contractor's Employee    o BSCC Employee    o Visitor    o Public

Date of Report: _SEPTEMBER 16, 2004_

Date/Time of Occurrence: _SEPTEMBER 16, 2004; @ APPROX. 0925_
Project Name and Number: _ST. GEORGE FERRY TERMINAL #2000ll_
Address: _1 RICHMOND TERRACE, STATEN ISLAND N.y_
Where: Describe property involved: _WEST ENTRANCE ELEVATOR SHAFT_
How: Brief description of incident, give details: _ACCORDING TO TWO (2) WITNESSES_
_(FELLOW IRONWORKERS)— JOHN MOORE IRON WORKER WAS PERFORMING_
_CONNECTOR PROCEDURES @ WEST ENTRANCE ELEVATOR SHAFT. HE WAS_
_STANDING ON A SCAFFOLD WITH ~~ANOTHER~~ 2ND IRON WORKER WHEN HE_
_ATTEMPTED TO STEP FROM SCAFFOLD ONTO ELEVATOR SHAFT BLOCK WALL_
_E. SIDE OF WALL WHEN HE LOST HIS FOOTING AND FELL APPROX. 23 FEET_
_TO GROUND LEVEL. PAGE TWO_
NYC Police Department Responding Name: _OFFICER AIMONE_

Precinct: _120TH_                    Shield Number: _____

Witness Name: _JAMES SULLIVAN_
    Address: _52 ZARRIELLO LANE_
    City, State: _WEST HAVERSTRAW, NEW YORK  10993_
    Phone: _1 (845) 405-1426_

Contractor's Name: _A. J MCNULTY_
    Address: _53-20 44TH ST._
    City, State: _MASPETH, N.y  11378_
    Phone: _(718) 784-1655_

                    D.O.B 9/14/55
Injured Party Name: _JOHN MOORE_  / AUNT KINSELLA (732) 495-2834
    Address: _30 PACIFIC AVENUE_
    City, State: _NORTH MIDDLETOWN N. JERSEY  07748_
    Phone: _(732) 787-1078_

BSCC Supervisor on-site: _SEAN MCCALLA_

Prepared by Name: _A. GEAEGRON JR_

9·16·04

SITE SAFETY
EXHIBIT 13-B

Title: _SITE SAFETY DIRECTOR_

Signature: _M. S. Ray Jr_                    Date: _9-16-04_


WITNESS #2

ROBERT CORREDON
29 NEPTUNE AVE
NEW ROCHELLE, NY 10805
1(914) 654-0133

FROM PAGE ONE: DISTANCE FROM SCAFFOLD TO BACK WALL APPROX 2 1/2 FT @ 2"
IRON WORKER SUSTAINED MULTIPLE LACERATIONS AND BRUISES
WAS TAKEN TO ST. VINCENT HOSPITAL AND FROM ALL REPORTS
HE IS IN GOOD STABLE CONDITION WITH NO SERIOUS OR LIFE
THREATENING INJURIES @ THIS TIME.

ACR/PCR # 2659713

9·16·04

# A.J. McNULTY & CO., INC.

53-20 44ᵗʰ Street, Maspeth, New York 11378  (718) 784-1655  Fax (718) 784-3889

## ACCIDENT REPORT

DATE: 9/20/04          JOB: St George Ferry Terminal  JOB#: 1864

1. Name of Injured: JOHN MOORE

2. Address of Injured:

3. Age: _____   Date of Birth: _____          SS# _____

4. Occupation: IRON Worker          Local: _____

5. Place Where Accident Occurred: New Steel Area          Date & Time: 9/16/04

6. Name of Foreman: Norman Pryce          Was Foreman Notified? Yes

7. Item Causing Injury: pre cut brick wall     Was Safety Device Available? Yes

8. How Did The Accident Occur? IRON WORKERS were connecting a beam. A Concrete brick wall was in way of work. John Moore goes to step on brick and brick collapses, sending worker down 23'2" Hole.

9. What Was The Employee Doing When Injured: going from a scaffold to a brick wall

10. Names of Witnesses: James Sullivan, Robert Corredor, Michael Greco

11. Nature of Injury: Broken Elbow, concussion possible rib fractures

12. Name & Address of Physician/Medical Center: St. Vincents Medical Center

13. Did Injured Employee Lose Time? Yes

14. How Could the Accident Have Been Avoided? Laborer should have removed concrete brick after cutting with demo saw. Shut also should have been property covered.

Prepared By: James M. Sullivan

Signed By: James M. Sullivan

(A-1)

9·16·04

62

1               Moore

2    have pain in one shoulder or both?

3    A.      Just the right one pretty much.

4    Q.      Did you have pain in your right elbow

5    or both?

6    A.      My right elbow.

7    Q.      Both knees?

8    A.      Yeah.

9    Q.      What part of your back?

10   A.      The middle of my back and the lower

11   part on the right side.  It kind of goes into

12   my hip over here.

13   Q.      The pain radiates down to your hip?

14   A.      Yes.

15   Q.      Which hip?

16   A.      My right hip.

17   Q.      What part of your neck?

18   A.      On the right side of my neck.  It

19   feels like dead sometimes in there.  I get

20   like a sharp pain and then it goes dead.

21   Q.      Like numb?

22   A.      Yes.

23   Q.      How frequently does that happen?

24   A.      A couple of times a week.

25   Q.      Did Dr. Touliopoulos send you for

63

1                              Moore

2    MRIs?

3    A.      Well, I was approved by the State

4    Compensation for an MRI at a hearing, but

5    they still haven't sent the official approval

6    to my doctor to have the MRI.

7    Q.      When was there a hearing with the

8    Compensation?

9    A.      It had to be ten months ago.

10   Q.      Are you receiving money from Workers'

11   Compensation?

12   A.      Yes.

13   Q.      How much are you receiving?

14   A.      400 a week.

15   Q.      That's for lost wages or something

16   else?

17   A.      I don't know what it's considered.

18   Q.      Did you have an MRI at Diagnostic

19   Radiology Associates on West 17th Street in

20   2004?

21   A.      I'm not sure.  I've had some x-rays

22   done there.

23   Q.      So, you do recall going to Diagnostic

24   Radiology Associates' office on West 17th

25   Street in New York City?

64

1                         Moore

2    A.      Yes.

3    Q.      Were you referred there by Dr.

4    Touliopoulos?

5    A.      Yes.

6    Q.      Did you go back for any MRIs at that

7    same facility in January of 2005?

8    A.      I don't know if I ever got an MRI

9    there.  I got a couple of MRIs by where I

10   live.

11              MR. DIAMOND:  I believe only

12           x-rays were taken at that facility.  I

13           believe.  I could be wrong.

14   Q.      Can you identify where near your home

15   you had MRIs?

16   A.      I think it's Middletown Imaging.

17              MR. KOVNER:  Off the record.

18              (Discussion held off the

19           record.)

20   Q.      Middletown Imaging?

21   A.      Yes.

22   Q.      How many MRIs have you had at that

23   facility?

24   A.      A couple that I recall.

25   Q.      Were you referred to Middletown

65

1                         Moore

2    Imaging by Dr. Touliopoulos or someone else?

3    A.      Yes.

4    Q.      Did someone at Middletown Imaging tell

5    you the results of the MRI or did Dr.

6    Touliopoulos tell you?

7    A.      I don't even know if I know the

8    results.

9    Q.      Can you tell us when you had the MRIs

10   at the Middletown Imaging facility?

11   A.      Vaguely.  Just within the last couple

12   of years.

13   Q.      Your accident was in 2004.  So,

14   everything was in the last couple of years.

15          Were the MRIs taken in 2006 at this

16   location?

17   A.      No.  I don't think so.

18   Q.      Sometime in 2005?

19   A.      Yes.

20              MR. KOVNER:  For the record, I

21          don't think we ever received

22          authorizations for Middletown Imaging.

23          I request them.

24   REQUEST NOTED:

25   Q.      On your last visit to Dr. Touliopoulos

66

Moore

1

2    in July of 2006 what, if anything, did he

3    tell you about your right shoulder?

4    A.        That I needed an operation.

5    Q.        Did Dr. Touliopoulos tell you that he

6    would do the surgery?

7    A.        Yeah.

8    Q.        Is it scheduled?

9    A.        No.  We need approval from the State

10   Compensation.  Even though at the hearing I

11   was approved, they still haven't formally

12   given approval.

13   Q.        At your last visit in July of 2006

14   what, if anything, did Dr. Touliopoulos tell

15   you about your right elbow?

16   A.        That he wanted to MRI it again.

17   Q.        Did he indicate that he was concerned

18   about a particular condition?

19   A.        Not that I recall.

20   Q.        Do you have an appointment for an MRI

21   of your right elbow?

22   A.        That's another thing.  It was approved

23   by the State Compensation, but it's still not

24   formally approved.

25   Q.        What, if anything, did Dr.

67

1                          Moore

2      Touliopoulos tell you about your knees in

3      July of 2006?

4      A.       That he wanted to MRI them to see why

5      I was still having pain in them.

6      Q.       I take it you have not yet had an MRI

7      of your knees?

8      A.       No.

9      Q.       Is it scheduled?

10     A.       Not that I know of.

11     Q.       Was that also approved at the Workers'

12     Compensation hearing?

13     A.       Yes.  I went in front of a judge at

14     the Compensation hearing, and they approved

15     four or five different things, but nothing

16     has formally been given to me.

17               MR. KOVNER:  Off the record.

18               (Discussion held off the

19          record.)

20     Q.       On your last visit to Dr. Touliopoulos

21     what, if anything, did he tell you about your

22     back?

23     A.       He wanted to give me some epidural

24     shots in my lower back.

25     Q.       Did you ever receive epidurals?

68

```
 1                    Moore

 2   A.      No.  I'm a little hesitant.

 3   Q.      Why is that?

 4   A.      I know this is going to sound

 5   contradictory to my life, but I really don't

 6   want somebody sticking needles in my back.

 7   Q.      Have you discussed that with your

 8   fiancee?

 9               MR. DIAMOND:  Note my objection.

10   A.      I think she's tired of hearing me

11   complain.

12   Q.      So, I take it at present you don't

13   have any appointments scheduled for an

14   epidural injection?

15   A.      No.  We discuss it when I go to visit

16   Dr. Touliopoulos, but I usually kind of try

17   to round on that.

18   Q.      Did Dr. Touliopoulos tell you in words

19   or substance that the epidural injections

20   might reduce your pain?

21   A.      That's not what I get from him.

22   Q.      What did you get from him?

23               MR. DIAMOND:  Note my objection.

24   A.      We're kind of reaching for anything

25   that might help.
```

69

1                        Moore

2    Q.      On your last visit to Dr. Touliopoulos

3    what, if anything, did he tell you about your

4    neck?

5    A.      That he wanted to take an MRI of that

6    as well.

7    Q.      I take it that has not yet been

8    scheduled?

9    A.      No.

10   Q.      Was an MRI of your neck also approved

11   at the Compensation hearing?  Do you know?

12   A.      I think it was.  Everything that I

13   applied for the judge okayed.

14   Q.      When for the first time did you see

15   Dr. Hausknecht?

16   A.      About a month and a half after I got

17   out of the hospital.

18   Q.      Prior to September 16th of 2004 had

19   you ever seen Dr. Hausknecht?

20   A.      No.

21   Q.      Is his office located on East 37th

22   Street in New York City?

23   A.      Yes.

24   Q.      Who referred you to Dr. Hausknecht?

25   A.      You know, I don't even remember.

70

```
 1                    Moore
 2   Q.      Were you referred to him by your
 3   attorney?
 4   A.      I don't even remember to tell you the
 5   truth.  I just heard that he was really good.
 6   Q.      Who did you hear that from?
 7   A.      I want to say somebody that got hurt
 8   in my business, but I'm not sure.
 9   Q.      You saw him approximately one month
10   after you were discharged from the hospital?
11                    MR. DIAMOND:  Month and a half.
12   A.      Month and a half.
13   Q.      What were your complaints at that
14   time?
15   A.      I think it was the first or second
16   visit that my girlfriend came with me,
17   because she was getting irritated that I was
18   having real problems with my short-term
19   memory.  I would keep asking her the same
20   things, and she said that we had already
21   discussed it and I had no recollection of
22   discussing it, and I would get severe
23   headaches, which I still get.  I get them
24   behind my eye and behind my right ear.
25   Q.      Behind your right eye and behind your
```

71

1                         Moore

2    right ear?

3    A.      Yes.

4    Q.      How frequently do you get the severe

5    headaches behind your right eye and right

6    ear?

7    A.      I would say everyday, especially when

8    I'm doing homework with my son.

9    Q.      Did Dr. Hausknecht perform any tests

10   on your first visit?

11   A.      He did several tests.  I'm not sure

12   what they're called.

13   Q.      Did he tell you the results of the

14   tests?

15   A.      I think he did, but I don't remember.

16   I don't mean to sound vague, but I don't.

17   Q.      As you sit here today you're unable to

18   tell us in substance what Dr. Hausknecht told

19   you the results of the tests were?

20   A.      Yeah.  I couldn't tell you in

21   substance.

22   Q.      How many times in total have you seen

23   Dr. Hausknecht?

24   A.      It's got to be 15 or 20.

25   Q.      When was the last time prior to today

72

1                        Moore

2    that you saw Dr. Hausknecht?

3    A.      July.

4    Q.      Before that, when was the last visit?

5    A.      June.

6    Q.      Do you see Dr. Hausknecht every month?

7    A.      Yes.

8    Q.      Do you try to see Dr. Hausknecht and

9    Dr. Touliopoulos on the same trip from your

10   home into the City?

11   A.      That would make sense, but I haven't

12   done it like that.

13   Q.      Do you have an appointment scheduled

14   with Dr. Hausknecht?

15   A.      No.

16   Q.      On your last visit to Dr. Hausknecht

17   in July of '06 what complaints, if any, did

18   you have with respect to the injuries that

19   you've sustained in this accident?

20   A.      That I was still getting headaches and

21   sometimes it affects my sleeping, that I get

22   really nervous.

23   Q.      Anything else?

24   A.      That I have been getting forgetful.

25   Q.      Is it fair to say that the complaints

73

Moore

2  that you've just listed for us have

3  essentially been the same complaints that

4  you've made to Dr. Hausknecht on each of your

5  15 to 20 visits to him?

6  A.      Sometimes the headaches are like more

7  intense than other times.

8  Q.      So, there would be times during these

9  15 to 20 visits when your complaints about

10  the headaches would be something that you

11  emphasized in your discussions with Dr.

12  Hausknecht, correct?

13  A.      Yeah.

14  Q.      But is it fair to say that you've

15  complained about the headaches on each of

16  your visits to him?

17  A.      Pretty much.

18  Q.      Have you also complained about getting

19  forgetful on each of your visits to him?

20  A.      Yes.

21  Q.      Have you complained about the effect

22  the accident has had on your sleeping on each

23  of your visits to him?

24  A.      Yes.

25  Q.      Have you complained about getting

74

Moore

1
2    really nervous on each of your visits to him?
3    A.      Probably not every visit.
4    Q.      On your last visit to Dr. Hausknecht
5    in July of 2006 what, if anything, did he
6    tell you about the headaches?
7    A.      That it was a result of hitting my
8    head, being unconscious.
9    Q.      Did he tell you that there was any
10   treatment that he could do that would help
11   alleviate the headaches?
12   A.      I don't remember.
13   Q.      What, if anything, did Dr. Hausknecht
14   tell you about your getting forgetful?
15   A.      That it could be from head trauma.
16   Q.      Did he tell you that it could be from
17   something else as well?
18   A.      No.  I think he just pretty much stays
19   for what I see him for, the head trauma.
20   Q.      Over the course of your 15 to 20
21   visits to Dr. Hausknecht from '04 when you
22   first saw him a month and a half after the
23   discharge from St. Vincent's right up through
24   to the present has your short-term memory
25   been about the same, gotten worse or gotten

75

1                            Moore

2   better?

3   A.      I think you have to ask somebody that

4   I deal with everyday, because I'm not sure.

5   I know it irritates my girlfriend.

6   Q.      Is the forgetfulness limited to

7   short-term memory or does it also apply to

8   long-term memory?

9   A.      I don't know.

10  Q.      Did Dr. Hausknecht ever prescribe any

11  medication for the headaches other than the

12  Vicodin?

13  A.      No.

14  Q.      Did Dr. Hausknecht ever prescribe any

15  treatment for the forgetfulness or the

16  headaches?

17  A.      Not that I remember.

18  Q.      Did Dr. Hausknecht perform any tests

19  on any of your visits in 2006?

20  A.      No, not this year.

21  Q.      Did Dr. Hausknecht perform any tests

22  on any of your visits in 2005?

23  A.      Yes.

24  Q.      When was the last time in 2005 that he

25  performed any tests?

76

1                           Moore

2    A.      I would say about over a year ago.

3    Q.      Sometime in 2005 before September?

4    A.      Yeah.

5    Q.      Can you describe the test that he did

6    at that time?

7    A.      He hooked up like these wires to my

8    head with some kind of gel.  I don't

9    remember.  I'm not trying to be vague, but I

10   don't really remember how the test

11   transpired.

12   Q.      You don't recall what, if anything, he

13   told you about the results; is that correct?

14   A.      No.

15   Q.      Have you been treated by anyone other

16   than at St. Vincent's, Dr. Touliopoulos and

17   Dr. Hausknecht as a result of the injuries

18   that you sustained in this accident?

19   A.      No.

20           MR. DIAMOND:  And the places for

21       testing.

22           MR. KOVNER:  Right.

23           (Brief recess taken.)

24   Q.      Have you ever gone for physical

25   therapy as a result of the injuries that you

77

1                         Moore

2    sustained?

3    A.      Yes.

4    Q.      When for the first time did you go for

5    physical therapy?

6    A.      About three weeks after the operation.

7    Q.      Where did you go?

8    A.      Pro-Care.

9    Q.      Where is Pro-Care located?

10   A.      Holmdel, New Jersey?

11   Q.      Had you been to Pro-Care at anytime

12   prior to September 16th of 2004?

13   A.      No.

14   Q.      How frequently did you go to Pro-Care?

15   A.      In the beginning like twice a week.

16   Q.      For how long approximately did you go

17   twice a week?

18   A.      A few months.

19   Q.      After a few months, did you continue

20   to go there but less frequently?

21   A.      I stopped after awhile.

22   Q.      Can you tell us approximately when you

23   stopped?

24   A.      After about three or four months, I

25   think.

78

                         Moore

1

2    Q.      At anytime after you stopped going for

3    physical therapy at Pro-Care did you get

4    physical therapy at any other place?

5    A.      I went to a chiropractor.

6    Q.      Who's the chiropractor?

7    A.      Dr. Sanford.

8    Q.      What's the complete name?

9    A.      I think Richard Sanford.

10   Q.      Where is Dr. Richard Sanford located?

11   A.      Middletown, New Jersey.

12   Q.      When did you see him for the first

13   time?

14   A.      Maybe three or four months after the

15   accident.

16   Q.      When did you start in with the

17   chiropractor, right after you stopped with

18   the physical therapy?

19   A.      Yes.  I asked my doctor if it would be

20   okay.

21   Q.      Who did you ask, Dr. Touliopoulos?

22   A.      Yes.

23   Q.      What did he say?

24   A.      He said yeah.

25   Q.      How frequently did you see the

79

1                            Moore

2    chiropractor?

3    A.       Twice a week.

4    Q.       When was the last time you saw the

5    chiropractor?

6    A.       Maybe a year ago.

7    Q.       Do you have any appointments scheduled

8    presently with a physical therapist or

9    chiropractor?

10   A.       No.  I was going to though because he

11   was helping to alleviate some of the pain in

12   my back.

13   Q.       The chiropractor was?

14   A.       Yes.

15   Q.       Did you get any relief from the

16   physical therapy?

17   A.       Yeah, it was helping.

18   Q.       Recently have you been looking around

19   for a new chiropractor to go to?

20   A.       No.  I'm thinking about going back to

21   him.

22   Q.       Going back to Dr. Sanford?

23            At anytime after your accident of

24   September 16th of 2004 were you taking Paxil?

25   A.       After the accident?

80

1                                  Moore

2    Q.      Yes.

3    A.      I was taking it for about a year.

4    Q.      Were you ever taking Paxil prior to

5    the accident?

6    A.      Yes.

7    Q.      When for the first time did you take

8    Paxil before the accident?

9    A.      Maybe a year before.

10   Q.      Who prescribed the Paxil?

11   A.      Dr. Gornish.

12   Q.      What condition did you complain to her

13   about that led her to prescribe Paxil?

14   A.      Anxiety.  That's about it.

15   Q.      Were you having trouble sleeping?

16   A.      A little bit.

17   Q.      How frequently did you have trouble

18   sleeping prior to the accident?

19   A.      Not too often.

20   Q.      Did you ever take Ambien prior to the

21   accident of September 16th of 2004?

22   A.      Yes.

23   Q.      When for the first time prior to the

24   accident did you take Ambien?

25   A.      I'm not sure.

81

```
 1                          Moore
 2    Q.      Who prescribed Ambien before the
 3    accident?
 4    A.      Dr. Gornish.
 5    Q.      How frequently did you take Paxil
 6    prior to the accident?
 7    A.      Daily.
 8    Q.      You took Paxil for approximately one
 9    year after the accident?
10    A.      Yes.
11    Q.      How frequently?
12    A.      Daily.
13    Q.      When was the last time prior to today
14    that you took Paxil?
15    A.      A little over a year ago.
16    Q.      Do you presently have a prescription
17    for any other medication for anxiety?
18    A.      Yes, Risperdal.
19    Q.      Was that prescribed by Dr. Gornish?
20    A.      No.
21    Q.      By whom?
22    A.      It was prescribed through this doctor,
23    through this psychologist that I started
24    seeing after the accident.
25    Q.      What is the psychologist's name?
```

82

1                           Moore

2  A.      Marie, and you know this sounds

3  outrageous, but I can't even remember her

4  last name.

5              MR. KOVNER:  Counsel, do you

6          have that information?

7              MR. DIAMOND:  I don't, other

8          than Marie.

9              MR. KOVNER:  I presume from your

10         answer that we also don't have

11         authorizations.  So, I'll request

12         those.

13             MR. DIAMOND:  It's a new

14         development.

15 REQUEST NOTED:

16 Q.      When approximately did the

17 psychologist prescribe Risperdal?

18 A.      Two months ago.

19 Q.      Was that your last appointment with

20 her or have you seen her since then?

21 A.      I have seen her like two or three

22 weeks ago.

23 Q.      Do you have an appointment scheduled

24 with her in the future?

25 A.      I can walk in on her unannounced any

83

1                          Moore

2    Wednesday or Friday.

3    Q.      Where is her office located?

4    A.      In Jersey Shore Medical in Neptune.

5    Q.      On your first visit to Marie what were

6    your complaints to her?

7    A.      Everything.  You know, being out of

8    work, not having enough money for bills.

9    Q.      Anything else?

10   A.      Just general stuff.

11   Q.      Well, can you tell us with any kind of

12   specificity any other complaint that you made

13   to Marie besides being out of work and not

14   having enough money to pay bills?

15   A.      Complaining about the kids being too

16   loud.

17   Q.      Anything else?

18   A.      That's about it.

19   Q.      Have you filled the prescription for

20   Risperdal?

21   A.      Yes.

22   Q.      How frequently, if at all, do you take

23   Risperdal?

24   A.      Twice a day.

25   Q.      Did you take any today before you came

84

                        Moore

1

2   here?

3   A.      No, I didn't.

4   Q.      Did you take two yesterday?

5   A.      Yes, two.  I took them last night.

6   Q.      What, if anything, did Marie tell you

7   about your condition?

8   A.      It's like a work in progress.  She

9   hasn't given me any definitive stuff yet.

10  Q.      How frequently did you take Ambien

11  prior to the accident?

12  A.      A couple of times a week.

13  Q.      Did you continue to take Ambien from

14  time to time after the accident?

15  A.      No.  I don't take it anymore.

16  Q.      Did you take it at anytime after the

17  accident?

18  A.      Yes.

19  Q.      When was the last time you took it?

20  A.      A couple of weeks ago.

21  Q.      Just before you stopped taking it a

22  couple of weeks ago how frequently did you

23  take the Ambien?

24  A.      I wasn't taking it at all.

25  Q.      Did you take Ambien at anytime in 2006

85

1                          Moore

2    before a couple of weeks ago?

3    A.      No.  I had stopped taking it for about

4    a year.

5    Q.      When you took it a couple of weeks

6    ago, was that part of an old prescription

7    which you had filled earlier or did you get a

8    new prescription?

9    A.      No.  I went and asked for a new

10   prescription.

11   Q.      From whom?

12   A.      Dr. Gornish.

13   Q.      As you sit here today do you have any

14   complaints of pain as a result of the

15   injuries that you sustained?

16   A.      My arm, my right arm, my right

17   shoulder, my lower back on my right side, my

18   neck, my head, my left knee today, my right

19   knee yesterday.

20   Q.      Anything else?

21   A.      That's it.

22   Q.      As a result of the injuries that you

23   sustained are there any activities which you

24   used to engage in, but which you're no longer

25   able to?

86

1                      Moore

2   A.      Sports, playing catch with my son.  I

3   really got into weightlifting when I got

4   straight 20 years ago.  I haven't been really

5   able to do that anymore.

6   Q.      Anything else?

7   A.      Ironworking, which is all I really

8   know how to do.

9   Q.      I'm not talking for the moment about

10  being able to work, but rather any non-work

11  activities.

12          Are there any other non-work

13  activities which you used to engage in, but

14  claim that you can no longer do as a result

15  of the injuries that you sustained?

16  A.      Wrestling around on the floor with the

17  kids.  You know?

18  Q.      Anything else?

19  A.      Yard work.  We like to plant flowers

20  and stuff.

21  Q.      Anything else?

22  A.      Swimming.

23  Q.      Anything else?

24  A.      No.

25  Q.      Did you play on any team sports in

87

1                          Moore

2    high school?

3    A.        Yeah.

4    Q.        What sports did you play?

5    A.        I played baseball, basketball.  I

6    played hockey.  I was on the swimming team in

7    the Boys Club in Manhattan.  I grew up in

8    Manhattan.  I did some boxing.

9    Q.        Did you ever hurt your knee playing

10   any sports in school?

11   A.        No.  I never had any serious injuries.

12   Q.        In 2004 just before September 16th

13   what sports did you engage in that you no

14   longer can do?

15   A.        Weightlifting, basketball, punch the

16   bag everyday, play baseball, football with my

17   sons.

18   Q.        Did you belong to a gym in September

19   of '04?

20   A.        Yes.

21   Q.        What's the name of the gym?

22   A.        It's no longer there.  It was called

23   the Study Hall Gym.

24   Q.        Where was it located?

25   A.        Keansburg, New Jersey.

88

1                      Moore

2    Q.      When did it go out of business?

3    A.      About a year and a half ago.

4    Q.      I take it you're not a member of a gym

5    today?

6    A.      Well, I go to one for therapy reasons.

7    Q.      What gym do you go to today?

8    A.      Gold's.

9    Q.      What's the address of the branch?

10   A.      It's in Middletown, New Jersey, but

11   I'm not really like -- if showing up counts

12   as membership, I'm really not a member.

13   Q.      How frequently do you go to Gold's?

14   A.      Once every few weeks.

15   Q.      What do you do when you're there?

16   A.      Socialize.

17   Q.      Do you ever try to lift weights?

18   A.      I can't.

19   Q.      Do you ever do push-ups, things like

20   that?

21   A.      I can't even do one push-up anymore.

22   Q.      Have you ever been able to do any

23   push-ups at anytime since the accident?

24   A.      No, not since the accident.  I used to

25   do 50 at a clip even when I was 49.

89

1                        Moore

2    Q.      How frequently did you play basketball

3    prior to the accident?

4    A.      Once a week.

5    Q.      Have you ever tried since the

6    accident?

7    A.      No.  I'm right-handed.  I can't shoot.

8    Q.      How frequently did you play baseball

9    prior to the accident?

10   A.      I hadn't played baseball in years.

11   Q.      You used to just fool around with your

12   sons?

13   A.      Yes.  Play catch in the backyard.  He

14   played on little league teams.

15   Q.      Have you tried to do that since your

16   accident?

17   A.      No.  I can't throw overhand.

18   Q.      How frequently did you use to do yard

19   work prior to the accident?

20   A.      A couple of times a week.

21   Q.      Have you been able to do it at all

22   since?

23   A.      No.  I'm pretty much useless.

24             MR. KOVNER:  Thank you, Mr.

25        Moore.  I have no further questions.

90

1                          Moore

2           I refer to my colleagues.

3    EXAMINATION BY

4    MR. MC DERMOTT:

5    Q.      My name is Matt McDermott.  I

6    represent Kel Tech Construction.  I have a

7    few questions for you.

8           Have you ever heard of Kel Tech

9    Construction?

10   A.      Is that with a C?

11   Q.      With a K.

12   A.      No.

13   Q.      Sir, at the time of your accident were

14   you wearing a hard hat?

15   A.      Yes.

16   Q.      Who provided it to you?

17   A.      I have my own.

18   Q.      Could you describe for me the basic

19   layout of the area of the building where you

20   were when your accident happened?  I

21   understand you were on a concrete deck and

22   there was an elevator shaft somewhere in the

23   vicinity, but to the best of your ability can

24   you give me a general description of the

25   layout of the area?

91

| 1 | | Moore |
|---|---|---|
| 2 | A. | I really can't. |
| 3 | Q. | Was it an open construction floor? |
| 4 | A. | Yeah. |

5    Q.      Did it have a roof on it or was it
6    open to the air?

7    A.      It was open to the air.

8    Q.      The beam that you were working with at
9    the time you had your accident, was that beam
10    to serve as a vertical column on the deck or
11    was it to serve as a support for the next
12    level of the building or something else?
13    What was that beam going to be?

14    A.      I think it was a support for the -- I
15    think other beams were going to come off of
16    it.

17    Q.      The beam that you were working with
18    when your accident happened, was it to be
19    installed horizontally or vertically?

20    A.      Horizontally.

21    Q.      When it was installed horizontally,
22    was it going to be at the level of the
23    concrete deck that you were standing at?

24    A.      No.

25    Q.      Higher than that?

92

1                            Moore

2      A.       Higher than that.

3      Q.       Was that to be the next horizontal

4      level of the building?

5      A.       I would think so, yeah.

6      Q.       The beam that you were working with,

7      was that going to be attached to other pieces

8      of steel or was it going to be set in a

9      pocket in a masonry wall or a combination of

10     that or something else?

11     A.       I think maybe a combination.

12     Q.       Was one end of it going to go into a

13     pocket in a masonry wall?

14     A.       Possibly.  I can't be specific.

15     Q.       The opening to the elevator shaft at

16     the level where you were, what were the

17     dimensions of that opening?

18     A.       Maybe three or four feet.

19     Q.       Three or four feet wide?

20     A.       Yes.

21     Q.       How far up did the shaft extend beyond

22     the level that you were standing on?  Was it

23     an entire open doorway or only a portion?

24     A.       It was an open doorway, but it had

25     walls next to it.

93

```
 1                      Moore
 2    Q.      There were walls that extended all the
 3    way up on both sides of the doorway?
 4    A.      Yes.
 5    Q.      Was there anything guarding or
 6    protecting the open doorway to the elevator
 7    shaft on the day of your accident?
 8    A.      No.
 9    Q.      Are you familiar with the name of a
10    gentleman named Robert Corridor or Corredon?
11                MR. DIAMOND:  Spell that for me.
12                MR. MC DERMOTT:
13                C-O-R-R-E-D-O-N.
14    Q.      I'll represent to you and your counsel
15    that that man is listed as a potential
16    witness to your accident according to this
17    accident report.  He's from New Rochelle, and
18    his name is Robert Corredon or Corridor.
19                MR. DIAMOND:  Note my objection
20                to some document that is not
21                identified in the record and we
22                haven't established that this witness
23                ever saw it and knows what it is, but
24                you have the question and he answered
25                it.  He doesn't know.
```

94

1          Moore

2          Just so we know what you're

3     referencing, which document are you

4     referring to?  Is that the Skanska

5     report?

6          MR. MC DERMOTT:  Yes.

7   Q.     Sir, as a member of Local 40 at the

8   time of your accident what was your hourly

9   wage?

10  A.     It's got to be $50 an hour.

11  Q.     Aside from the hourly wage, what other

12  benefits were you entitled to or did you

13  receive as a union ironworker?

14  A.     Pension, hospitalization, medical,

15  dental, vacation.

16  Q.     Is there an annuity?

17  A.     Annuity.

18  Q.     Anything else that you can think of as

19  you sit here right now?

20  A.     No.

21  Q.     Each of those benefits that were

22  included as part of your compensation, did

23  the employer make contributions to each of

24  those categories per hour?

25  A.     Yes.

95

1                      Moore

2    Q.     Do you know what the dollar figures

3    per hour were for each of those things that

4    you just listed?

5    A.     I know that I should, but I don't.

6           MR. DIAMOND:  Off the record.

7           (Discussion held off the

8    record.)

9    A.     And the topping out fund.

10    Q.     Sir, have you ever heard of something

11    called a forced furlough program?

12    A.     No.

13    Q.     In the ten years before the accident

14    happened was there ever an occasion where the

15    union indicated that we're going to have to

16    lay you off for a period of time to give some

17    other union member an opportunity to work?

18    A.     No.

19    Q.     In the five years before your accident

20    happened did the union provide you with a

21    work opportunity if you wanted one?  Did you

22    work full-time?

23    A.     If it was available, yeah.

24    Q.     Were there any periods when there was

25    no work for you from the union hall in the

96

Moore

1
2     five years prior to the accident?

3     A.      Sometimes.

4     Q.      What was the longest period that there

5     was no work for you?

6     A.      A couple of weeks.

7     Q.      Were there periods each year where

8     there was no work or was it less frequent

9     than yearly that there would be periods of no

10    work for you?

11    A.      It was less frequent as I became more

12    established.

13    Q.      Is there an attorney who is

14    representing you in your Workers'

15    Compensation claim?

16    A.      I think so.

17    Q.      Is it someone at Sacks & Sacks or is

18    it a different law firm?

19    A.      No.  I think it's Pulsky & -- I'm not

20    sure of the other member of the firm.

21    Q.      Aside from the $400 a week in

22    indemnity benefits that you receive from the

23    State Insurance Fund, your Workers'

24    Compensation benefits, do you have any other

25    source of income right now?

97

1                          Moore

2    A.      No.

3    Q.      Do you receive any benefits from the

4    union?

5    A.      The first six months I received $150 a

6    week.   Then after six months that ends.

7    Q.      Have you applied for disability

8    benefits from the Social Security

9    Administration?

10   A.      Yes.

11   Q.      Did you receive a response to your

12   application?

13   A.      I was turned down once.

14   Q.      Did an attorney assist you in the

15   preparation of your application?

16   A.      Yes, Binder & Binder.

17   Q.      When were you denied benefits from

18   Social Security?

19   A.      About seven months ago.

20   Q.      Are you pursuing an appeal of that

21   decision?

22   A.      Yes.

23   Q.      Is Binder & Binder helping you with

24   that?

25   A.      Yes.

98

Moore

1

2    Q.      Have you ever spoken to anyone at the

3    scene of the accident about how your accident

4    occurred, aside from your attorneys

5    obviously?

6    A.      Not really.

7    Q.      Has anyone ever indicated to you why

8    the concrete at the threshold of the elevator

9    shaft crumbled?

10   A.      No.

11   Q.      Aside from the potential surgery to

12   your right shoulder, have any of your

13   physicians recommended any other surgical

14   procedures to any other part of your body?

15   A.      Not yet.

16           MR. MC DERMOTT:  I don't have

17           any further questions.  Thank you for

18           your time.

19   EXAMINATION BY

20   MR. VERAS:

21   Q.      Good afternoon.  I represent Arena

22   Construction.  I'll try to be very brief and

23   not repeat any of the questions that you were

24   asked this morning.  I'll ask for your

25   patience.

99

```
 1                    Moore
 2         Going back to the job site at the
 3    Staten Island Ferry Terminal project.  You
 4    were there approximately four days?
 5    A.      Yes.
 6    Q.      During your involvement over the
 7    course of the four days at the job site did
 8    you ever become aware of a company called
 9    Arena Construction Company at the job site?
10    A.      I can't say I have.
11    Q.      Do you know if there was a general
12    contractor during the four days at the job
13    site?
14    A.      I thought Skanska was.
15    Q.      During those four days while at the
16    job site did you ever see any Skanska
17    employees in or about the area where you were
18    working or the areas that you were working?
19    A.      I don't really recall.
20    Q.      Going back to the date of your
21    accident.  Approximately what time did you
22    start work that day?
23    A.      7:00 we start.
24    Q.      Do you recall what time of day the
25    accident occurred?
```

100

1                          Moore

2    A.      Sometime in the morning.

3    Q.      When you say sometime in the morning,

4    had you been on the job site an hour, a

5    couple of hours or something else?

6    A.      I think a couple of hours.

7    Q.      During those couple of hours did you

8    observe any Skanska employees in or about the

9    area where your accident eventually occurred?

10   A.      I don't remember to tell you the

11   truth.

12   Q.      Do you recall just in general seeing

13   Skanska employees at the job site over the

14   four days?

15   A.      Laborers.  They were some of the

16   Skanska employees.

17   Q.      How did you know they were Skanska

18   laborers?

19   A.      I think some of them had hard hats on

20   them.

21   Q.      Which said Skanska on them?

22   A.      Yes.

23   Q.      Other than the laborers, did you ever

24   see any other Skanska employees with hard

25   hats or shirts or anything that indicated

101

```
 1                    Moore
 2    that they worked with Skanska?
 3    A.      No, not that I know of.
 4    Q.      Now, you brought your own hard hat to
 5    the job?
 6    A.      Yes.
 7    Q.      With regard to the four days that you
 8    were there did McNulty have any type of a
 9    shanty or trailer at this job site?
10    A.      It was like a trailer.  A tool shed
11    really.
12    Q.      In general what was housed in the tool
13    shed?
14    A.      Tools.
15    Q.      Were there any types of safety
16    devices; eye protection, fall protection,
17    maintained in the tool area?
18    A.      I never seen any.
19    Q.      Did you ever inquire while you were
20    there over those four days whether or not
21    McNulty had any type of fall protection at
22    this job site?
23    A.      I didn't ask.
24    Q.      After your accident occurred, you
25    indicated that there was a point in time when
```

102

1              Moore

2    you came to and you were treated by an EMT,

3    correct?

4    A.        Yes.

5    Q.        Mike was also present at the bottom of

6    the shaft?

7    A.        Yes.

8    Q.        Do you know how Mike was physically

9    able to get down to the bottom of the shaft?

10   A.        No.

11   Q.        After you regained consciousness,

12   there was a time when you were removed from

13   the shaft?

14   A.        Yes.

15   Q.        Do you recall how you were removed

16   from the shaft?

17   A.        No.

18   Q.        Who removed you from the bottom of the

19   shaft?

20   A.        Paramedic.

21   Q.        Was it more than one?

22   A.        Yes.

23   Q.        You don't recall the mechanism of how

24   they removed you from the bottom of the

25   shaft?

103

1                          Moore

2    A.      No.

3    Q.      During the time that you've treated

4    with Dr. Touliopoulos did he ever recommend

5    you or refer you to see a Dr. Caliguiri?

6              MR. DIAMOND:  Spell that for the

7              record.

8              MR. VERAS:  Sure.

9              C-A-L-I-G-U-I-R-I.

10   A.      No.

11   Q.      Did Dr. Touliopoulos refer you to any

12   doctors during the course of time that you've

13   treated with him?

14   A.      A podiatrist.

15   Q.      Do you recall the name of the

16   podiatrist that he referred you to?

17   A.      Ivan Herstick.

18   Q.      Why did Dr. Touliopoulos refer you to

19   a podiatrist?

20   A.      I was starting to have problems with

21   my right leg and there was intense pain in my

22   right foot, which I still have.

23   Q.      Did you see the podiatrist?

24   A.      Yes.

25   Q.      When did you first see the podiatrist?

104

1                              Moore

2    A.        About four or five months ago.

3    Q.        On how many occasions did you see the

4    podiatrist?

5    A.        About six.

6    Q.        What type of treatment did the

7    podiatrist provide?

8    A.        Cortisone shots.

9    Q.        Did the podiatrist send you for any

10   type of diagnostic tests, such as MRIs,

11   x-rays?

12   A.        Yes.  That was what was baffling them.

13   They did two MRIs of my right foot.

14   Q.        Where were those MRIs done?

15   A.        In his office.

16   Q.        In the podiatrist's office?

17   A.        Yes.

18   Q.        Where was the podiatrist's office?

19   A.        In St. Vincent's Hospital on 12th

20   Street and Seventh Avenue.

21   Q.        Did the podiatrist discuss the results

22   of the MRIs to your foot?

23   A.        They were negative.

24   Q.        Did the podiatrist provide any other

25   treatment other than the cortisone shots?

105

```
 1                        Moore
 2   A.      An anti-inflammatory.
 3   Q.      Do you recall the name of it?
 4   A.      No.
 5   Q.      That was an oral medication that you
 6   took?
 7   A.      Yes.
 8   Q.      Do you still take it?
 9   A.      Yes.
10   Q.      How often do you take it?
11   A.      Every night, once a night.
12   Q.      Do you have any appointments scheduled
13   to see the podiatrist presently?
14   A.      No.
15   Q.      With regard to the anti-inflammatory
16   that you presently take that was prescribed
17   by the podiatrist, do you have any refill
18   prescriptions presently on that medication?
19   A.      No.
20   Q.      Other than the podiatrist, did Dr.
21   Touliopoulos send you or recommend you to see
22   any other doctors or health care
23   professionals?
24   A.      Initially there was a hand specialist,
25   because I was having a problem with my right
```

106

1                        Moore

2    hand, but I can't remember the doctor's name.

3    I never went to see the doctor.

4    Q.      Other than the podiatrist and the

5    recommendation of the hand specialist, did he

6    recommend that you see anyone else?

7    A.      No.

8    Q.      During the course of time that you

9    treated with Dr. Hausknecht did he ever send

10   you for any type of an MRI?

11   A.      I'm not sure.

12   Q.      After you began treatment with Dr.

13   Hausknecht, do you recall whether or not,

14   regardless of whether he sent you or someone

15   else, you had an MRI taken of your neck?

16   A.      I'm not sure.

17   Q.      Do you recall if you had an MRI taken

18   of your head after you started seeing Dr.

19   Hausknecht?

20   A.      I think I did.

21   Q.      Do you recall where that MRI was

22   taken?

23   A.      I think it was at Middletown Imaging.

24   Q.      Did anyone, including Dr. Hausknecht,

25   ever discuss the results of the MRI of your

107

```
 1                    Moore
 2    head?
 3    A.      If he did, I don't remember.
 4    Q.      Other than Dr. Hausknecht, do you
 5    recall discussing the results of those MRIs
 6    with anyone else?
 7    A.      No.
 8    Q.      With regard to your occupation as an
 9    ironworker did you have a union title, such
10    as journeyman?
11    A.      Yes.
12    Q.      Were you a journeyman ironworker on
13    the day of the accident?
14    A.      Yes.
15    Q.      At anytime prior to the date of the
16    accident had you ever worked as a foreman on
17    any job?
18    A.      No.
19                    (Continued on next page.)
20
21
22
23
24
25
```

108

1           Moore

2    Q.    With regard to your local and with

3    regard to pay scale were foremen paid more

4    than journeymen in terms of hourly rates?

5    A.    Yes.

6           MR. VERAS:  I have nothing

7           further.

8           (Time noted:  1:20 p.m.)

9

10

11           ---------------------------

12           JOHN MOORE

13

14

15    Subscribed and sworn to before me

16    this    day of        2006.

17

18    ---------------------------------

19        Notary Public

20

21

22

23

24

25

109

```
 1
 2                           INDEX
 3   WITNESS           EXAMINATION BY              PAGE
 4   JOHN MOORE            MR. KOVNER                 4
 5                         MR. MC DERMOTT            90
 6                         MR. VERAS                 98
 7
 8              INFORMATION/DOCUMENTS REQUESTED
 9   PAGE                 DESCRIPTION
10   10                   Production of an authorization
                          for A-Team or whatever the
11                        precise name for that clinic is
                          called
12
     10                   Production of an authorization
13                        for Dr. Gornish's records
14   17                   Production of Bob's last name,
                          who was one of the gentleman in
15                        the crew that Plaintiff was
                          working with on the day of his
16                        accident
17   65                   Production of an authorization
                          for Middletown Imaging
18
     82                   Production of an authorization
19                        for the psychologist named
                          Marie who treated the Plaintiff
20
21
22
23
24
25
```

110

1

2                    C E R T I F I C A T E

3          I, CAROLYN PALADINO, hereby certify

4     that the Examination Before Trial of JOHN

5     MOORE was held before me on the 15th day of

6     September, 2006; that said witness was duly

7     sworn before the commencement of his

8     testimony; that the testimony was taken

9     stenographically by myself and then

10    transcribed by myself; that the party was

11    represented by counsel as appears herein;

12          That the within transcript is a true

13    record of the Examination Before Trial of

14    said witness;

15          That I am not connected by blood or

16    marriage with any of the parties; that I am

17    not interested directly or indirectly in the

18    outcome of this matter; that I am not in the

19    employ of any of the counsel.

20          IN WITNESS WHEREOF, I have hereunto set

21    my hand this 19th of Sept           2006.

22

23    _____

24                    CAROLYN PALADINO

25

111

ERRATA_SHEET

PAGE/LINE                    CORRECTION

———————                    ———————

—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————
—————————    ———————————————————————————

## A

**ability** 90:23
**able** 85:25 86:5,10 88:22 89:21 102:9
**about** 8:21,23 10:18,20 12:4,11 16:3
  37:10 47:3,5 53:7 59:7 61:23 66:3
  66:15,18 67:2,21 69:3,16 73:9,15,18
  73:21,25 74:6,14,25 76:2,13 77:6,24
  79:20 80:3,13,14 83:15,18 84:7 85:3
  86:9 88:3 97:19 98:3 99:17 100:8
  104:2,5
**above** 26:5 28:17 29:10,14,20,24
  31:24 32:2
**abuse** 11:24 12:3
**abusing** 14:4
**accident** 4:21 6:25 7:2,23 13:22 15:6
  15:12 16:3,4,24 17:4 18:5,10,15,19
  19:8,16 20:10,16 21:3 22:14 24:8,12
  24:16 25:6,19 26:16 27:17 37:15
  38:4,12,13 40:10 43:22 44:23 46:9
  47:9 48:24 49:13,24 50:6 57:14
  58:19 65:13 72:19 73:22 76:18
  78:15 79:23,25 80:5,8,18,21,24 81:3
  81:6,9,24 84:11,14,17 88:23,24 89:3
  89:6,9,16,19 90:13,20 91:9,18 93:7
  93:16,17 94:8 95:13,19 96:2 98:3,3
  99:21,25 100:9 101:24 107:13,16
  109:16
**accidents** 37:25 38:5,9
**accompany** 39:21
**according** 93:16
**action** 3:12
**activities** 85:23 86:11,13
**actually** 18:11
**addition** 3:9
**address** 4:12 88:9
**Administration** 97:9
**admitted** 39:2
**adopt** 27:13
**advisement** 10:6
**affected** 15:22
**affects** 8:2 72:21
**afford** 48:20,23
**after** 13:7 14:14 41:19 50:3 52:18
  56:21 57:16 59:6,11 69:16 70:10
  74:22 77:6,19,21,24 78:2,14,17
  79:23,25 81:9,24 84:14,16 97:6
  101:24 102:11 106:12,18
**afternoon** 98:21
**again** 57:12,17 66:16
**against** 1:4,12
**age** 43:19
**ages** 44:21,22
**ago** 10:18 12:4 43:8,11 47:3,5 54:6
  63:9 76:2 79:6 81:15 82:18,22 84:20
  84:22 85:2,6 86:4 88:3 97:19 104:2
**agreed** 3:3,13,22 43:2
**agreement** 42:24
**air** 33:19,23,25 91:6,7
**alimony** 45:20
**alleviate** 74:11 79:11

**along** 35:14
**already** 70:20
**Ambien** 80:20,24 81:2 84:10,13,23,25
**ambulance** 39:12
**ANDREW** 2:6
**ankle** 52:24
**ankles** 37:23 38:10
**annuity** 94:16,17
**another** 20:18 59:8 66:22
**answer** 5:3 19:6,24 20:3 22:8 32:10
  46:5 50:18 82:10
**answered** 22:7 93:24
**anti-inflammatory** 105:2,15
**anxiety** 80:14 81:17
**anxious** 50:14
**anymore** 84:15 86:5 88:21
**anyone** 9:4 18:17 19:9,15 21:21,25
  35:10 76:15 98:2,7 106:6,24 107:6
**anything** 5:5 8:12 10:19 11:14 36:6,8
  42:20 50:16 61:20,22 66:2,14,25
  67:21 68:24 69:3 72:23 74:5,13
  76:12 83:9,17 84:6 85:20 86:6,18,21
  86:23 93:5 94:18 100:25
**anytime** 7:13,15 13:6,9 18:15,19
  24:16 25:18 37:13 47:25 58:5,15
  59:11,25 77:11 78:2 79:23 84:16,25
  88:23 107:15
**appeal** 97:20
**appears** 110:11
**application** 97:12,15
**applied** 69:13 97:7
**apply** 75:7
**appointment** 10:22 60:12 61:9 66:20
  72:13 82:19,23
**appointments** 61:5 68:13 79:7 105:12
**approval** 63:5 66:9,12
**approved** 63:3 66:11,22,24 67:11,14
  69:10
**approximately** 7:8 11:2,6 35:3 37:6
  43:5 44:12 46:19 52:13,18 70:9
  77:16,22 81:8 82:16 99:4,21
**area** 37:14 90:19,25 99:17 100:9
  101:17
**areas** 99:18
**arena** 1:13 2:21 98:21 99:9
**arising** 4:20
**arm** 36:12,13,14 37:22 40:25 41:6,20
  52:23 53:2,9,11,16 54:18 56:13
  85:16,16
**arms** 38:2 53:3,7
**around** 25:4 31:22 32:8,24 34:4 79:18
  86:16 89:11
**arrived** 39:14
**aside** 94:11 96:21 98:4,11
**asked** 22:7 56:15 78:19 85:9 98:24
**asking** 7:11 23:15 50:17 53:7 70:19
**assist** 97:14
**assisting** 16:13
**Associates** 63:19,24
**attached** 92:7

**attend** 5:19 48:16,19,22
**attended** 14:19
**attorney** 70:3 96:13 97:14
**attorneys** 2:3,8,15,20 3:4 98:4
**authorization** 9:24 10:14 109:10,12
  109:17,18
**authorizations** 65:22 82:11
**available** 95:23
**Avenue** 2:11,16 52:4 104:20
**award** 45:25
**aware** 99:8
**awhile** 77:21
**A-Team** 9:9,25 109:10
**A.J** 6:19
**a.m** 1:19

## B

**back** 4:21 20:4,7 25:12,14 32:12,13,16
  32:22 34:3 37:23 38:10 52:23 55:12
  55:14,15 61:19 62:9,10 64:6 67:22
  67:24 68:6 79:12,20,22 85:17 99:2
  99:20
**backwards** 33:15,17,21
**backyard** 89:13
**baffling** 104:12
**bag** 87:16
**bar** 3:11
**Barberville** 6:2
**barney** 1:6,10 2:10 4:18 18:21,25
  19:10,15
**BARRISTER** 1:21
**baseball** 87:5,16 89:8,10
**based** 49:10
**basic** 90:18
**basically** 36:4
**basketball** 87:5,15 89:2
**Bauers** 51:12,14,18
**beam** 26:8,17,18,20,22,25 27:6,18,22
  27:25 28:10 29:2,22 30:12,13,14,16
  30:20,24,25 31:6,7,12,16,18,19 32:5
  33:14 91:8,9,13,17 92:6
**beams** 16:5,13,15 24:6,20 91:15
**became** 96:11
**become** 6:10 42:18 99:8
**before** 1:15,20 3:15,16 4:3 6:25 7:12
  7:22 16:2 18:5,10,15,19 19:16 20:16
  21:3,6,12,15 23:21 24:8,11,14 25:19
  26:15 27:17 32:15,20 34:22 43:10
  49:5,13 50:12,17 54:5,10 72:4 76:3
  80:8,9 81:2 83:25 84:21 85:2 87:12
  95:13,19 108:15 110:4,5,7,13
**began** 7:22 18:11 21:15 106:12
**beginning** 77:15
**begun** 3:17 45:6
**behind** 31:23 70:24,24,25,25 71:5
**being** 3:15 9:3 13:7 14:14 22:24 30:6
  52:19 74:8 83:7,13,15 86:10
**believe** 9:24 49:13 64:11,13
**belong** 87:18
**below** 33:7

benefit 16:8
benefits 94:12,21 96:22,24 97:3,8,17
besides 83:13
best 15:16 90:23
better 75:2
between 3:4 30:16
beyond 92:21
bills 83:8,14
Binder 97:16,16,23,23
birth 5:9
bit 80:16
bleeding 36:10
block 24:25,25 31:21 32:8,24 34:4,12
   34:14
blood 110:15
board 38:16,19
Bob 17:8 27:24 30:8 31:15,17 35:19
Bobby 51:11,14,18
Bob's 17:11 109:14
body 36:11 37:20 38:14 58:22 98:14
bolt 27:3 28:11 30:17 31:12
borough 52:5
both 31:13 32:14 46:12 50:20 53:2
   54:16 55:17,20 62:2,5,7 93:3
bottom 35:7 102:5,9,18,24
boxing 87:8
Boys 87:7
branch 88:9
brief 32:21 76:23 98:22
bringing 16:6
Broadway 1:18,22 2:4,22
broken 41:3,5
brought 101:4
building 22:21 29:18 30:5 90:19 91:12
   92:4
built 22:24
business 70:8 88:2

───────────────────
C
───────────────────

C 2:2 90:10 110:2,2
Caliguiri 103:5
call 12:20
called 71:12 87:22 95:11 99:8 109:11
came 34:23 41:19 42:11 70:16 83:25
   102:2
care 40:20 105:22
career 7:14,16
CAROLYN 110:3,24
cast 41:20,23 42:2,2,3 54:19,22 56:21
Catapano 42:13 43:6,10,24 45:3,16
   46:13 48:2,25
Catapano's 45:10 46:11 47:20
Catarina 44:25 46:25 47:14,23 48:4
catch 86:2 89:13
categories 94:24
center 9:12,14 12:21,22 39:18,25 40:6
   40:17,23
ceremony 42:20
certify 110:3
child 43:16 45:16,25

children 44:18,20 45:10 46:8,11,23
child's 43:19
chiropractor 78:5,6,17 79:2,5,9,13,19
choose 27:12
cinder 24:24,25 31:21 32:8,24 34:4,12
   34:14
city 1:5,6,9,9 2:9,9 4:17,18 63:25
   69:22 72:10
claim 46:6 86:14 96:15
CLERKIN 2:19
clinic 9:5,8,18,20 10:2 14:19 109:11
clip 88:25
close 27:21
Club 87:7
CO 1:6,10,13 2:10,21
cold 11:14
colleagues 90:2
college 5:21,23,24 47:22 48:3,17,19
   48:23 49:2,15,19
column 91:10
columns 16:5
combination 92:9,11
come 14:14 32:6 36:21 91:15
commencement 110:7
company 18:21,22 46:18 99:8,9
compensation 63:4,8,11 66:10,23
   67:12,14 69:11 94:22 96:15,24
complain 61:23,24 68:11 80:12
complained 73:15,18,21,25
Complaining 83:15
complaint 83:12
complaints 52:20 61:16 70:13 72:17
   72:25 73:3,9 83:6 85:14
complete 78:8
completed 5:17
complicated 29:19 44:14
concerned 66:17
concrete 24:25 28:21,22 29:8,9,25
   30:3,4,5,8 32:7,11 33:15 90:21
   91:23 98:8
condition 10:20 14:21 66:18 80:12
   84:7
connected 110:15
connecting 24:6
connection 4:19 15:12 19:2 28:3
Connections 28:2
conscious 39:11,14
consciousness 34:25 35:4,6,11,15 36:2
   37:21 102:11
considered 63:17
constant 53:10 55:8
constructed 30:6
construction 1:6,7,10,13 2:10,15,21
   4:19 18:22,25 23:12 24:3 90:6,9
   91:3 98:22 99:9
consulted 60:9
continue 77:19 84:13
Continued 107:19
continuous 7:12
continuously 6:14

contractor 99:12
contradictory 68:5
contribute 48:3 49:2,19
contributions 94:23
controlled 3:21
conversation 36:3
convicted 5:13
corp 1:5,9 2:9 4:17
correct 6:4 13:22 15:19 16:19 26:15
   26:21 39:5 40:10 52:9 53:25 57:3
   73:12 76:13 102:3
CORRECTION 111:2
Corredon 93:10,18
Corridor 93:10,18
cortisone 104:8,25
counsel 3:19 9:23 15:14 37:17 82:5
   93:14 110:11,19
counsel's 17:15
counts 88:11
COUNTY 1:1
couple 18:23 61:7 62:24 64:9,24 65:11
   65:14 84:12,20,22 85:2,5 89:20 96:6
   100:5,6,7
course 54:9 74:20 99:7 103:12 106:8
court 1:1 5:4
covered 25:10
co-workers 26:16 27:3,20 28:8 30:10
   30:17 31:11 35:13
crane 16:12 26:24,25
crashed 23:3
crew 16:19,21,22,23 17:3,19 109:15
crime 5:14
Crisis 9:12
crumble 33:12,13,16
crumbled 33:16 98:9
crumbling 33:3
currently 8:7
C-A-L-I-G-U-I-R-I 103:9
C-O-R-R-E-D-O-N 93:13
C.P.L.R 3:5,20

───────────────────
D
───────────────────

Daily 81:7,12
date 5:9 6:25 16:4 18:5 20:13 38:4
   61:10 99:20 107:15
dates 7:17
day 7:3,3,4 11:18,20,22 16:4,24 17:3
   17:25 18:10,15 19:8 20:10,19 21:6
   21:21 24:11,12,14 25:5,5,8 40:19,25
   41:11 54:5,9 56:20 83:24 93:7 99:22
   99:24 107:13 108:16 109:15 110:5
days 6:24,24 7:13 13:5 18:5,8 20:15
   20:21,25 21:3 22:4 42:6 54:6 99:4,7
   99:12,15 100:14 101:7,20
day-to-day 18:9
dead 57:8 62:19,20
deal 75:4
dealing 9:6 60:7
decided 48:20 49:22
decision 97:21

deck 90:21 91:10,23
decree 47:22
deemed 3:19
Defendant 1:14 2:15,21
defendants 1:8,16 2:8 4:16
definitive 84:9
delve 46:6
denied 97:17
dental 94:15
department 1:6,9 2:9 4:18
depending 11:11
DERMOTT 2:18 41:6 90:4 93:12
    94:6 98:16 109:5
describe 30:19 55:4,12 76:5 90:18
description 90:24 109:9
designed 23:11
detail 54:14
determine 20:18
development 1:5,9 2:9 4:17 82:14
devices 101:16
diagnosed 8:22
diagnosis 12:7
diagnostic 63:18,23 104:10
DIAMOND 2:6 7:11 10:4 13:14 14:11
    19:5,12,17 20:2 22:6 23:7,14 25:11
    26:11 27:4,15 29:5,12 30:19 31:2
    32:3,9,19 33:11 34:8,11 37:19 43:7
    46:3 49:3,7 51:20 56:17,22 60:17
    64:11 68:9,23 70:11 76:20 82:7,13
    93:11,19 95:6 103:6
different 67:15 96:18
dimensions 92:17
directly 110:17
dirty 15:3
disability 97:7
discharge 74:23
discharged 42:7 50:3 52:19 57:11,16
    70:10
discuss 48:2 49:18 68:15 104:21
    106:25
discussed 48:25 68:7 70:21
discussing 70:22 107:5
Discussion 31:3 41:14 51:24 56:24
    64:18 67:18 95:7
discussions 73:11
distance 36:15
divorce 47:22
divorced 43:9,14,25 44:3,6,8
doctor 9:6 40:20 41:16 63:6 78:19
    81:22 106:3
doctors 103:12 105:22
doctor's 106:2
document 93:20 94:3
doing 10:21 15:19,25 18:7 19:3 24:10
    24:14 27:9,16 29:6 71:8
dollar 95:2
done 63:22 72:12 104:14
door 25:24
doorway 92:23,24 93:3,6
down 5:5 33:7,19,21 38:20 40:13 41:5

50:20 62:13 97:13 102:9
Dr 8:16,19 9:4,21 10:10,13,17,19,23
    11:5,16 13:12,19 14:9,18 50:9,11,22
    51:2,6,8,14 52:2,7,15,17 53:22
    54:13,20 55:3,13 56:15 59:17 60:15
    60:22 61:15 62:25 64:3 65:2,5,25
    66:5,14,25 67:20 68:16,18 69:2,15
    69:19,24 71:9,18,23 72:2,6,8,9,14
    72:16 73:4,11 74:4,13,21 75:10,14
    75:18,21 76:16,17 78:7,10,21 79:22
    80:11 81:4,19 85:12 103:4,5,11,18
    105:20 106:9,12,18,24 107:4 109:13
due 14:22
duly 4:3 110:6
during 11:6 14:3 73:8 99:6,12,15
    100:7 103:3,12 106:8

———————— E ————————
E 2:2,2 4:2 110:2,2
each 73:4,15,19,22 74:2 94:21,23 95:3
    96:7
ear 70:24 71:2,6
earlier 53:24 85:7
East 69:21
economic 1:5,9 2:9 4:17
education 5:16 47:23 48:3
effect 21:21 47:9 49:24 73:21
Eighties 7:20
either 19:24 30:23 48:16
elapsed 34:2,22
elbow 41:3,4,9 61:18 62:4,6 66:15,21
elevator 23:9,11,17,20,23 24:2,7,17
    24:24 25:4,4,10,20 26:8 28:16,19,22
    29:4 31:22 32:8,12,24 33:5 34:4
    35:8 36:25 90:22 92:15 93:6 98:8
elevators 23:19
eliminate 58:21
emergency 39:7
emphasized 73:11
employ 110:19
employed 6:17,21 7:5,9,19 46:13
employees 99:17 100:8,13,16,24
employer 94:23
employment 7:12
EMT 102:2
enable 23:12 24:18
end 30:24 92:12
ends 30:11,14 31:11,13 97:6
enforce 45:25
engage 85:24 86:13 87:13
engaged 15:6 22:21 28:13 42:16,18
    43:2
engagement 42:21
enough 83:8,14
enter 44:15
entire 92:23
entitled 94:12
entrance 23:5
epidural 67:23 68:14,19
epidurals 67:25

erecting 16:5
ERRATA_SHEET 111:1
especially 71:7
ESQ 2:6,13,18,24
ESQS 2:20
essence 31:5
essentially 18:7 73:3
established 19:18 93:22 96:12
Estimate 32:3
even 22:22 50:18 65:7 66:10 69:25
    70:4 82:3 88:21,25
eventually 100:9
ever 5:13 7:5 11:23 13:6,9,12 14:2,6,9
    14:14,20 36:21 50:11,22 51:18 56:5
    56:15,17 57:12,17 59:3,7,12 60:9
    64:8 65:21 67:25 69:19 75:10,14
    76:24 80:4,20 87:9 88:17,19,22 89:5
    90:8 93:23 95:10,14 98:2,7 99:8,16
    100:23 101:19 103:4 106:9,25
    107:16
every 11:2 72:6 74:3 88:14 105:11
everyday 51:12 53:12 54:12 71:7 75:4
    87:16
everything 49:12 65:14 69:12 83:7
exact 7:17 9:6
examination 1:15 3:8,10,14,17,18,24
    4:8 90:3 98:19 109:3 110:4,13
examined 3:15 4:5
except 3:7
Excuse 11:9 33:13 35:23
execute 17:14
extend 41:24 92:21
extended 36:25 93:2
ex-husband 45:17,21 46:2 47:21
eye 70:24,25 71:5 101:16

———————— F ————————
F 110:2
face 57:9
facility 12:25 14:16 64:7,12,23 65:10
facing 30:10,13,14,24 31:5,15
failure 3:9,17
fair 36:19 72:25 73:14
fall 32:12 36:15 101:16,21
falling 36:18
familiar 28:6 93:9
family 49:12
far 36:18,21 37:7 92:21
fast 34:7
faster 27:8
feels 57:8 62:19
feet 31:25 32:4,14 33:15 37:6,8 92:18
    92:19
fell 12:15 33:4,5,17,19,20,21 34:5,15
    36:17,22 37:3,7
ferry 15:5 16:2 19:3 22:15 23:2 99:3
few 43:8 58:10 77:18,19 88:14 90:7
fiancee 14:9 68:8
fifth 7:3
figure 20:18

figures 95:2
filed 4:20
filing 3:23
fill 17:16 57:22
filled 83:19 85:7
financial 46:10
fine 46:8
fingers 34:9
finish 50:17
FIORELLA 2:7
firm 50:25 51:5 96:18,20
first 4:3 6:10,20 7:19 9:18 12:2 33:21
  39:7,18 43:16 44:10,13,15 45:6
  50:12 51:2 52:7,17,17 54:13,20,22
  55:3,13,18 56:20 59:18 60:15,19
  69:14 70:15 71:10 74:22 77:4 78:12
  80:7,23 83:5 97:5 103:25
five 16:22,25 42:6 67:15 95:19 96:2
  104:2
flange 26:23
floor 1:18 2:4,11,22 29:23,24 31:24
  32:4 86:16 91:3
floors 36:23 37:4
flowers 86:19
focused 40:24
follows 4:6
fool 89:11
foot 32:13,15,16,17,23 103:22 104:13
  104:22
football 87:16
forced 95:11
foreman 15:4 107:16
foremen 108:3
forgetful 72:24 73:19 74:14
forgetfulness 75:6,15
form 3:7 13:15 19:6 23:15 27:4,12
  32:9 46:4 51:21
formally 66:11,24 67:16
found 12:4
four 6:24,24 7:13 10:18 11:3 16:21,22
  16:25 18:4 42:6 67:15 77:24 78:14
  92:18,19 99:4,7,12,15 100:14 101:7
  101:20 104:2
fourth 7:2,4
frequency 11:6
frequent 96:8,11
frequently 11:17,19,21 61:13 62:23
  71:4 77:14,20 78:25 80:17 81:5,11
  83:22 84:10,22 88:13 89:2,8,18
Friday 83:2
FRIEDMAN 2:7
friend 51:7,10
from 9:20 13:7 14:15 15:2 18:17 19:9
  19:14 21:21,24 34:3,11,13 36:10
  41:23,25 42:7 45:17,20 50:3 52:14
  52:19 53:23 56:20 57:8,9,11,16
  58:25 63:10 66:9 68:21,22 70:6,10
  72:9 74:15,16,21,23 79:15 82:9
  84:13 85:11 93:17 94:11 95:25
  96:21,22 97:3,8,17 98:4,11 102:12

102:16,18,24
front 28:15,18 67:13
full-time 95:22
fund 95:9 96:23
furlough 95:11
further 3:13,22 89:25 98:17 108:7
future 10:23 61:6 82:24

_____

G

gel 76:8
general 15:24 22:13 83:10 90:24
  99:11 100:12 101:12
generally 43:7
gentleman 93:10 109:14
George's 16:2
gestures 5:6
getting 70:17 72:20,24 73:18,25 74:14
girlfriend 42:11 70:16 75:5
GIRVAN 2:20
give 18:17 32:19 42:21 50:15 67:23
  90:24 95:16
given 57:3,5 66:12 67:16 84:9
go 5:23 9:20 12:17,19 42:8 49:16,20
  49:23 61:7 64:6 68:15 77:4,7,14,16
  77:20 79:19 88:2,6,7,13 92:12
goes 11:4 25:24 47:16 62:11,20
going 27:19,23,25 29:3 30:12,17
  31:12 49:2,14,16 55:16 63:23 68:4
  78:2 79:10,20,22 91:13,15,22 92:7,8
  92:12 95:15 99:2,20
GOLDBERG 2:14
Gold's 88:8,13
gone 76:24
good 4:15 70:5 98:21
Gornish 8:16,20 9:4,21 10:10,13,17
  10:19,23 11:5,16 14:18 80:11 81:4
  81:19 85:12
Gornish's 109:13
gotten 74:25,25
grab 33:24
graduated 48:7,12
Grecko 17:10
grew 87:7
ground 26:5,7,9 28:17,18,23,24 29:2
  33:3,7,10 34:19,21 35:7
group 18:3
guarding 93:5
guess 22:17 23:19 32:15 39:3 40:2
guide 27:2,22 29:21 32:5
guided 28:10
guiding 26:20 27:6
guy 61:24
guys 26:12 30:21 51:12
gym 87:18,21,23 88:4,7
G-O-R-N-I-S-H 8:16

_____

H

H 4:2
half 36:23 37:3 69:16 70:11,12 74:22
  88:3
hall

87:23 95:25
Hamilton 2:16
hand 5:6 105:24 106:2,5 110:21
handled 46:22
hands 29:6 52:24
happen 40:16 62:23
happened 33:2 34:7 40:18 90:20
  91:18 95:14,20
happy 4:25
hard 42:2,3 50:19 90:14 100:19,24
  101:4
harness 21:8,11,17 22:2
hat 90:14 101:4
hats 100:19,25
Hausknecht 13:12,19 14:10 59:17
  69:15,19,24 71:9,18,23 72:2,6,8,14
  72:16 73:4,12 74:4,13,21 75:10,14
  75:18,21 76:17 106:9,13,19,24
  107:4
having 4:3 13:13 67:5 70:18 80:15
  83:8,14 105:25
head 5:6 33:21 36:12 37:22 38:2
  52:24 57:10 61:23 74:8,15,19 76:8
  85:18 106:18 107:2
headache 57:7
headaches 70:23 71:5 72:20 73:6,10
  73:15 74:6,11 75:11,16
health 40:20 105:22
hear 70:6
heard 19:20 70:5 90:8 95:10
hearing 15:12,22 63:4,7 66:10 67:12
  67:14 68:10 69:11
heavy 16:18
height 29:10
held 1:17 31:3 41:14 51:24 56:24
  64:18 67:18 95:7 110:5
help 31:18 49:14 56:9,11,13 68:25
  74:10
helping 27:18 79:11,17 97:23
her 11:11 42:12,14,16,21,25 44:10,13
  44:16,19 45:17,20,25 46:19,23
  70:19 80:12,13 82:3,20,20,21,24,25
  83:3,6
hereto 3:5
hereunto 110:20
heroin 11:23 12:3,6,9,11 13:6,9,13
  14:4,7,10,16,22
Herstick 103:17
hesitant 68:2
high 26:5 28:17 29:20 31:25 47:16
  48:7,12 49:17 87:2
higher 23:13 91:25 92:2
highest 5:16
him 10:25 13:15,24 14:2,6 23:15 27:5
  27:11 46:4 51:9 56:18 60:25 61:6,8
  61:13,24,25 68:21,22 70:2,9 73:5,16
  73:19,23 74:2,19,22 78:12 79:21
  103:13
hip 55:16 62:12,13,15,16
hitting 74:7

116

HIV 8:18,22,25 9:3 12:5,7 14:21
hockey 87:6
Holmdel 77:10
home 42:8,10 52:14 64:14 72:10
homework 71:8
hooked 26:24,25 76:7
Hope 12:20,21 13:4,7 14:15
horizontal 92:3
horizontally 91:19,20,21
hospital 37:12 38:18,22 39:2,15,22
    41:11 42:4,8 50:4 57:2,12,17,19
    69:17 70:10 104:19
hospitalization 94:14
hour 52:16 94:10,24 95:3 100:4
hourly 94:8,11 108:4
hours 100:5,6,7
housed 101:12
hurt 38:14 70:7 87:9

## I

Ibuprofen 53:18 56:7,8
idea 36:18
identified 27:21 93:21
identify 17:2 64:14
Imaging 64:16,20 65:2,4,10,22 106:23
    109:17
immediately 7:21
inc 1:7,13,21 2:15,21 4:19
included 94:22
including 3:6 106:24
income 46:20 49:25 96:25
indemnity 96:22
index 1:4 109:2
indicate 47:6 66:17
indicated 95:15 98:7 100:25 101:25
indirectly 110:17
infected 15:2
information 82:6
INFORMATION/DOCUMENTS
    109:8
initial 56:20
Initially 105:24
injection 68:14
injections 68:19
injured 38:2,6,10
injuries 13:21 40:9,21 47:8 49:23 50:6
    57:13 58:19 72:18 76:17,25 85:15
    85:22 86:15 87:11
injury 51:15
inquire 101:19
INSERT 17:17
installed 91:19,21
instruct 46:4
instructions 18:18 19:9,14 21:20,24
Insurance 96:23
intense 73:7 103:21
interested 110:17
involved 37:25 38:5,9,13 45:24
involvement 99:6
iron 16:7

ironic 55:24
ironworker 6:3,14 13:10 28:6 51:8
    94:13 107:9,12
Ironworking 86:7
irritated 70:17
irritates 75:5
Island 15:5 19:3 22:15,18,20 38:23
    99:3
issue 27:9
Ivan 103:17

## J

J 2:18 4:2
January 64:7
Jersey 4:14 5:25 9:9,10,11,13 10:11
    12:23 52:9 77:10 78:11 83:4 87:25
    88:10
Jessica 44:22,25 47:2,6 48:6,16
Jim 17:21
Jimmy 44:25 47:4,11 48:10,16,22
    49:2,14,19,22
job 6:22 7:3,6,22 15:4 18:18 21:18,25
    51:16 99:2,7,9,12,16 100:4,13 101:5
    101:9,22 107:17
john 1:2,16 4:11 43:20 108:12 109:4
    110:4
journeyman 107:10,12
journeymen 108:4
judge 67:13 69:13
July 61:2,16,25 66:2,13 67:3 72:3,17
    74:5
June 72:5
Junior 47:17
jury 16:8
just 9:13 15:19 20:17 25:11,22 26:15
    29:6 33:17 35:20,25 36:4 42:23 43:7
    46:25 48:21 49:4,10 56:7 62:3 65:11
    70:5 73:2 74:18 83:10 84:21 87:12
    89:11 94:2 95:4 100:12

## K

K 90:11
Kaletra 8:10,15 11:17
Keansburg 87:25
keep 70:19
kel 1:6 2:15 90:6,8
Kentucky 6:2
kicked 46:12
kids 83:15 86:11
kind 34:20 38:17 40:14 41:21 46:16
    62:11 68:16,24 76:8 83:11
knee 55:24,25 56:2 85:18,19 87:9
knees 37:23 38:6 52:24 55:17,19,20
    55:22 56:6,9 61:18 62:7 67:2,7
knew 25:22
know 4:24 12:20 17:12 18:21 20:12
    20:19 21:13 22:12,25 24:21 27:7
    29:7,16 34:24 36:16 44:8 46:22
    47:24 50:2,14,18 57:7,9 63:17 64:8
    65:7,7 67:10 68:4 69:11,25 75:5,9

82:2 83:7 86:8,17 93:25 94:2 95:2,5
    99:11 100:17 101:3 102:8
knowledge 14:11 15:17 22:23 37:9
    47:20
known 23:4 28:3
knows 19:19 93:23
kovner 2:13 4:9,16 7:15 9:23 10:12
    13:16 19:23 26:13 27:11 37:17
    41:13 49:6,9 51:23 56:19 64:17
    65:20 67:17 76:22 82:5,9 89:24
    109:4
KRAL 2:19
K-A-L-E-T-R-A 8:10

## L

L 3:2
laborers 100:15,18,23
land 34:19
landed 34:23
last 5:19 10:16 15:13 17:9,11 19:13
    24:11 54:10 58:17 59:6,11 60:3,24
    61:15,25 65:11,14,25 66:13 67:20
    69:2 71:25 72:4,16 74:4 75:24 79:4
    81:13 82:4,19 84:5,19 109:14
later 40:8
law 50:25 96:18
lawsuit 4:20
lay 95:16
layout 90:19,25
laypeople 16:8
league 89:14
learn 24:17 36:21
leave 17:13
led 80:13
left 32:17 53:4 54:16 55:23 57:19
    85:18
leg 103:21
legal 45:24
length 31:6
less 6:13 34:10,17 77:20 96:8,11
let 4:24
level 5:16 25:25 26:3,7,10 29:11,12,14
    91:12,22 92:4,16,22
levels 23:13
life 13:18 47:9 68:5
lift 88:17
like 26:23 31:8 42:19 53:5 55:6,15
    57:6 62:19,20,21 72:12 73:6 76:7
    77:15 82:21 84:8 86:19 88:11,19
    101:10
limited 75:6
listed 73:2 93:15 95:4
little 29:19 68:2 80:16 81:15 89:14
live 46:23 64:10
lived 44:18
living 43:21 45:3,7,10 52:8,11
LLP 1:18 2:3,7,14
local 6:9,11 94:7 108:2
located 10:10 12:22 52:3 69:21 77:9
    78:10 83:3 87:24

location 65:16
long 7:8 8:19 13:3 52:13 77:16
longer 85:24 86:14 87:14,22
longest 96:4
long-term 75:8
looking 31:18 79:18
lose 34:25
loss 46:5
lost 63:15
loud 83:16
lower 55:15 62:10 67:24 85:17
lying 40:13

**M**

M 4:2
made 10:7 24:24 73:4 83:12
Madison 2:11
maintained 101:17
make 3:11 10:5 11:3 27:8 72:11 94:23
makes 50:19
man 16:21,22 93:15
management 60:10,13
manager 19:2
Manhattan 22:19 52:6 87:7,8
many 16:17,23 54:8 57:24 58:8 60:21
    64:22 71:22 104:3
Marie 82:2,8 83:5,13 84:6 109:19
Marlboro 12:23
marriage 110:16
married 42:14 43:2,9,12,25
masonry 92:9,13
material 34:20
materials 23:12
Matt 90:5
matter 34:5 110:18
MATTHEW 2:18
may 3:14 14:21 20:2 50:18
maybe 27:9 58:20 78:14 79:6 80:9
    92:11,18
MC 2:18 41:6 90:4 93:12 94:6 98:16
    109:5
McDermott 90:5
McNulty 6:19,21 7:5,9,19,22 15:4
    18:17 21:16,21 101:8,21
mean 13:17 16:9 22:12 25:23 26:9
    29:16 31:8 33:9,20,22,24 39:4 71:16
mechanism 102:23
medical 9:9,11,13 83:4 94:14
medication 7:25 8:4,6 15:21 53:16
    54:3,11 56:5,16 57:3 59:9,14 75:11
    81:17 105:5,18
meeting 18:12,14
member 6:6,11 17:18 88:4,12 94:7
    95:17 96:20
members 17:2 21:10 24:5,19
membership 88:12
memory 8:2 15:22 70:19 74:24 75:7,8
men 18:3
met 43:10 44:10,13
MICHAEL 2:24

middle 30:25 55:14 62:10
Middletown 47:19 64:16,20,25 65:4
    65:10,22 78:11 88:10 106:23 109:17
might 19:20,21 68:20,25
Mike 17:8 35:18,20 36:6 39:20,21
    102:5,8
Mike's 17:9
mine 51:7
moment 34:11,13,14 36:17 53:8 86:9
Monday 20:22
money 46:12 63:10 83:8,14
Monmouth 4:13 52:9,15
month 50:7 52:18 61:14 69:16 70:9,11
    70:12 72:6 74:22
months 10:18 11:2,3 47:3 63:9 77:18
    77:19,24 78:14 82:18 97:5,6,19
    104:2
moore 1:2,16 4:11,15 5:1 6:1 7:1 8:1
    9:1 10:1 11:1 12:1 13:1 14:1 15:1
    16:1 17:1 18:1 19:1 20:1 21:1 22:1
    23:1 24:1 25:1 26:1 27:1 28:1 29:1
    30:1 31:1 32:1 33:1 34:1 35:1 36:1
    37:1 38:1 39:1 40:1 41:1 42:1 43:1
    44:1 45:1 46:1 47:1 48:1 49:1 50:1
    51:1 52:1 53:1 54:1 55:1 56:1 57:1
    58:1 59:1 60:1 61:1 62:1 63:1 64:1
    65:1 66:1 67:1 68:1 69:1 70:1 71:1
    72:1 73:1 74:1 75:1 76:1 77:1 78:1
    79:1 80:1 81:1 82:1 83:1 84:1 85:1
    86:1 87:1 88:1 89:1,25 90:1 91:1
    92:1 93:1 94:1 95:1 96:1 97:1 98:1
    99:1 100:1 101:1 102:1 103:1 104:1
    105:1 106:1 107:1 108:1,12 109:4
    110:5
more 6:13 11:11 29:19 34:10 35:22,24
    54:14 73:6 96:11 102:21 108:3
morning 4:15 19:15 21:14 53:24
    55:23 98:24 100:2,3
morphine 57:6,12
motion 3:11
move 3:7,10 36:4,9 47:2,4
moving 47:7
MRI 40:5,13 63:4,6,18 64:8 65:5
    66:16,20 67:4,6 69:5,10 106:10,15
    106:17,21,25
MRIs 40:8 63:2 64:6,9,15,22 65:9,15
    104:10,13,14,22 107:5
much 11:10 34:2,22 36:15 43:4 52:25
    54:12 62:3 63:13 73:17 74:18 89:23
Mutual 42:24
myself 110:9,10

**N**

N 2:2 3:2 4:2
name 4:10 9:8 10:2 15:8 17:9,11,15,16
    19:21 41:16 42:12 43:19 78:8 81:25
    82:4 87:21 90:5 93:9,18 103:15
    105:3 106:2 109:11,14
named 93:10 109:19
names 8:8 17:7 44:21

nature 15:25
near 64:14
neck 52:23 55:5,7,10 56:11 57:9 61:21
    62:17,18 69:4,10 85:18 106:15
need 8:8 66:9
needed 66:4
needle 15:3
needles 68:6
negative 104:23
Neptune 9:10,15 10:11 14:20 83:4
nervous 72:22 74:2
never 48:21 87:11 101:18 106:3
new 1:1,5,6,9,9,18,19,20,23 2:5,5,9,9
    2:12,12,17,23,23 4:4,13,16,17 5:25
    9:10 10:11 12:20,21,23 13:3,7 14:15
    52:9 58:6 63:25 69:22 77:10 78:11
    79:19 82:13 85:8,9 87:25 88:10
    93:17
next 26:7 28:9 29:3 31:15 32:20 33:2
    50:4,7 61:7 91:11 92:3,25 107:19
night 84:5 105:11,11
nine 47:3
nod 5:6
non-work 86:10,12
Norm 15:8
North 47:19
Notary 1:20 3:15,16 4:4 108:19
note 13:14 19:5,12,17 22:6 23:7,14
    25:9,20 34:8 49:3 51:20 56:22 68:9
    68:23 93:19
noted 10:9,15 65:24 82:15 108:8
nothing 27:7 33:18,25 53:5 67:15
    108:6
numb 62:21
number 5:11
N.Y 1:23

**O**

O 3:2 4:2,2,2
object 3:6,9 46:3
objection 13:14 19:5,12,17 20:3 22:6
    23:7,14 27:4 32:9 33:11 49:3 51:20
    56:22 68:9,23 93:19
objects 30:22
obligation 47:21
observe 100:8
obtain 59:8
obviously 20:20 98:5
occasion 95:14
occasions 104:3
occupation 107:8
occur 20:11
occurred 7:2 16:3 19:16 21:4 24:8
    26:16 27:17 37:15 38:12 98:4 99:25
    100:9 101:24
October 10:24
off 31:2,3 32:7 41:5,13,14 51:23,24
    54:22 56:23,24 64:17,18 67:17,18
    91:15 95:6,7,16
office 52:2 63:24 69:21 83:3 104:15

104:16,18
offices 1:17
official 42:19 63:5
often 11:11 80:19 105:10
Oh 32:18 39:6
okay 17:6 31:10 78:20
okayed 69:13
old 85:6
once 11:20,22 61:14 88:14 89:4 97:13
　105:11
one 8:13 10:8 13:19 29:23,24 31:24
　32:13,15,19 35:22,22,24,24,25
　40:24 41:7 43:16 52:18 53:2,5 62:2
　62:3 70:9 81:8 88:6,21 92:12 95:21
　102:21 109:14
ones 45:12
only 17:5 64:11 92:23
onto 32:7 34:3,12,13
open 25:21,22,23 33:5 91:3,6,7 92:23
　92:24 93:6
opening 92:15,17
operate 40:25
operation 66:4 77:6
operator 16:12
opportunity 50:15 95:17,21
opposed 20:21
opposite 30:11,14 31:11
oral 105:5
Order 1:17
original 3:18,23
orthopedic 50:9
other 3:16 7:6,9 8:13 14:16 17:24
　21:10 24:18 28:8 30:16,21 32:15
　38:13 40:20 59:13 61:24 73:7 75:11
　76:15 78:4 81:17 82:7 83:12 86:12
　91:15 92:7 94:11 95:17 96:20,24
　98:13,14 100:23,24 104:24,25
　105:20,22 106:4 107:4
out 4:20 12:4 16:6,9 20:18 29:18
　41:19 47:2,4,7 69:17 83:7,13 88:2
　95:9
outcome 110:18
outrageous 82:3
outset 56:20
over 20:3 25:10 54:9 62:12 74:20 76:2
　81:15 99:6 100:13 101:20
overhand 89:17
over-the-counter 53:19
own 90:17 101:4

P

P 2:2,2 3:2
page 26:12 107:19 109:3,9
PAGE/LINE 111:2
paid 108:3
pain 37:20 53:2,4,10,16 54:3,11,15,17
　55:4,6,10,12,17,19,22,23 56:2,6,9
　56:11,13,16 57:3 58:21,24 59:3,8,13
　60:6,9,13 61:17 62:2,4,13,20 67:5
　68:20 79:11 85:14 103:21

painkillers 12:16
Pain-wise 52:21
PALADINO 110:3,24
paperwork 46:22
paramedic 35:12,14,21,22,24 36:3
　38:16 102:20
part 14:22 24:17 30:3,4,5 36:10 47:7
　55:15 62:9,11,17 85:6 94:22 98:14
particular 18:18 66:18
parties 3:4 110:16
parts 37:20 58:22
party 110:10
past 19:22
patience 98:25
paul 2:13 4:15
Paxil 79:24 80:4,8,10,13 81:5,8,14
pay 49:14 83:14 108:3
Pension 94:14
people 16:23
per 94:24 95:3
Percocet 57:6,17,20 58:6,8,12,15,18
　58:21 59:6,12
perform 71:9 75:18,21
performed 40:5 41:10,17 75:25
period 7:8 42:5 95:16 96:4
periodic 55:8
periods 95:24 96:7,9
permission 17:16
permitted 5:4
perpendicular 31:7
PERRY 2:19
person 17:24
phonetic 6:2 17:10 51:13
photographs 37:14,18
physical 76:24 77:5 78:3,4,18 79:8,16
physically 102:8
physician 41:2
physicians 13:20 14:19 98:13
piece 41:4
pieces 92:7
pills 57:24 58:3
place 24:19 26:17 27:3 28:10 30:18
　31:13 32:6 78:4
placed 30:12 39:12 40:13
places 76:20
placing 16:13
Plains 2:17
Plaintiff 1:3,16 2:3 109:15,19
Plaintiffs 1:11 2:8
plant 86:19
play 86:25 87:4,16 89:2,8,13
played 87:5,6 89:10,14
playing 86:2 87:9
please 4:10,24 17:16 50:16
pocket 92:9,13
podiatrist 103:14,16,19,23,25 104:4,7
　104:9,21,24 105:13,17,20 106:4
podiatrist's 104:16,18
point 42:25 43:3 101:25
Port 4:13 52:8,14

portion 25:3 92:23
portions 38:14
position 49:22
positive 8:22,25 9:4 12:7 14:21
Possibly 92:14
potential 93:15 98:11
pounds 16:17
precede 12:6
precise 9:25 49:9 109:11
preparation 97:15
prescribe 56:16 59:19 75:10,14 80:13
　82:17
prescribed 8:15 11:15 53:21 59:16
　80:10 81:2,19,22 105:16
prescription 53:15,20 57:20,22,25
　58:6,11 59:8,13,21,24 81:16 83:19
　85:6,8,10
prescriptions 58:8,14 105:18
presence 14:12
present 68:12 74:24 102:5
presently 58:11 59:21 79:8 81:16
　105:13,16,18
presume 36:17 82:9
pretty 11:10 43:4 52:25 54:12 62:3
　73:17 74:18 89:23
previous 13:17
previously 43:24
Price 15:8
Primarily 53:9
prior 9:4 10:16 16:4 19:8 21:22 22:4
　24:16 25:5,8 37:13,24 38:4,8 46:9
　47:25 48:24 50:23 51:2 53:23 60:10
　60:24 69:18 71:25 77:12 80:4,18,20
　80:23 81:6,13 84:11 89:3,9,19 96:2
　107:15
probably 9:19 15:2 74:3
problem 12:15 13:13 105:25
problems 70:18 103:20
procedures 98:14
proceeding 45:24
process 28:13
Production 109:10,12,14,17,18
professionals 105:23
program 95:11
progress 84:8
project 99:3
protecting 93:6
protection 101:16,16,21
provide 47:22 95:20 104:7,24
provided 3:5,20 90:16
provider 40:21
providing 46:10
Pro-Care 77:8,9,11,14 78:3
psychologist 81:23 82:17 109:19
psychologist's 81:25
Public 1:20 3:15,16 4:4 108:19
Pulsky 96:19
punch 87:15
purpose 23:16,17
pursuant 1:17

pursuing 97:20
push 26:23 27:18 31:18
pushing 26:22 33:14
push-up 88:21
push-ups 88:19,23
put 26:18 38:16,19
putting 26:8
p.m 108:8

**O**

question 3:6,9 4:25 19:13,24 20:4
  25:12 27:12 32:20 46:4 49:4,10
  50:17,19 51:21 93:24
questions 4:22,24 46:7 89:25 90:7
  98:17,23

**R**

R 2:2,6 4:2 110:2
radiates 62:13
Radiology 63:19,24
rates 108:4
rather 86:10
reach 33:18,24
reached 43:6
reaching 33:23 68:24
read 20:4,6 25:11,13
real 34:7 46:21 70:18
really 10:21 15:10 37:11 44:8 46:21
  48:23 56:10,12,14 58:23 59:5 60:8
  68:5 70:5 72:22 74:2 76:10 86:3,4,7
  88:11,12 91:2 98:6 99:19 101:11
reasons 88:6
recall 21:19 63:23 64:24 66:19 76:12
  99:19,24 100:12 102:15,23 103:15
  105:3 106:13,17,21 107:5
receive 19:9,14 21:20,24 45:16,20
  67:25 94:13 96:22 97:3,11
received 9:24 65:21 97:5
receiving 63:10,13
Recently 79:18
recess 32:21 76:23
recollection 15:9,17 17:22 70:21
recommend 103:4 105:21 106:6
recommendation 106:5
recommended 51:9 98:13
record 4:10 20:6 25:13 31:2,4 41:13
  41:15 51:23,25 56:23,25 64:17,19
  65:20 67:17,19 93:21 95:6,8 103:7
  110:13
records 10:14 109:13
recovery 41:19
REDMOND 2:19
reduce 56:9 58:24 59:3 60:6 68:20
refer 51:6 90:2 103:5,11,18
referencing 94:3
referred 64:3,25 69:24 70:2 103:16
referring 28:25 94:4
refill 105:17
refresh 15:8 17:21
regained 35:4,6,11,14 36:2 37:21

102:11
regard 14:25 101:7 105:15 107:8
  108:2,3
regardless 106:14
Rehabilitation 12:21
relation 30:20
relationship 31:20 44:16
released 13:7 14:15 39:5
relief 79:15
remain 13:3 42:4
remember 7:7,24 15:7,11 17:5,15,20
  18:20 21:5 25:16 31:17 32:18 33:17
  33:23 35:25 36:7 37:11 40:3,18
  41:18 58:10 69:25 70:4 71:15 74:12
  75:17 76:9,10 82:3 100:10 106:2
  107:3
removed 24:18 56:21 102:12,15,18,24
renovations 23:2
repeat 98:3
rephrase 4:25
report 93:17 94:5
reporter 5:4 17:13 20:8 25:15 50:20
REPORTING 1:21
represent 4:16 90:6 93:14 98:21
represented 15:14 51:18 110:11
representing 96:14
request 10:3,7,8,9,12,15 65:23,24
  82:11,15
REQUESTED 109:8
requests 10:4
reserved 3:8,12
residential 12:24
respect 10:13 46:7 72:18
respective 3:4
response 5:5 97:11
result 13:21 40:9 51:15 58:18 74:7
  76:17,25 85:14,22 86:14
results 65:5,8 71:13,19 76:13 104:21
  106:25 107:5
retained 50:25
return 3:18
Richard 78:9,10
RICHMOND 1:1
right 3:6 13:25 26:2 27:8 29:3,17
  30:14 31:23 32:16 36:14 41:8,9,20
  52:24 53:6,9,11,16 54:2,16,17,18
  55:6,7,15,25 57:7,8 62:3,4,6,11,16
  62:18 66:3,15,21 70:24,25 71:2,5,5
  74:23 76:22 78:17 85:16,16,17,18
  94:19 96:25 98:12 103:21,22 104:13
  105:25
rights 3:5,19
right-handed 89:7
ring 42:21
Risperdal 81:18 82:17 83:20,23
Robert 93:10,18
Rochelle 93:17
roof 91:5
room 39:8
round 68:17

row 20:15,21,25 21:3
RUBIN 2:7
Rules 3:20
RYAN 2:19

**S**

S 2:2 3:2,2
sacks 1:17,18 2:3,3 50:25 51:2,5,6,19
  51:19 96:17,17
safety 18:11,14,18 19:10 21:8,11,17
  21:25 101:15
same 10:12 11:6 18:3,7 21:7 24:10
  26:12 50:21 64:7 70:19 72:9 73:3
  74:25
Sanford 78:7,9,10 79:22
saw 10:17 52:7,17 54:20 61:25 70:9
  72:2 74:22 79:4 93:23
scaffold 28:20 30:3
scale 108:3
scene 98:3
scheduled 10:22 55:2 60:12,18,19
  61:5 66:8 67:9 68:13 69:8 72:13
  79:7 82:23 105:12
school 5:19 47:14,16,18 48:6,7,10,12
  49:17 87:2,10
sealing 3:23
second 32:19 70:15
seconds 34:6,10,16,17
secretary 46:17
Security 5:11 97:8,18
see 10:23,25 11:10 20:17 29:5 50:8
  61:8,13 67:4 69:14 72:6,8 74:19
  78:12,25 99:16 100:24 103:5,23,25
  104:3 105:13,21 106:3,6
seeing 81:24 100:12 106:18
seen 8:19 11:5 13:24 37:13 39:7,9,18
  50:11,22 60:21,25 69:19 71:22
  82:20,21 101:18
sees 51:8
SEGALLA 2:14
send 10:5 49:14 62:25 104:9 105:21
  106:9
sending 49:19
sense 72:11
sent 63:5 106:14
September 1:19 4:21 6:17 12:12 21:6
  21:12,14,22 22:2,11 23:21 24:7 25:8
  25:18 26:6 37:24 38:8 45:4,9 46:13
  47:25 50:23 69:18 76:3 77:12 79:24
  80:21 87:12,18 110:6
series 4:22
serious 87:11
serve 91:10,11
SERVICE 1:21
services 46:6
set 92:8 110:20
seven 8:21 11:7 97:19
Seventh 52:4 104:20
several 20:15,21,24 21:3 71:11
severe 70:22 71:4

120

shaft 23:9,11,18 24:2,7,17,24 25:4,5
   25:10,20 26:8 28:16,19,22 29:4
   31:22 32:8,12,24 33:5 34:5 35:8
   36:25 90:22 92:15,21 93:7 98:9
   102:6,9,13,16,19,25
shake 33:10
shaking 16:6,9
shanty 101:9
sharp 62:20
shed 101:10,13
shirts 100:25
shoot 89:7
Shore 9:9,11,13 83:4
short-term 70:18 74:24 75:7
shots 67:24 104:8,25
shoulder 37:22 41:25 52:23 53:5,6
   54:15,17 61:18 62:2 66:3 85:17
   98:12
shoulders 38:6 53:8
showing 88:11
side 22:18,19 25:22,23 55:7 57:8
   62:11,18 85:17
sides 93:3
significantly 59:4
simple 19:23
since 6:14 8:25 13:15 38:12 56:17
   82:20 88:23,24 89:5,15,22
sir 41:6 90:13 94:7 95:10
sit 71:17 85:13 94:19
site 7:23 18:19 19:10,20 21:7,12,22,25
   22:5,11,24 23:13,21 24:3,11 99:2,7
   99:9,13,16 100:4,13 101:9,22
sites 7:6,10
six 11:2,4 47:5 97:5,6 104:5
skanska 1:6,10 2:10 4:19 18:21,25
   19:10,15 94:4 99:14,16 100:8,13,16
   100:17,21,24 101:2
sleeping 72:21 73:22 80:15,18
slot 26:21 27:2,6 28:3,7,9
snapping 34:8
Social 5:11 97:8,18
soft 42:2
some 29:10 34:19,20 38:17 40:14
   41:21 42:25 43:2 47:21 60:19 63:21
   67:23 76:8 79:11 87:8 93:20 95:16
   100:15,19
somebody 37:12 68:6 70:7 75:3
someone 27:21 34:22 51:5 65:2,4
   96:17 106:14
something 9:12 28:25 33:18,24 63:15
   73:10 74:17 91:12 92:10 95:10
   100:5
sometime 65:18 76:3 100:2,3
sometimes 11:4,10 62:19 72:21 73:6
   96:3
Somewhat 59:2
somewhere 90:22
son 71:8 86:2
sons 87:17 89:12

Sorry 41:9
Sort 17:23
sought 50:5
sound 68:4 71:16
sounds 82:2
source 37:9 96:25
space 17:13
speaking 50:21
specialist 60:10,13 105:24 106:5
specialty 8:17
specific 46:21 61:10 92:14
specificity 83:12
Spell 93:11 103:6
spoken 98:2
sporadic 53:4
sports 86:2,25 87:4,10,13
spring 58:20 59:7,12
St 16:2 38:21 50:3 52:19 74:23 76:16
   104:19
standing 27:21 28:14,15,18,20,21
   29:7,10,21,24 30:8 31:5,15,21 91:23
   92:22
start 78:16 99:22,23
started 33:3,10,16 81:23 106:18
starting 103:20
state 1:1,20 4:4,10 63:3 66:9,23 96:23
Staten 15:5 19:3 22:15,18,20 38:23
   99:3
stayed 12:14
stays 74:18
steel 16:15 24:19 92:8
stenographically 110:9
step 32:7,12,13,16,23 33:14
stepped 25:3 32:22 34:3,12,13
sticking 68:6
still 12:9 44:23 49:17 52:8,11 53:13
   54:19 55:9,10,19 63:5 66:11,23 67:5
   70:23 72:20 103:22 105:8
STIPULATED 3:3,13,22
stopped 77:21,23 78:2,17 84:21 85:3
story 50:15
straight 12:13,14 86:4
strapped 38:20
street 4:13 26:3,4 28:25 29:10,17,17
   29:20 31:25 32:2 52:4 63:19,25
   69:22 104:20
strike 3:7,10
stronger 56:16
Study 87:23
stuff 83:10 84:9 86:20
subbasement 36:24
subbasements 29:15
Subscribed 108:15
substance 14:3,20 21:16 41:3 47:7,12
   49:7 68:19 71:18,21
suffering 58:25
suggestion 27:13
Suite 2:16
Sullivan 17:21
summertime 60:5

supervisor 21:15
supply 46:18
support 45:16,25 46:8,10 91:11,14
suppose 45:18,23
SUPREME 1:1
sure 7:17 9:6 16:18 19:7 22:12,22
   23:3,6 24:4 35:5 40:2,7 44:4 45:18
   49:16,21 51:22 59:20 63:21 70:8
   71:11 75:4 80:25 96:20 103:8
   106:11,16
surgeon 50:10
surgery 41:10,17,20 66:6 98:11
surgical 46:17 98:13
Susan 42:13 49:18
sustained 13:21 40:10,22 47:8 49:24
   50:6 51:16 57:13 58:19 72:19 76:18
   77:2 85:15,23 86:15
Sustiva 8:13 11:16,21
swimming 86:22 87:6
switched 9:21
sworn 3:14 4:3 108:15 110:7
S-U-S-T-I-V-A 8:14

T

T 3:2,2 31:8 110:2,2
take 5:4 10:6 11:17,19,21 25:9,19
   50:20 52:13 53:15,23 54:3,8,22,25
   56:5,7,8 57:12,17 58:3 60:16 67:6
   68:12 69:5,7 80:7,20,24 81:5 83:22
   83:25 84:4,10,13,15,16,23,25 88:4
   105:8,10,16
taken 1:16 32:21 38:21,24 39:24
   53:24 54:11 64:12 65:15 76:23
   106:15,17,22 110:8
taking 7:25 8:4,6 15:21 79:24 80:3,4
   84:21,24 85:3
talking 16:3 86:9
team 21:11 24:5,19 86:25 87:6
teams 89:14
tech 1:7 2:15 90:6,8
tell 7:18 9:17 10:20 13:12 14:2,6,9,20
   14:24 15:16,24 16:9 17:7,18 21:2,16
   22:10,13 25:16 27:16 31:25 33:9
   34:2 37:6 40:19,21 41:2,16 43:5
   44:5,12 46:19 50:14,15 54:14 65:4,6
   65:9 66:3,5,14 67:2,21 68:18 69:3
   70:4 71:13,18,20 74:6,9,14,16 77:22
   83:11 84:6 100:10
ten 34:10,17 63:9 95:13
term 28:5,7
terminal 15:5 16:2 19:4 22:16,17 23:5
   99:3
terms 15:24 108:4
test 76:5,10
testified 4:5 49:11 60:17
testifying 15:11 27:5
testimony 3:8,10 53:23 110:8,8
testing 76:21
tests 40:7 71:9,11,14,19 75:18,21,25
   104:10

Thank 27:15 89:24 98:17
their 17:7 44:21,22
therapist 79:8
therapy 76:25 77:5 78:3,4,18 79:16
  88:6
thing 18:8 24:10 40:24 66:22
things 18:8 67:15 70:20 88:19 95:3
think 7:4,20 9:19 17:24 18:23 22:25
  24:15,23 26:11 27:24 35:20 36:5
  37:8 38:25 42:6 45:18,22 48:22
  50:18 51:4 58:2 64:16 65:17,21
  68:10 69:12 70:15 71:15 74:18 75:3
  77:25 78:9 91:14,15 92:5,11 94:18
  96:16,19 100:6,19 106:20,23
thinking 79:20
third 17:18
Third-Party 1:11,14 2:8,20
Thirteen 5:18
though 50:18 66:10 79:10
thought 99:14
thousands 16:17
three 18:4 44:20 45:13,14 77:6,24
  78:14 82:21 92:18,19
threshold 98:8
throbbing 55:6
through 74:23 81:22,23
throw 89:17
Thursday 20:20,24
time 6:10,15,20 7:9 9:20,21 10:16
  12:2 14:3,14 15:6,17 22:14 27:14
  32:6,11 34:2,3,22 35:3 42:5,25
  43:21 44:23 45:6 50:4,8,21 52:7,17
  54:8,10 58:17 59:6,18 60:3,24 69:14
  70:14 71:25 75:24 76:6 77:4 78:13
  79:4 80:7,23 81:13 84:14,14,19
  90:13 91:9 94:8 95:16 98:18 99:21
  99:24 101:25 102:12 103:3,12 106:8
  108:8
times 13:24 18:24 60:21,23 62:24
  71:22 73:7,8 84:12 89:20
tired 68:10
title 107:9
today 4:23 8:2 10:5,16 12:9 15:19
  37:14 46:24 52:11 53:13,17,25
  55:10 60:10,24 71:17,25 81:13
  83:25 85:13,18 88:5,7
together 45:4,7 48:5 49:8,12
told 14:24 36:4,16 37:11,12 39:9,17
  39:19 43:4 71:18 76:13
tool 101:10,12,17
Tools 101:14
top 25:9,20 32:23 34:3,14
topping 95:9
total 37:3 58:9 60:21 71:22
Touliopoulos 50:9,11,22 51:3,6,8,15
  52:2,8,15,18 53:22 54:14,20 55:4,13
  56:15 60:16,22 61:15 62:25 64:4
  65:2,6,25 66:5,14 67:2,20 68:16,18
  69:2 72:9 76:16 78:21 103:4,11,18
  105:21

trailer 101:9,10
transcribed 110:10
transcript 17:14,14 110:12
transpired 76:11
transport 38:17
transportation 1:6,9 2:10 4:18
trauma 39:9,18,24 40:5,17,22 74:15
  74:19
treated 9:3 11:23 12:3 13:15,20 14:15
  39:5 51:14 76:15 102:2 103:3,13
  106:9 109:19
treating 11:7 56:18
treatment 12:14,17,19,24 14:4 40:9
  50:5 74:10 75:15 104:6,25 106:12
trial 1:15 3:12 110:4,13
tried 89:5,15
trip 72:9
trouble 80:15,17
trucks 16:6,10 24:15
true 110:12
truth 15:16 25:17 40:19 70:5 100:11
try 11:3 45:24 68:16 72:8 88:17 98:22
trying 20:17 26:17,18,23 27:2,8,22
  29:21 31:18 32:5 33:17,24 76:9
tube 40:14
turned 97:13
twice 11:18 77:15,17 79:3 83:24
two 17:5 28:8 29:14 30:10,17,21
  36:23 37:3 46:24 54:6,9 82:18,21
  84:4,5 104:13
type 47:21 101:8,21 104:6,10 106:10
types 101:15

U

U 3:2
unable 71:17
unannounced 82:25
unconscious 74:8
under 10:6 24:2 33:15 47:21
understand 4:23 10:25 26:14 40:12
  51:11 90:21
understanding 43:6
understood 5:2,7
underwent 40:8
union 5:24 6:6,8 94:13 95:15,17,20,25
  97:4 107:9
unit 39:10
Unloading 16:11 24:15
until 9:21 12:14 34:5,14 50:17
upside 33:19,20
use 5:6 12:6,9 13:6,9 14:22 28:7 30:22
  89:18
used 85:24 86:13 88:24 89:11
useless 89:23
using 12:11 14:7,10 30:21
usually 16:22 55:24 68:16

V

vacation 94:15
vague 71:16 76:9
Vaguely

65:11
various 13:24 58:22
vary 18:9
VERAS 2:24 10:7 98:20 103:8 108:6
  109:6
verbal 5:5
vertical 91:10
vertically 91:19
very 19:23 20:2 50:7 98:22
vicinity 23:8 24:6 90:23
Vicodin 59:15,16,19,22,25 60:4,6
  75:12
Vincent's 38:21 50:4 52:19 74:23
  76:16 104:19
Viread 8:10 11:15,19
visit 10:20 50:12 51:2 54:13,23 55:3
  55:13,18 60:15,20 61:15 65:25
  66:13 67:20 68:15 69:2 70:16 71:10
  72:4,16 74:3,4 83:5
visits 73:5,9,16,19,23 74:2,21 75:19
  75:22
V-I-R-E-A-D 8:11

W

wage 94:9,11
wages 63:15
wait 50:16
waived 3:24
waiver 3:11,19
walk 29:18 82:25
walking 26:2
wall 25:4 28:2,9 31:21 32:8,24 34:4,12
  34:14 92:9,13
walls 92:25 93:2
Walnut 4:13
want 16:25 20:4 46:6 48:19 50:16
  68:6 70:7
wanted 48:21,22 49:20 66:16 67:4,23
  69:5 95:21
wants 29:6,12
wasn't 27:9 49:16 84:24
way 20:18 93:3
wear 21:8,11,17,25
wearing 90:14
Wednesday 83:2
week 20:10,19 62:24 63:14 77:15,17
  79:3 84:12 89:4,20 96:21 97:6
weekend 20:23 21:4
weeks 47:5 61:7 77:6 82:22 84:20,22
  85:2,5 88:14 96:6
weigh 16:17
weightlifting 86:3 87:15
weights 88:17
well 9:5 10:21 11:16 20:2 31:16 39:4
  41:4 46:12 55:14 63:3 69:6 74:17
  83:11 88:6
went 9:5,18 12:13 41:5 67:13 78:5
  85:9 106:3
were 5:21 6:3,6,17,20 7:5,9,19 8:22
  9:3 12:2,11 13:10,13 14:4,6,10,15

14:24 15:6,14,21,25 16:5,6,23 17:3
17:25 18:4,7 19:3,19 21:7 22:5,10
22:14,21 23:4,8 24:5,10,14 26:5,8
26:17,18,20 27:2,16 28:8,13,14,17
28:20 29:7,9,13,20,21,24 30:10,11
30:13,17 31:21,24 32:2,5 35:6,13
36:10,18 37:15,20 38:21,24 39:2,7
39:11,11,14,17,18,24 40:16,22 42:7
43:12,14 45:3,9 46:9 48:5 49:8,14
50:3 52:8,19 57:2,3,5,11,16,24
58:24 60:7 61:16 64:3,12,25 65:15
70:2,10,13 71:19 79:24 80:4,15 83:5
90:13,20,21 91:8,15,17,23 92:6,16
92:16,22 93:2 94:12,21 95:3,24 96:7
97:17 98:23 99:4,17,18 100:15,17
101:8,15,19 102:2,12,15 104:14,23
107:12 108:3
**weren't** 26:4 39:4
**west** 23:5 63:19,24
**we'll** 10:6 53:7
**we're** 26:13 29:17 50:21 68:24 95:15
**WHEREOF** 110:20
**whichever** 32:22
**while** 13:10 21:7,11 40:16 99:15
101:19
**White** 2:17
**whole** 32:11
**wide** 92:19
**wife** 43:17
**wires** 76:7
**witness** 3:15 19:19 30:23 41:7 93:16
93:22 109:3 110:6,14,20
**words** 5:3 14:2,20 21:16 30:22 41:2
47:6,11 68:18
**work** 7:21,22 15:25 16:19 18:11 19:2
20:15 21:15 46:16 48:8,14 51:12
83:8,13 84:8 86:10,19 89:19 95:17
95:21,22,25 96:5,8,10 99:22
**worked** 6:13 18:23 19:21 20:21,24
21:2 24:11 101:2 107:16
**workers** 23:12 63:10 67:11 96:14,23
**working** 13:10 17:3,25 18:4 21:7,11
22:10,14 23:4,8,21 29:13 37:15 91:8
91:17 92:6 99:18,18 109:15
**worse** 74:25
**Wrestling** 86:16
**wrist** 41:5,25
**writing** 10:5
**wrong** 64:13

                    **X**
**x** 1:2,8,14
**xxxxx** 2:25 3:25
**x-rays** 39:24 54:25 55:2 60:16 63:21
64:12 104:11

                    **Y**
**yard** 86:19 89:18
**yeah** 22:17 26:18 28:7 36:20,23 38:25
39:3,6 40:15 42:6,17 46:15 53:14

55:11 62:8 66:7 71:20 73:13 76:4
78:24 79:17 87:3 91:4 92:5 95:23
**year** 7:18 9:17 15:13 43:12,14 44:5
75:20 76:2 79:6 80:3,9 81:9,15 85:4
88:3 96:7
**yearly** 96:9
**years** 8:21 11:7 12:4 43:8,11 65:12,14
86:4 89:10 95:13,19 96:2
**yesterday** 54:4 56:3 84:4 85:19
**york** 1:1,5,6,9,9,18,19,20,23 2:5,5,9,9
2:12,12,17,23,23 4:5,16,17 63:25
69:22

                    **$**
**$150** 97:5
**$400** 96:21
**$50** 94:10

                    **0**
**04** 74:21 87:19
**06** 61:3 72:17
**07748** 4:14

                    **1**
**1:20** 108:8
**10** 109:10,12
**10:50** 1:19
**100** 58:2,3
**10017** 2:12
**10388** 2:5,23
**10271** 1:23
**10601** 2:17
**11th** 2:11
**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** 5:12
**12** 32:4
**12th** 52:4 104:19
**120** 1:22
**13658/04** 1:4
**15** 1:19 71:24 73:5,9 74:20
**15th** 110:5
**150** 1:18 2:4
**16** 45:2
**16th** 21:6,12,14,22 22:2,11 23:22 24:7
25:8,18 26:6 37:24 38:8 46:14 47:25
50:23 69:18 77:12 79:24 80:21
87:12
**17** 109:14
**17th** 63:19,24
**170** 2:16,22
**1975** 5:20
**1979** 43:13
**1985** 43:15
**1987** 8:24 12:18 13:4
**1989** 8:23
**1998** 44:17

                    **2**
**2nd** 10:24
**20** 12:4 44:25 60:23 71:24 73:5,9
74:20 86:4
**2000** 45:8

**2004** 4:21 6:3,18 12:12 21:7,12,15,22
22:2,11 23:22 24:7 25:9,18 26:6
37:24 38:8 45:4,9 46:14 48:2 50:23
63:20 65:13 69:18 77:12 79:24
80:21 87:12
**2005** 58:17 59:7,10,12 60:3 64:7 65:18
75:22,24 76:3
**2006** 1:19 58:15 59:25 61:16 65:15
66:2,13 67:3 74:5 75:19 84:25
110:6,21
**203** 2:16
**212-732-8066** 1:24
**22** 44:25
**23** 37:8
**25** 60:23
**27** 43:20
**28** 13:5
**292** 2:11

                    **3**
**3116** 3:20
**3117** 3:20
**37th** 69:21

                    **4**
**4** 109:4
**4th** 1:18 2:4
**40** 6:9,11 94:7
**400** 63:14
**421** 4:13
**49** 88:25

                    **5**
**5th** 2:22
**50** 88:25
**50-H** 15:11,22

                    **6**
**65** 109:17

                    **7**
**7:00** 99:23
**78** 6:12

                    **8**
**82** 109:18
**87** 9:19

                    **9**
**9/16** 20:14
**9/16/55** 5:10
**90** 109:5
**98** 109:6

1

2                                            JOHN MOORE
                                          2004 PI 020981
3                                          O15-220
        ------------------------------------------X
4       In the Matter of the Claim of:

5       JOHN MOORE,

6                                    Claimant,

7              -against-

8       THE CITY OF NEW YORK,

9                                    Respondent.

10      ------------------------------------------X

11

12                              61 Broadway
                                New York, New York
13
                                December 9, 2004
14                              3:30 P.M.

15          50-h HEARING of JOHN MOORE, the Claimant herein,

16      taken by the attorney for the Respondent, pursuant to

17      Section 50(h) of the General Municipal Law, held at the

18      above-noted time and place before a Notary Public of

19      the State of New York.

20

21

22

23

24

25

2

1

2

3        A P P E A R A N C E S:

4

5

6          SACKS & SACKS
                Attorneys for John Moore
7               150 Broadway, 4th Floor
                New York, New York 10038

8

9          BY: ANDREW R. DIAMOND

10

11

12

13         JANE N. BARRETT, ESQ.
                Attorney for the City of New York
14              61 Broadway
                New York, New York 10006

15

           BY: CASEY McARDLE, ESQ.
16         BLA NO.: 2004 PI 02981

17

18

19

20

21

22

23

24

25

3

1    J O H N   M O O R E,

2         The witness herein, having first been duly sworn

3    by Joseph J. Pontillo, a Notary Public in and for the

4    State of New York, was examined and testified as

5    follows:

6    DIRECT EXAMINATION BY CASEY McARDLE, ESQ.:

7         Q    State your name for the record, please.

8         A    John Moore.

9         Q    What is your address?

10        A    421 Walnut Street, Port Monmouth, New

11   Jersey, 07758.

12        Q    Good afternoon, Mr. Moore.  My name is

13   Casey Mcardle.  I represent the City for this

14   hearing.  I'm going to ask you some questions.  If

15   you don't understand my question, please tell me or

16   your attorney before you respond.  Otherwise, if you

17   respond it means you understood the question.  Do

18   you understand everything so far?

19        A    Yes.

20        Q    What is your date of birth?

21        A    9/16/55.

22        Q    What is your Social Security number?

23        A    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.

24        Q    Are you currently employed?

25        A    No.

4

```
 1                    JOHN MOORE

 2       Q    What is the last time you were employed?

 3       A    September 16, 2004.

 4       Q    Is that your birthday?

 5       A    Yes.

 6       Q    Where were you employed at that time?

 7       A    Saint George's Terminal in Staten Island.

 8       Q    Who was your employer?

 9       A    A.J. McNulty.

10       Q    What is A.J. McNulty in the business of?

11       A    Iron work.

12       Q    What did you do for them?

13       A    Erection.

14       Q    Did you have other job duties there?

15       A    Just erection.

16       Q    Erection of what?

17       A    Iron.

18       Q    How long did work there?

19       A    Four days.

20       Q    How long did you work for A.J. McNulty

21  before 9/16/04?

22       A    I hadn't worked for them in years.

23       Q    When was the last time you worked before

24  you worked for several days for A.J. McNulty at that

25  location?
```

5

```
 1                        JOHN MOORE

 2         A     A week or so.

 3         Q     Where was the last location you worked

 4   before that?

 5         A     The Sloan-Kettering Building for Cornell

 6   Iron Works.

 7         Q     How long did you work with them?

 8         A     Six months.

 9         Q     Are you a member of a union?

10         A     Local 40.

11         Q     Prior to the work that you did at

12   Sloan-Kettering with Cornell, where did work before

13   that?

14         A     To be honest, I don't recall.

15         Q     Were you working regularly before that?

16         A     Yes, I have been for twenty-five years.

17         Q     Who do you live with?

18         A     My girlfriend and my son and her children.

19         Q     What is your girlfriend's name?

20         A     Susan Catapano.

21         Q     What is you son's name that you live with?

22         A     Michael Moore.

23         Q     What are the other children's names that

24   you live with?

25         A     Catarina, Jessica and Jimmy.
```

6

```
1                    JOHN MOORE

2      Q    What are their ages?

3      A    They are fourteen, eighteen and twenty.

4      Q    Do you live with anybody else?

5      A    No.

6      Q    How long have you lived at your present

7   address?

8      A    Six years.

9      Q    Where did you live immediately before

10  that?

11     A    Westchester County, Dobb's Ferry.

12     Q    How long did you live there?

13     A    About ten or eleven years.

14     Q    Have you ever been legally married?

15     A    Yes.

16     Q    Who were you married to?

17     A    Caroline Kidney.

18     Q    Is that the only person that you have been

19  married to?

20     A    Yes.

21     Q    Are you currently married, separated,

22  divorced or something else?

23     A    No.

24     Q    What are you?

25     A    We are engaged.
```

7

```
 1                         JOHN MOORE
 2      Q    Who are you engaged to?
 3      A    Susan Catapano.
 4      Q    What is your martial status?
 5      A    I'm engaged.
 6           MR. DIAMOND:  She means to Caroline.
 7      A    I have been divorced for fifteen years.
 8      Q    Were you involved in an accident that took
 9  place sometime this year?
10      A    Yes.
11      Q    What was the date of the accident?
12      A    9/16/04.
13      Q    Where did it occur?
14      A    Staten Island at the Saint George's Ferry
15  Terminal.
16      Q    How many terminals are there for the ferry
17  there?
18      A    I don't know.
19      Q    Do you know how to identify with more
20  specificity where exactly you were when the accident
21  happened at the Saint George's Terminal on Staten
22  Island?
23           MR. DIAMOND:  What were you working on?
24      Describe the structure.
25      A    We were putting a beam in.  It was an
```

8

```
 1                    JOHN MOORE

 2   addition in a renovation.  I'm not sure what you're

 3   looking for.

 4        Q    You said you were at the Saint George's

 5   Terminal at the Staten Island Ferry.

 6        A    Yes.

 7        Q    How big is the Saint George's Terminal at

 8   the Staten Island Ferry?

 9        A    Five blocks wide, about two or three blocks

10   from the water to the street.

11        Q    What part of it specifically were you at

12   when your accident happened?

13        A    I don't know.

14             MR. DIAMOND:  She means were you working

15        at the building?  Is there any way to pinpoint

16        what you were working on so she can get an

17        understanding of where.

18        A    We were building a new terminal, I think.

19        Q    Were there any markings or designations

20   that said exactly where you were at the terminal at

21   the time of your accident?

22        A    No.

23        Q    Was there a building near you?

24        A    Yes, there was, a couple of a hundred feet

25   away.  It was also a new addition.
```

9

1                        JOHN MOORE

2        Q    Were you outside at the time?

3        A    Yes.

4        Q    Do you know the name of the building that

5   was a couple of hundred feet away?

6        A    No.

7        Q    Do you know the number or street address

8   to that building, if there is one?

9        A    No.  When I was sent from the union hall

10  it was just Saint George's Terminal at the Staten

11  Island Ferry.

12       Q    Do you know what that building that was a

13  couple of hundred feet away from where your accident

14  happened housed?  What was inside that building?

15  What was the building used for?

16       A    No, I don't know.  I imagine it was for

17  buses.  There was a lot of buses that waited for the

18  people to come off the ferry.  We were working about

19  twenty feet away from a ramp that exited the terminal

20  into the street.

21       Q    Into what street?

22       A    I don't know.  I'm not familiar with

23  Staten Island.  I don't know the name of the blocks.

24       Q    Do you recall seeing any structures across

25  the street from where you were working.

JOHN MOORE

2      A      On the other side of the street, yes.

3   There was a big structure there.  I don't know if it

4   was a post office or a library.

5      Q      Maybe a courthouse.

6      A      Yes.

7      Q      How far were you from the sidewalk of the

8   street?

9      A      A quarter mile.

10             MR. DIAMOND:  Off the record.

11             (Whereupon, a discussion was held off

12         the record.)

13      Q      How high up were you from ground level at

14   the time of your accident?

15      A      From ground, I was one floor.

16      Q      Can you estimate how many feet you were

17   from ground level at the place you were at the time

18   the accident happened?

19      A      Ten or twelve feet.

20      Q      What were you resting your body on at the

21   time?

22      A      I wasn't resting it on anything.  I was

23   helping push a beam.

24      Q      Were you standing on something?

25      A      I was on cinder blocks that were right

11

JOHN MOORE

1

2  next to an elevator shaft that went down two

3  subbasement levels in addition to one floor above

4  the ground and it wasn't closed off.

5      Q    What do you mean closed off, closed off

6  from what?

7      A    Whenever I work in a building, if there is

8  an existing elevator shaft, whether it's operable or

9  inoperable, if it has no doors on it, it has to have

10  safety so someone doesn't just walk into the elevator

11  shaft.

12      Q    Did you make a comment about that to anyone

13  before your accident?

14      A    All of us were commenting on it.

15      Q    Who is "us" that you are referring to?

16      A    The guys that I was working with.

17      Q    What are their names?

18      A    The only guys I remember are Jim Sullivan

19  and Michael Greco.

20      Q    Do you know who Jim Sullivan worked for at

21  the time?

22      A    A.J. McNulty.

23      Q    Do you know who Michael Greco worked for

24  at the time?

25      A    A.J. McNulty.

12

1                              JOHN MOORE

2        Q      Do you know where they work now?

3        A      No.  I haven't been in contact with

4    anybody since I fell.

5        Q      Was the elevator shaft involved in your

6    accident?

7        A      Yes.

8        Q      What is the first thing that happened in

9    the accident?

10       A      I reached up to push the beam in, to help

11   the connectors to push the beam in and I fell

12   backwards down the shaft.

13       Q      What were you pushing the beam into?

14       A      The existing building that was there.  We

15   were adding onto it.  We were having a problem with

16   it and the crane was holding the beam.  I imagine it

17   was about a three thousand pound beam.

18       Q      Was the beam you were trying to push into

19   the building several thousand pounds?

20            MR. DIAMOND:  Note my objection to the

21         form, you can answer.

22       A      I imagine it was a couple of thousand

23   pounds.

24       Q      Had you ever pushed a beam of that weight

25   prior to the accident?

13

JOHN MOORE

1

2          MR. DIAMOND:  Over objection, you can

3      answer.

4          A    Yes, when it's suspend in the air by a

5  crane it gives it a swing where you are not actually

6  pushing the whole weight of the beam itself.  You're

7  trying to guide it in.

8          Q    Was anybody else pushing simultaneously

9  with you?

10         A    Yes.

11         Q    Who else?

12         A    Bob, I don't know his last name.

13         Q    Did you speak to Bob before you began

14  pushing the beam about the manner in which you were

15  going to push the beam?

16         A    Yes.  We understood we were going push it

17  to the connector so he could make his bolts.

18         Q    How did you understand that?

19         A    How do I know that I understood that?

20         Q    Yes, and he understood that.

21         A    We had been doing it for years.

22         Q    Had you worked with him prior to the

23  accident?

24         A    Yes.

25         Q    What caused you to fall backwards in the

14

JOHN MOORE

1

2    accident?

3        A    The concrete I was standing on, the cinder

4    block shaft, it busted up.

5        Q    At the time of the accident, were you in

6    an upright position?

7        A    Yes.

8        Q    When you say the cinder block busted up,

9    what do you mean by that?

10        A    It broke off.

11        Q    Broke off from what?

12        A    From the existing foundation that it was

13    supposed to have been chopped out of, but it

14    evidently wasn't.  It was --

15            MR. DIAMOND:  Where did it break off

16        from, is her question.

17        A    The foundation.

18        Q    Can you describe the foundation that you

19    are referring to?

20        A    The wall of the elevator shaft.

21        Q    In the place where you were standing on

22    the cinder block, at the time that you pushed the

23    beam, were you in the elevator shaft?

24        A    No, I was standing on the threshold of the

25    elevator shaft.

15

JOHN MOORE

1

2    Q    How many feet were you from the elevator

3  shaft at that time or any other measurement?

4    A    A foot or two feet, maybe.

5    Q    Where was that, in front of you, to the

6  left, right or something else?

7    A    Behind me.

8    Q    Did you notice that the elevator was not

9  blocked off?

10        MS. McARDLE:  I don't want to

11    mischaracterize the term that he used.

12        MR. DIAMOND:  That's okay, I appreciate

13    that.  Off the record.

14        (Whereupon, a discussion was held off the

15    record.)

16    Q    I'll rephrase.  At the time of your

17  accident, were you aware that there was nothing

18  between where you were standing and the elevator

19  shaft?

20        MR. DIAMOND:  Over objection to form, you

21    can answer.  Do you understand the question?

22        THE WITNESS:  No.

23    Q    Was there anything between behind you and

24  the elevator shaft when the accident happened?

25    A    No.

16

JOHN MOORE

1

2      Q      Were you aware of that before the accident

3  happened?

4      A      Yes.

5      Q      Was the movement of the beam the cause of

6  you falling backward?

7           MR. DIAMOND:  I'll object to the form.

8        Can you rephrase the question.

9      Q      Are you aware of whether the movement of

10  the beam caused you to fall backward?

11           MR. DIAMOND:  Did it contribute, aside

12        from what he already testified to, about the

13        breaking of the cinder block?

14      Q      Aside from what you already testified to.

15      A      No.

16      Q      Do you know what happened to the beam when

17  you fell?

18      A      No, I was unconscious.

19      Q      For how long?

20      A      From what I understand, a half hour or so.

21      Q      Do you know what you landed on?

22      A      The concrete.

23      Q      Do you recall landing?

24      A      No.

25      Q      What is the last thing that you remember

17

JOHN MOORE

1

2    in the accident?

3        A    The concrete breaking off and me grasping

4    for something so I wouldn't fall.

5        Q    Did you grasp for something?

6        A    I tried to grasp for something.

7        Q    Do you know what you were grasping for?

8        A    Anything.

9        Q    Did you come in contact with anything while

10    you were attempting to grasp for something?

11        A    I must have, because I shattered my arm.

12        Q    Which arm?

13        A    My right arm.

14        Q    Aside from the injury to your right arm,

15    did you injure any other part of your body in the

16    accident?

17        A    My shoulder, my neck, my back, my head, my

18    knees, my ankles.

19        Q    Which shoulder?

20        A    My right shoulder.

21        Q    What injury did you sustain to your right

22    shoulder?

23        A    I'm waiting for an MRI.  They believe it's

24    a torn rotator cuff.

25        Q    Aside from what you described about the

18

JOHN MOORE

1

2   shattering injury to your right arm, were you given a

3   diagnosis of the injury to your right arm following

4   the incident by a medical practitioner of some kind?

5      A   After the x-rays?

6      MR. DIAMOND:  At any time, has any one

7      diagnosed your injury other than what you

8      said about it being shattered?

9      A   Of my arm and shoulder or just my arm?

10      Q   Just the right arm.

11      A   I broke off a piece of the elbow and it

12   floated down into my forearm.  They had to

13   subsequently retrieve the bone within the forearm.

14      After I had the operation, I was in a cast

15   which I just got off about ten days ago.

16      Q   Was any surgery performed to your right

17   elbow?

18      A   Yes.

19      Q   What surgery was performed to your right

20   elbow?

21      A   Replacing the chip.  You have a point on

22   your elbow, I no longer have a point on my elbow.

23      Q   Do you know what it was replaced with?

24      A   No.

25      Q   Can you indicate the place on the forearm

19

1                          JOHN MOORE

2    where the chip fell to from your elbow.

3         A    Somewhere in here.  (Indicating)

4         MR. DIAMOND:  Indicating the outside

5    portion of the right arm between the elbow

6    and the wrist, closer to the elbow.

7         MS. McARDLE:  Would you say about two

8    inches below the elbow?

9         MR. DIAMOND:  I would say about six

10   inches below the elbow, almost between the

11   wrist and the elbow.

12        MS. McARDLE:  I'd say four.

13    Q    Now you're pointing to a lower place.

14    A    The pain is all in here. (Indicating)

15        MR. DIAMOND:  John, the purpose of this

16   question, as far as you understood, point to

17   the spot on your arm, without moving your

18   finger, where you understood the chip fracture

19   traveled to.

20        MS. McARDLE:  Now it's six inches.

21    Q    Do you have a scar on your right arm as a

22   result?

23    A    Yes.

24    Q    Can you describe the scar?

25        MR. DIAMOND:  Describe it, don't point.

20

JOHN MOORE

1

2    What does it look like to you, size, shape?

3    A    It's about four inches.  I no longer have

4    a point in the elbow.

5         MR. DIAMOND:  Just talk about the scar,

6         it's four inches.  Is there anything else

7         about it?

8         MS. McARDLE:  That's part of the scar.

9    Q    Go ahead.

10   A    It's dented, I can't lift anything with the

11   right arm.  I'm right handed.

12   Q    Did you ever injure your right arm before

13   this accident?

14   A    No.

15   Q    When you testified earlier you had a

16   shatter injury to your right arm, is that what you

17   meant, the part of the right elbow that broke off?

18   A    Yes.

19   Q    Aside from that, are you aware of any

20   other injury to your right arm?

21   A    No.

22   Q    Are you required to undergo any future

23   surgery to the right arm that you are aware of?

24   A    Not that I'm aware of yet.

25   Q    Is that the only surgery that you have

21

1                              JOHN MOORE

2     undergone in connection with this accident?

3          A     So far.

4          Q     Are you scheduled to have any more in the

5     future?

6          A     My rotator cuff and my shoulder.

7          Q     When is that scheduled for?

8          A     We are waiting on the MRI.

9                MR. DIAMOND:  Off the record.

10               (Whereupon, a discussion was held off the

11          record.)

12         Q     What injuries did you sustain to your

13    neck?

14         A     We're waiting for the MRI on that as well.

15    He believes from the x-ray that I cracked a vertebra

16    in my neck.

17         Q     Did you ever injure your neck before this

18    accident?

19         A     No.

20         Q     Did you ever injure your right shoulder

21    before this accident?

22         A     No.

23         Q     Did you ever have an MRI to your right

24    shoulder before this accident?

25         A     No.

22

```
 1                    JOHN MOORE

 2       Q    Did you ever have an MRI to your neck

 3  before this accident?

 4       A    No.

 5       Q    What injuries did you sustain to your back,

 6  aside from what you just testified to, about the

 7  vertebra?

 8       A    The lower back down here.  I guess where

 9  the disks, I imagine are.  (Indicating)

10       Q    What disks are you referring to?

11       A    Right here.  (Indicating)

12            MR. DIAMOND:  Do you know the numbers?

13       Q    There are disks throughout your spine.

14       A    I don't know.

15       Q    Are you talking about disks that a doctor

16  has pointed out to you as being part of an injury?

17       A    I'm not trying to be difficult, but I have

18  had a problem since I hit my head retaining

19  information.

20            My girlfriend works and she can't come to

21  the doctor with me.  The only time she came was to

22  the neurologist.  Unless I write it down, what they

23  are saying to me, I don't retain a lot of the

24  information that they are saying.

25       Q    Do you recall anything about the injuries
```

23

JOHN MOORE

1

2  that you were told you sustained to your back in the

3  accident, aside from that it is the lower level of

4  your back and it involves disks?

5      A    Just that my whole back was black and

6  blue.

7      Q    What injury did you sustain to your head

8  in this accident?

9      A    I had a cut back here, I was unconscious.

10 (Indicating)

11     Q    Are you indicating the back of your head?

12     A    Yes.  I was unconscious for a while.

13     Q    Can you describe the size of the cut?

14     A    Two and a half to three inches.  I'm just

15 guessing.

16     Q    Did you have stitches to the back of the

17 head?

18     A    Yes.

19     Q    Do you know how many?

20     A    About six or seven.

21     Q    What injuries did you sustain to your

22 knees in the accident?

23     A    Nothing showed up on the x-rays, but I

24 have to wear those pull up knee things now.

25     Q    Do you know what they are for?

24

1                          JOHN MOORE

2       A    I wear them for support so I'm not limping

3    around.

4       Q    Were they prescribed?

5       A    No.

6       Q    Have you received treatment to the knees

7    in connection with this accident?

8       A    No.  I've been doing physical therapy for

9    my back.

10      Q    What about the knees?

11      A    Nothing showed up on the x-rays, so I

12   haven't.  There is no visual thing, but I experience

13   pain.

14      Q    Have you talked to a doctor or a medical

15   practitioner about the pain in your knees?

16      A    Yes.

17      Q    Who have you spoken to about that?

18      A    The orthopedic surgeon that is working on

19   my shoulder and elbow.

20      Q    What is his or her name?

21      A    Dr. Touliopoulos.

22      Q    What did Dr. Touliopoulos tell you about

23   the condition of your knees?

24      A    He said it's probably connected to the

25   fall.

25

JOHN MOORE

1

2    Q    Were you ever given a diagnosis about the

3  knees following the accident?

4    A    No.

5    Q    Did you receive any physical therapy to

6  the knees?

7    A    Yes, I do light exercises at physical

8  therapy for the knees.

9    Q    Where do you go for physical therapy?

10    A    Holmdel, New Jersey.

11    Q    What is the name of the facility?

12    A    Procare Rehabilitation Services.

13    Q    Do you know the street address?

14    A    Highway 35.  I don't know the exact number.

15  I know how to get there by landmarks.

16    Q    Did you suffer any cognitive injuries that

17  you are aware of?

18    A    What is cognitive.

19    Q    Thinking.

20    A    Yeah.

21    Q    Were you told by a medical practitioner of

22  some kind that you had suffered cognitive injuries

23  in this accident?

24    A    I have only seen the neurologist twice.

25    Q    What is that person's name?

26

JOHN MOORE

```
 1
 2      A    Dr. Hausknecht.
 3           MR. DIAMOND:  By Counsel, that's
 4      H-A-U-S-K-N-E-C-H-T.
 5      Q    Do you know where Dr. Hausknecht's office
 6  is located?
 7      A    No.  I think on 39th Street in Manhattan
 8  near 5th Avenue or Park Avenue.
 9      Q    Do you know Dr. Hausknecht's first name.
10      A    No, I don't.
11           MR. DIAMOND:  By Counsel, Aric, A-R-I-C.
12      Q    What did Dr. Hausknecht tell you about your
13  condition?
14      A    That the pain in my head and the ringing
15  in my ears and the blurred vision and me forgetting
16  things during a conversation, is probably a result of
17  the fall.
18      Q    What sort of things do you forget, except
19  what you have testified to?
20           MR. DIAMOND:  Let me object to that.
21      I don't know if that is a fairly phrased
22      question.  You are asking him to remember
23      what he forgot.
24      Q    What brought to your attention that you
25  had the forgetfulness that you spoke to Dr.
```

27

JOHN MOORE

1

2   Hausknecht about following the accident?

3       A    In conversations with my girlfriend, I was

4   losing my trend of thought in the middle of a

5   conversation.  This was the cause of a little bit of

6   a rift because it was frustrating for her.  I wasn't

7   consciously trying to forget what we were talking

8   about.

9           My son would say things, like you're

10  supposed to take me to practice today and I'd say,

11  you never mentioned it to me.

12      Q    How old is your son?

13      A    He'll be ten in February.

14      Q    Do you have partial custody or full custody

15  of him?

16      A    It's partial custody but I have full

17  physical custody.  He lives with me.  He gets to

18  visit his grandmother on the maternal side once

19  every couple of weeks.  I have full physical

20  custody.  I have him in school, I pay for all the

21  bills.

22      Q    What injuries did you sustain to your

23  ankles in the accident?

24      A    Nothing was revealed on the x-rays, but to

25  support myself walking, I have to wear these things.

28

1                           JOHN MOORE

2      (Indicating)

3                MR. DIAMOND:  Indicating an ace bandage.

4         Q    Do you know what happened to your ankles

5    in the accident?

6         A    No, I don't remember a whole lot about the

7    accident.

8         Q    Were there any markings on your ankles

9    after the accident?

10        A    No.

11        Q    Were there any markings on your knees

12   after the accident?

13        A    No.

14        Q    Was there any kind of markings on your

15   right shoulder after the accident?

16        A    Black and blue and scrapes.

17        Q    Do you know what your shoulder came in

18   contact with in the accident?

19        A    No.

20        Q    What time of day was the accident?

21        A    In the morning.

22        Q    Can you be more specific?

23        A    It was, I guess, around eight or nine in

24   the morning.  We start at seven.  It was pretty much

25   one of the first things we did that day.

29

```
 1                    JOHN MOORE
 2       Q    What was weather like at the time?
 3       A    A little cloudy, I think.
 4       Q    Was there anything overhead of you at the
 5   place where the accident happened?
 6            MR. DIAMOND:  Do you mean covering him?
 7       Q    Anything overhead except for the sky?
 8       A    The boom of the crane.
 9       Q    How high overhead was it?
10       A    Do you want me to guess?
11            MR. DIAMOND:  No.
12       Q    Approximately, don't guess.
13            MR. DIAMOND:  If you can, give an
14   estimate.  If you cannot, don't guess.
15       A    Not really.
16       Q    Where was the crane itself in relation to
17   where you were at the time of the accident?
18       A    To my right.
19       Q    Was it at ground level?
20       A    Yes.
21       Q    Was somebody operating it?
22       A    Yes.
23       Q    Who was operating it?
24       A    I don't remember.  An operating engineer.
25   I don't remember his name.
```

30

JOHN MOORE

1

2      Q      Do you have any pictures of the accident

3    site?

4      A      No.

5      Q      Do you know if any were taken?

6      A      I don't know.

7      Q      Did anyone ever tell you that they were?

8      A      No.

9      Q      Did anyone ever return to the site on your

10   behalf to take pictures of the accident site?

11     A      I don't know.   I'm not trying to be

12   difficult.

13     Q      I don't think you're trying to be difficult.

14            Do you know what happened to the cinder

15   block that you were standing on at the time of the

16   accident?

17     A      No.

18     Q      Who was your immediate supervisor at the

19   time?

20     A      I don't remember his name, it was the

21   first time I worked for him.

22     Q      What did he look like?

23     A      A black gentleman, close to my age, close

24   to fifty.   He was out of my local but there's a

25   thousand guys in my local.   I may know a hundred

31

1                    JOHN MOORE

2   fifty.  I've been in that local twenty-five years.

3       Q   Do you know what caused the part of the

4   cinder block to break off in the accident?

5       A   My estimation?

6       MR. DIAMOND:  No, you can't guess.

7   She's asking if you know.

8       Q   In your experience.

9       MR. DIAMOND:  No, I object to that.

10   He's not here as an expert.  He either knows

11   or doesn't.  It's not an experience question.

12       Q   Do you know what caused the cinder block

13   to break off in part?

14       A   No.

15       Q   Did you ever have a conversation with

16   anybody about what might have caused the cinder

17   block to break off, aside from conversations with

18   your attorney?

19       MR. DIAMOND:  Objection to the form

20   of the question.

21       A   No.

22       Q   Did you hear of any complaints made about

23   that particular cinder block you were standing on at

24   the time of your accident before your accident

25   happened?

32

JOHN MOORE

1

2      A    No.

3      Q    Did you yourself complain about the cinder

4  block before the accident?

5      A    It was the first time I worked in that

6  area.

7      Q    Were there any indications that the cinder

8  block was about to break before your accident?

9      A    No.

10     Q    Did you hear any noise of any kind before

11  the accident?

12     A    No.

13     Q    Did you feel anything underfoot that gave

14  an indication that the cinder block was about to

15  give way in the place where you were standing?

16     A    Yes, it broke off and it was too late.

17     Q    What did it feel like as it was breaking

18  off?

19     A    Like a snapping and crumbling.  Guys had

20  been complaining for days about the fact that that

21  elevator shaft shouldn't have been erected until we

22  had the iron in there already.

23     Q    Did they say why it shouldn't have been

24  erected before you had the iron in there already?

25     A    Because it was in the way of us putting in

33

1                          JOHN MOORE

2      the beams.

3           Q     Do you know who erected it, the elevator

4      shaft?

5           A     No, I don't know.

6           Q     Is that something that A.J. McNulty would

7      do on the job?

8           A     No.

9           Q     Were there other contractors on the job?

10          A     Yes.

11          Q     What are their names?

12          A     I think Skanska.

13          Q     Do you know who the general contractor was

14      on the site?

15          A     Skanska

16          Q     How many other contractors were on the site

17      aside from Skanska and A.J. McNulty?

18          A     There had to be electricians, plumbers

19      steamfitters, laborers.

20          Q     Was there a site safety contractor there?

21          A     I never met him.

22          Q     Did you observe any safety inspectors at

23      the site?

24          A     No.

25          Q     Do you know which of those contractors

34

1                          JOHN MOORE

2    would have been responsible for the erection of the

3    elevator shaft?

4         A    I imagine the GC, Skanska.

5         Q    Did you ever speak to anybody at Skanska

6    on that job?

7         A    No.

8         Q    Do you know who the foreman was for Skanska

9    on that job?

10        A    No.

11        Q    Did ever see any employees of the City of

12   New York on that site at any time while you were

13   working there?

14        A    There were MTA bus drivers there.

15        Q    Did you ever see any employees of the City

16   of New York who had some responsibility regarding the

17   construction underway there at the site while you

18   were there at the site before your accident?

19             MR. DIAMOND:  Over my objection to the

20        form, you can answer, if you understand the

21        question.

22             MS. McARDLE:  What is your objection?

23             MR. DIAMOND:  You are assuming that he

24        would be able to recognize somebody from

25        the City that had a role regarding this project

35

                        JOHN MOORE

1        in some way.

2            MS. McARDLE:  I'll rephrase it.

3    Q    Did you ever see any employees of the City

4    of New York that you believed had some role in the

5    construction at the site before your accident

6    happened?

7    A    No.

8    Q    Did you ever attend any safety meetings

9    about the work performed there?

10   A    No.

11           MR. DIAMOND:  Note my objection to the

12       form.

13           MS. McARDLE:  What is the objection?

14           MR. DIAMOND:  Is assumes there were

15       meetings.

16           MS. McARDLE:  There may not have been any.

17           MR. DIAMOND:  You have his answer.

18   Q    Do you know if safety meetings were

19   conducted at the site?

20   A    I was --

21           MR. DIAMOND:  Do you know, yes or no?

22   A    No.

23   Q    Do know what distance you fell in the

24   accident?


36

JOHN MOORE

1

2          MR. DIAMOND:  Estimate, if you can.

3      A    About twenty-five to thirty feet.

4      Q    Do you know what you physically landed on?

5      A    The concrete, I think.

6      Q    Did you land on any objects or just flat

7  concrete?

8      A    I don't know.

9      Q    Do you know if you struck any objects on

10  the way down before landing?

11          MR. DIAMOND:  Other than what he testified

12        to before about his arm.

13      Q    Other than what you testified to about the

14  injuries you sustained to your arm.

15      A    No, I don't know.

16      Q    Did you speak to any eyewitnesses after

17  the accident about the accident?

18      A    Yes.

19      Q    Who did you speak to?

20      A    Jim Sullivan.

21      Q    What was your conversation with Jim

22  Sullivan about?

23      A    He visited me in the hospital and he

24  basically said, I'm glad to see that you are not

25  dead.  Is there anything that I can do for you?

37

JOHN MOORE

2     I wasn't interested in particulars.  I'm

3  not trying to be --

4          MR. DIAMOND:  You don't have to say that.

5     Q    Is that the only conversation you had with

6  him?

7     A    Yes.

8     Q    Did you speak to anybody else that worked

9  at that job site about your accident after the

10  accident?

11     A    No.

12     Q    Do you know of anyone else who had an

13  accident at that job site before your accident?

14     A    No.

15     Q    What were you wearing at the time of the

16  accident?

17     A    A hardhat, gloves construction boots.

18          MR. DIAMOND:  What else, what was on

19     your body?

20     A    A tool belt.

21     Q    Did you have any other safety gear on at

22  the time?

23     A    No.

24     Q    Did you have a harness on?

25     A    No, I wasn't given a harness.

38

JOHN MOORE

1

2   Q     Did you ask for one?

3   A     No.

4   Q     Was anybody working with a harness at the

5   site that you were aware of?

6   A     No.

7   Q     Were you attached to any objects by a rope

8   or a wire?

9   A     No.

10   Q     Was there a scaffolding near by where you

11   were working at the time of the accident?

12   A     No.

13   Q     How did get up on top of the cinder block

14   before the accident?

15   A     It was ground level.

16   Q   . How wide was the elevator shaft?

17   A     Maybe eight by six.

18       MR. DIAMOND:  In feet?

19       THE WITNESS:  Yes.

20   Q     What is the shaft made of?

21   A     Concrete, cinder blocks.

22   Q     What was the first thing that you remember

23   when you came to after the accident?

24   A     The paramedics standing over me and a guy

25   I work with, Mike Greco, standing over me.  They

39

JOHN MOORE

2   told me not to move.

3       Q       Did you say anything to anyone at that

4   time?

5       A       I said, I guess I took a ten count.

6       Q       What does that mean?

7       A       In boxing, when you get knocked out, you

8   take a ten count.

9       Q       What happened after that?

10      A       They put me on a board and strapped my

11  neck down.  The paramedics asked me not to move.

12  They said they would get me out and I'd be okay.

13      Q       Can you describe how your body felt at the

14  time that you regained consciousness?

15      A       Pain.

16      Q       Can you describe that?

17      A       Not to be theatrical, tremendous pain in

18  the right side of my body, even in my ribs.

19      Q       Are you indicating your right elbow?

20      A       Yes.

21      Q       Do you mean your right arm?

22      A       Yes, my right arm, shoulder.  I had a

23  headache, a little bit of blurred vision.  My legs

24  hurt, my right hip, I was afraid.

25      Q       Did anybody, before the accident, tell you

40

                    JOHN MOORE

1

2    to work in the particular location where you were

3    working before you fell?

4         A    Yes, that is where the beam was going in.

5         Q    Who told you to work at the particular

6    place where you were located when the accident

7    happened?

8         A    The foreman.

9         Q    Who was the foreman?

10         A    I told you, I don't remember.  All I

11    remember is it was a black fellow about my age.

12         Q    Was there a supervisor on the job?

13         A    I imagine.

14         Q    Do you know that person's name.

15         A    No.

16         Q    What did the foreman say specifically about

17    you working at that location?

18         A    Put the beam in and work together.

19         Q    Were you given any further directions or

20    instructions on how to go about doing that from the

21    foreman?

22         A    No, I don't recall.

23         Q    Do you know if A.J. McNulty had a contract

24    with any entities to perform work at that location?

25         A    No idea.

41

JOHN MOORE

1

2      Q    Do you know who was responsible for the

3   contracts at A.J. McNulty?

4      A    No.

5      Q    After you fell in the accident, have you

6   re-injured any part of your body that was injured in

7   the accident?

8          MR. DIAMOND:  Meaning in another accident.

9      A    No.  My right elbow tends to swell up from

10  physical therapy.

11     Q    Where were you taken to from the scene?

12     A    Saint Vincent's Hospital in Staten Island.

13     Q    How long were you there following the

14  accident?

15     A    Four days.

16     Q    Did you have medical coverage for the stay

17  at the hospital?

18     A    Yes.

19     Q    Did you go straight home after you left the

20  hospital?

21     A    Yes.

22     Q    Did somebody care for you at home?

23     A    Yes.

24     Q    Who cared for you at home?

25     A    My girlfriend's children.

42

JOHN MOORE

1

2      Q      What does your girlfriend do for a living?

3      A      She is a marketing executive and a graphic

4    web designer.

5      Q      Was anyone hired to assist you at home

6    following the accident?

7      A      No.

8      Q      Were you confined to bed for any period of

9    time after you returned home from the hospital?

10     A      Yes.

11     Q      For how long?

12     A      I spent a lot of time in bed and on the

13   couch.  The kids would help me around the house and

14   to the dinner table.

15     Q      Did you use anything to help you walk

16   during that time?

17     A      The walls.

18     Q      Any medical apparatus?

19     A      No.

20     Q      Did you have to wear any kind of medical

21   apparatus following the accident aside from what you

22   already testified to, the cast and the bandages?

23     A      I had a sling.

24     Q      Was that on the right arm?

25     A      Yes.

43

1                              JOHN MOORE

2        Q      For how long?

3        A      About six weeks.

4        Q      Anything else?

5        A      No.

6        Q      Did you ever have to wear a back brace or

7    a neck collar?

8        A      No.

9        Q      When you regained consciousness, did you

10   still have your hardhat on?

11       A      I don't remember.

12       Q      How tall are you?

13       A      About five ten and a half.

14       Q      How much do you weigh?

15       A      One hundred ninety pounds.

16       Q      What was your weight on the day of the

17   accident?

18       A      Two fifteen.

19       Q      Are there any exercises or sports that you

20   did on a regular basis before the accident that you

21   are limited or can't do since the accident?

22       A      Yes.

23       Q      What are they?

24       A      I did weight lifting, hiking, basketball,

25   running, playing football and playing basketball with

44

JOHN MOORE

1

2    my son.

3        Q    Where would you weight lift before the

4    accident?

5        A    In the local gym.

6        Q    Do you have difficultly walking currently?

7        A    Yes.

8        Q    Can you describe it?

9        A    I'm slow.  After a while it starts hurting

10   my lower back on my right side by the hip over here.

11   (Indicating)

12       Q    The right hip, correct?

13       A    Yes.  My knees bothers me, on the inside of

14   my right knee specifically and my ankle hurts.

15       Q    Which ankle?

16       A    My right ankle, mostly.

17       Q    Is that after you walk a certain period of

18   time?

19       A    It depends on the day.

20       Q    How frequently did you have difficulty

21   walking in the past month?

22       A    Just about everyday.

23       Q    How far do you walk before you experience

24   difficulty?

25       A    Some days just from the bed to the kitchen,

45

JOHN MOORE

1

2   about sixty feet, some days longer.

3       Q     Do you take painkillers currently for your

4   pain?

5       A     Yes.

6       Q     What are you on right now?

7       A     Vicodin and Percocet.

8       Q     How long have been taking those?

9       A     Since I fell.

10      Q     What dosage are you taking of the Vicodin

11  currently?

12      A     I take one to two every six hours.

13      Q     Did you know what the dosage is?

14      A     Does seven fifty sound correct?

15      Q     If you are not sure, just say so.

16      A     I'm not sure.

17      Q     What about the Percocet?

18      A     I'm not sure.

19      Q     How many pills per day of the Percocet?

20      A     Three.

21      Q     Have you had any problems in taking either

22  of those medications?

23      A     What do you mean?

24      Q     Sides effects, any problem at all taking

25  them?

46

```
 1                    JOHN MOORE

 2        A    I can't drive and I can't pick my kid up

 3    from school.  My girlfriend has to do basically

 4    everything for me in addition to taking care of her

 5    own children.  We are working together even though

 6    she's doing most of the work.

 7             Before I got hurt, I still don't drink, I

 8    was pretty much a physical fitness buff.  I started

 9    smoking cigarettes again after almost eighteen years

10    of not smoking.

11        Q    Do you have any history of alcohol

12    problems?

13        A    No.

14        Q    Do you have a history of drug addiction of

15    any kind?

16        A    No.

17        Q    Have you had any craving for the Vicodin?

18        A    No.

19        Q    Have you had any cravings for the

20    Percocet?

21        A    No.

22        Q    How much are you smoking now?

23        A    A pack and a half a day.

24        Q    Prior to this accident, had you ever

25    received Workers Compensation?
```

47

```
 1                    JOHN MOORE

 2        A    Once for a broken finger.

 3        Q    When was that?

 4        A    About three years ago.

 5        Q    Where were you working when you broke your

 6   finger?

 7             MR. DIAMOND:  I'm going to object to the

 8        form of the question, it's not related.

 9        Q    Did you injure any other part of your body

10   in the accident in which you broke your finger?

11        A    No.

12        Q    Are you receiving Workers Compensation at

13   this time?

14        A    Disability.

15        Q    Did you receive Workers Compensation, at

16   all, in connection with this accident?

17             MR. DIAMOND:  Do you understand, do you

18        get Workers Comp checks?

19        Q    Or did you, after the accident?

20        A    Yes, I do now.  I think that is what I'm

21   getting.

22        Q    Do you know who is paying it?

23        A    The State Insurance Fund of New York.

24        Q    Have you been to a hearing for disability

25   or Workers Compensation benefits?
```

48

JOHN MOORE

```
 1
 2      A    No.
 3      Q    Are any planned or scheduled?
 4      A    No.
 5      Q    What are you receiving currently?
 6      A    Four hundred dollars a week.
 7      Q    Is that the total?
 8      A    Yes, and one hundred fifty from my local.
 9      Q    In total, you are receiving five hundred
10   fifty per week, correct?
11      A    Yes.
12      Q    What were your earnings before this
13   accident?
14      A    Net or gross?
15      Q    Either.
16           MR. DIAMOND:  What was the gross?
17      A    About thirteen hundred a week.
18      Q    What did you net?
19      A    About eight hundred.
20      Q    At the time of the accident, were you
21   enrolled in any school or taking any courses?
22      A    No.
23      Q    Did you have any other position of
24   employment or volunteer positions?
25      A    No.
```

49

JOHN MOORE

1

2      Q      Aside from what you testified to, are

3   there any hobbies that you are unable to do now

4   because of the accident?

5      A      That's pretty much what I did, physical

6   fitness.

7      Q      Where did you weight lift before the

8   accident?

9      A      In the local gym.

10      Q      What is the name of it?

11      A      Study Hall.

12      Q      What is the address?

13      A      I don't know the specific number.  It's on

14   Highway 36 in Kingsburg.

15      Q      Is that in New Jersey?

16      A      Yes.

17      Q      Do you have any pictures depicting how

18   your body appeared before the accident, within two or

19   three months before the accident happened?

20      A      I'm not that vain.

21      Q      Do you have any that exist that any family

22   or friends have?

23      A      I have a picture at my sister's wedding a

24   year or two ago.  I'm in a suit and you can see the

25   total difference in my mass.

50

JOHN MOORE

1

2      Q    I'll ask that you retain that, don't

3    destroy it until this matter is resolved.

4      A    It was all natural too.

5          MR. DIAMOND:  We will retain it.

6      Q    Do you have outstanding medical expenses

7    because of this accident?

8      A    Doctors visits.

9      Q    Were they paid for by an insurance

10   company?

11     A    Yes.

12     Q    Do you have any expenses, medical related,

13   because of the accident?

14         MR. DIAMOND:  Anything out of pocket that

15         hasn't been covered?

16     A    No.

17     Q    Any other expenses aside from medical

18   because of the accident?

19         MR. DIAMOND:  Do you understand?  Anything

20         that you had to pay for that you would not

21         have, had you not been injured?

22     A    Not that I can think of.

23     Q    Where was Bob standing at the time of the

24   accident?

25     A    Next to me.

51

JOHN MOORE

1

2      Q    Was he also standing on the cinder block?

3      A    I don't know.

4      Q    Was anything resting on the cinder block

5  you were standing on aside from you and possibly

6  Bob?

7      A    No.

8      Q    Do you know if the cinder block that you

9  were standing on was wet or damp?

10     A    No.

11     Q    Do you know how long it had been there in

12  that position before your accident?

13     A    No.

14     Q    Do you know who placed it there?

15     A    I guess --

16     MR. DIAMOND:  Note my objection, you can

17     answer.  Asked and answered before.

18     MS. McARDLE:  It was --

19     MR. DIAMOND:  He said who built the thing.

20     Q    Did the general contractor put the cinder

21  block there that you were standing on?

22     A    They were responsible for erecting the

23  elevator shaft and I assume that they did that.

24     Q    Did you receive any directions or

25  instructions from Skanska on the day of the accident

52

JOHN MOORE

1

2    as to how to perform your work that day before this

3    accident happened?

4        A    No.

5        Q    Were you holding anything in your hand at

6    the time of the accident?

7            MR. DIAMOND:    Other than pushing the beam?

8        Q    Were you contacting the beam when the

9    accident happened?

10        A    Yes.

11        Q    Before you fell, did you step backward?

12        A    I don't know.

13        Q    Do you know if there are any progress photos

14    taken of the work site by any of the contractors at

15    all or anybody?

16            MR. DIAMOND:    The question is, did anybody

17        take photos of the job that you know of?

18            MS. McARDLE:    Progress.

19            MR. DIAMOND:    I know, but I didn't think

20        he would know if they were necessarily

21        progress photos.

22        A    No.

23        Q    Were you on any medication at the time of

24    the accident?

25        A    No.

53

JOHN MOORE

1

2      Q      Do you wear glasses or contacts?

3      A      No.

4      Q      When is last time that you had your eyes

5   examined?

6      A      I can't remember.

7      Q      Did you consume any drugs, alcohol or

8   intoxicating substances within twenty-four hours of

9   the accident happening?

10      A      Absolutely not.

11      Q      On the days prior to the accident that you

12   worked at that job site, had you ever stood on that

13   particular cinder block before?

14      A      No.

15      Q      Did you see anybody else standing on it

16   before you stood on it and your accident happened?

17      A      No.

18      Q      Aside from you and Bob, who else was

19   working to put the beam in place at the time?

20      A      Mike Greco and the other guy.  I don't

21   remember his name.

22      Q      Were four people in total working to put

23   the beam in place at the time?

24      A      Yes.

25      Q      Does that include the crane operator?

54

JOHN MOORE

1

2      A    No.

3      Q    So it was is five people, correct?

4      A    Yes.

5      Q    What was Mike doing to put the beam in

6   place at the time of your accident?

7      A    We were all just trying to fit the beam

8   into the slot.

9      Q    Did you notice any barricades or

10  obstructions at all in the vicinity of where the

11  accident happened?

12     A    No.

13     Q    Were there any signs posted in the area?

14     A    No.

15     Q    Where was Michael standing when your

16  accident happened, if he was standing?

17     A    I don't know.

18     Q    Did you see him right before you fell?

19     A    I was looking at the other connector.

20     Q    The what?

21          MR. DIAMOND:  The other connector.  That

22  is his title.

23     Q    Is Mike a connector?

24     A    He was on that job.

25     Q    Where was the other connector located when

55

                              JOHN MOORE

1

2    your accident happened?

3         A    Up on the beam.

4         Q    Was Mike on the cinder block that you were

5    on when the accident happened?

6         A    No.

7         Q    Was Mike on the beam?

8         A    Yes.

9         Q    Did Mike know where you were located when

10   your accident happened?

11             MR. DIAMOND:  Objection, don't answer.

12        Q    Do you know if Mike was where you were

13   when the accident happened?

14             MR. DIAMOND:  Objection, don't answer.

15        Just rephrase.

16        Q    Within the period of time that you were

17   standing on the cinder block before you fell, did

18   you have a conversation with Mike?

19        A    No.

20        Q    During the time that you were on the

21   cinder block before you fell that day, did you have

22   a conversation with the other connector?

23        A    I really don't remember.

24        Q    Did you fill out a written report for your

25   employer about the accident?

56

JOHN MOORE

1

2     A     I was in the hospital.

3     Q     What treatment did you receive in the

4  hospital?

5     A     Surgery on my right elbow.  They took

6  x-rays of my head and I was in the trauma unit for a

7  couple of hours.

8     Q     Did you learn the results the x-rays to

9  your head?

10     A     A severe concussion.

11     Q     Do you plan on returning to work in the

12  future?

13          MR. DIAMOND:  Note my objection to the

14     form.  You can answer over my objection.

15     A     That is the only thing that I know how to

16  do.

17     Q     Have you spoken to a doctor about whether

18  you will be physically able to return to work in the

19  future?

20     A     He said there is a possibility, but being

21  that I have to use both of my arms, I might not have

22  full effect in my right arm.

23     Q     Aside from the medical providers and the

24  facilities that you have testified to already, did

25  you treat anywhere else in connection with the

57

JOHN MOORE

1

2    accident?

3        A    What do you mean?

4        Q    Did you go anyplace else for treatment,

5    examinations or testing, aside from the people and

6    the places that you have testified to already?

7        A    No.

8        Q    Besides what you testified to about the

9    condition of the elevator shaft when your accident

10   happened, did you observe any other safety concerns

11   with the work site before your accident?

12           MR. DIAMOND:  Object to the form of the

13       question.

14           MS. McARDLE:  What is the objection.

15           MR. DIAMOND:  First of all, it's so

16       incredibly broad, I don't know what you mean.

17       More importantly, he's not a safety inspector.

18           He took a fall into an elevator shaft and

19       that is what this case is about and this is a

20       50-H Hearing about that accident.  Anything

21       else is way above and beyond what is

22       permissible.

23       Q    Were you and the other employees at the

24   site complaining about anything else on the job

25   before your accident?

58

JOHN MOORE

1

2    A    No.

3    Q    Do you know if anyone said anything to the

4    foreman at A.J. McNulty about the condition of the

5    elevator shaft before your accident happened?

6    A    I don't know.

7    Q    Have you ever received welfare or public

8    assistance?

9    A    No.

10    Q    Have you ever received SSI?

11    A    No.

12    Q    Have you ever received Social Security

13    disability?

14    A    No.

15    Q    Have you received Section Eight or

16    subsidized housing?

17    A    No.

18    Q    Have you ever been convicted of a crime?

19    A    No.

20    Q    Have you been known by any other name aside

21    from John Moore.

22    A    No.

23    Q    Does the City of New York hold any

24    judgments or liens against you for any reason, such

25    as parking violations or fines?

59

```
 1                    JOHN MOORE

 2       A    Not that I know of.

 3       Q    Do you hold any professional licenses?

 4       A    Journeyman Iron Worker.

 5            MS. McARDLE:  Counsel, are you pursuing

 6       this matter against any private parties?

 7            MR. DIAMOND:  We are not sure yet.

 8            MS. McARDLE:  Are you willing to have your

 9       client examined by a doctor for the City?

10            MR. DIAMOND:  Yes.

11       Q    Mr Moore, have you ever worked for the City

12       of New York?

13       A    No.

14       Q    Does your ex-wife have custodial rights of

15       your son?

16       A    My ten year old?

17       Q    Yes.

18       A    It's not her child.

19       Q    Does the mother of your ten year old child

20       have custodial rights over your son?

21       A    No.

22       Q    Has your relationship with your family

23       members and significant other been affected by the

24       incident?

25       A    Yes.
```

60

JOHN MOORE

1

2     Q    How, aside from what you have testified to

3  already?

4     A    What did I testify to?

5          MR. DIAMOND:  Just explain how, if you

6     want to, how have relationships with other

7     people been affected by this?

8     Q    If you repeat yourself, it's not a problem.

9     A    I can't take my son to the park.  I can't

10  play basketball with him.  I can't wrestle around

11  the house with him.  My girlfriend's oldest son, I

12  used play basketball and go hiking with him sometimes.

13  I can't do any of those things.

14    Q    Okay.

15    A    I'm not very attentive to my girlfriend as

16  I used to be, whether it be physically, mentally or

17  emotionally.  I have become very self-absorbed.  I

18  don't know if that is viable or not.

19    Q    Is there anything else that you can think

20  of?

21    A    No.

22    Q    Is there a wedding date planned at this

23  time?

24    A    No.

25    Q    Have you gone for any kind of therapy or

61

JOHN MOORE

1

2    counseling in connection with the accident?

3        A    No, but the neurologist suggested that I

4    might have some problem mentally with the trauma to

5    my head.  He hasn't elaborated any further than

6    that.

7        Q    Are you the sole provider of your ten year

8    old son?

9        A    Yes.

10       Q    Do you have any other dependants?

11       A    No.

12       Q    Have you ever sued the City of New York

13   before, including on anyone's behalf, such as your

14   children?

15       A    No.

16       Q    Did you have any private insurance at the

17   time of the accident?

18       A    Through my union.

19       Q    What kind of insurance?

20       A    I have Empire Blue Cross for

21   hospitalization, Magna Care for doctor office visits

22   and for dental.

23       Q    Did you have any private disability

24   insurance?

25       A    No.

62

JOHN MOORE

1

2    Q   Do you have any photographs showing how

3  your injuries appeared right after the accident?

4    A   No, I don't.

5    MS. McARDLE:  Counsel, will you provide

6  medical authorizations here today?

7    MR. DIAMOND:  We won't provide them here

8  today, but we will respond to the request.

9    MS. McARDLE:  Please, include the claim

10  number on any responses that you make and

11  forward them directly to the Comptroller's

12  Office.

13    (Continued on the next page to include the

14  jurat and signature line.)

15

16

17

18

19

20

21

22

23

24

25

63

JOHN MOORE

1

2      MR. DIAMOND:  Okay.

3      MS. McARDLE:  Thank you, nothing further.

4      (Whereupon, the examination of

5    this witness was concluded at 5:00 p.m.)

6

7      I have read the foregoing record of my

8    testimony taken at the time and place noted in the

9    heading hereof and I do hereby acknowledge it to be

10    a true and correct transcript of the same.

11

12

13    _____

14      JOHN MOORE

15

16    Subscribed and sworn to

17    before me on this_____day

18    of_____, 2004.

19

20    _____

21      NOTARY PUBLIC

22

23

24

25

64

2                          I N D E X

3

4    EXAMINATION OF              BY                PAGE

5

6    John Moore            Ms. McArdle            3-62

7

8

9                 INFORMATION TO BE SUPPLIED

10   DESCRIPTION                               PAGE

11   Medical Authorizations                     63

12

13

14

15

16

17

18

19

20

21

22

23

24

25

65

2                    C E R T I F I C A T I O N

3

4              I, Joseph J. Pontillo, a Notary Public of

5      the State of New York do hereby certify:

6              That the testimony in the within hearing

7      was held before me at the aforesaid time and place.

8      That said witness was duly sworn before the

9      commencement of the testimony, and that the testimony

10     was taken stenographically by me then transcribed under

11     my supervision, and that the within transcript is a

12     true record of the testimony of said witness.

13             I further certify that I am not related to

14     any of the parties to this action by blood or marriage,

15     that I am not interested directly or indirectly in the

16     matter in controversy, nor am I in the employ of any of

17     the counsel.

18

19             IN WITNESS HEREOF, I have hereunto set my

20     hand this ___ day of _____, 2004.

21

22     _____

23             JOSEPH J. PONTILLO

24

25